**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raymond Parenteau and Jolene Parenteau, husband and wife, and Raymond and Jolene Parenteau on behalf of their minor son, CP,<br><br>Plaintiffs,<br><br>vs.<br><br>Prescott Unified School District, an Arizona school district; Kevin J. Kapp, Superintendent, Prescott Unified School District; John Does I-V; Jane Does I-V; and Black and White Corporations I-X,<br><br>Defendants. | No. CV 07-8072-PCT-NVW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PLAINTIFFS' IDEA CLAIM**<br><br>**and**<br><br>**ORDER** |

Plaintiffs Raymond Parenteau and Jolene Parenteau bring this action under the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1400 *et seq.*, alleging that Defendants Prescott Unified School District ("the District") and Superintendent Kevin J. Kapp failed to provide a free appropriate public education to their son Cody as required by federal law during the 2003-04, 2004-05, and 2005-06 school years. On November 18 and 19, 2008, upon the parties' request, a bench trial was held on the Parenteaus' IDEA claim before proceeding on their other claims, which Plaintiffs concede are dependent on their IDEA claim.

Having reviewed the administrative proceedings, the transcript of the administrative due process hearing, the evidence submitted by the parties in conjunction

with their trial briefs, the stipulated trial exhibits, and the testimony of trial witnesses, the Court makes the following findings of fact and conclusions of law.

## I. Standard of Review

Under the IDEA, any party aggrieved by the findings and decision rendered in an administrative hearing conducted pursuant to 20 U.S.C. § 1415(f) has the right to bring a civil action for judicial review. 20 U.S.C. § 1415(i)(2)(A). The reviewing district court shall receive the records of the administrative proceedings, hear additional evidence at the request of a party, and grant appropriate relief based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). Under the IDEA, the party seeking relief bears the burden of proof. *Schaffer ex rel. Schaffer v. Weast*, 456 U.S. 49, 62 (2005).

In reviewing the decision of the Administrative Law Judge ("ALJ"), the district court applies a modified *de novo* standard—an "unusual mixture of discretion and deference." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993). The district court is not controlled by the ALJ's recommendations and is not required to give a high level of deference to the ALJ's decision, but must give due weight to the ALJ's judgments regarding educational policy. *Id.* The district court has discretion to determine how much deference to give to administrative findings, but may not simply ignore administrative findings and must accord more deference to thorough and careful administrative findings. *L.M. ex rel. Sam M. v. Capistrano Unified Sch. Dist.*, 538 F.3d 1261, 1267 (9th Cir. 2008).

## II. Procedural Background

On November 27, 2006, the Parenteaus filed the Due Process Complaint that is at issue in this case. On March 21, 2007, an administrative hearing regarding the Due Process Complaint was held. In the due process proceeding, the ALJ determined that the two-year statutory limitation period for the Due Process Complaint applied and the District had not made any misrepresentations or withheld any information that would extend the limitation period. The ALJ, therefore, did not rule on any of the Parenteaus' allegations regarding the 2003-04 school year, but did permit the parties to present

background information regarding events before November 27, 2004, that were relevant to services provided to Cody after November 27, 2004. The ALJ determined that the District's provision of special education services to Cody under the District's 2004 and 2005 individualized education programs ("IEPs") did not violate the IDEA. On May 14, 2007, the ALJ made thorough and careful findings rendered in an eighteen-page decision to which the Court gives due weight. However, the Court would reach the conclusions it does even if it gave no weight to the ALJ's findings.

On August 10, 2007, the Parenteaus initiated this action alleging, among other things, that the District violated the IDEA and they "are entitled to compensation for all reasonable and necessary expenses including educational, medical and all other damages associated with the gross failures to comply" with the IDEA. In Plaintiffs' Opening Trial Brief, the Parenteaus summarize their claim as follows:

> This case presents squarely the issue of whether a school district may successfully claim that it complied with the requirement of providing a free, appropriate, public education ("FAPE") to a child when it provides only procedural compliance with the law, does not provide experts on the particular disability the child possesses as part of the IEP team, does not construct, modify, and measure progress under the IEP in accordance with measurable goals and objectives, and does not convey or provide education consistent with the best practices for education of children with autism, and results in absolutely no educational progress.

The Parenteaus do not contend that they have incurred any out-of-pocket costs for educational services for which they should be reimbursed. They seek monetary damages to pay for educational services for Cody that will compensate for services that they contend he should have received, but did not receive, during the 2003-04, 2004-05, and 2005-06 school years.

**III.   Findings of Fact**

Ray and Jolene Parenteau adopted Cody at birth in June 1998. He was diagnosed with autism when he was approximately 2.75 years old and was enrolled in a full-day preschool autism program in California shortly before his third birthday. The Parenteaus enrolled Cody in the District on August 12, 2003. At the time, the Parenteaus did not know that they did not reside within District boundaries. There is no evidence that

1  Cody's enrollment in the District apparently as a boundary exception had any effect on
2  the services the District provided.
3        At the beginning of the 2003-04 school year, the District provided services to
4  Cody as prescribed by the IEP developed by his former school in California.  Cody was
5  placed in a self-contained, cross-categorical special education class, which included
6  students classified as autistic and those classified as mildly or moderately mentally
7  retarded.
8        When Cody began school in the District, at the age of five years old, he was
9  significantly delayed in speech and language, social interaction, and general knowledge.
10 He did not respond to his name although he did respond to familiar voices.  He could
11 name some objects and a few pictures.  He could scribble, but he could not draw a
12 recognizable picture.  He did not play with other children and needed an adult to direct
13 him through play activities.  He could work well with an adult for a short time, but his
14 attention span was short, and it was difficult for him to complete a task without an adult
15 to redirect him.  He could not drink from a cup and was not toilet trained.  Cody ran from
16 adults and showed no signs of fear in unsafe situations. Throughout the 2003-04, 2004-
17 05, and 2005-06 school years, Cody was, at times, uncooperative with staff and his
18 parents, "flopping" on the floor instead of following directions, refusing to sit at a table,
19 and pinching, hitting, and spitting at staff.  He was not toilet trained until 2008.
20       Mr. Parenteau testified that they did not maintain a consistent schedule for Cody at
21 home, although some experts recommended it, because they did not want Cody to become
22 dependent on a specific schedule.  Mr. Parenteau testified that they treat Cody as if he
23 were not autistic.  Mrs. Parenteau  testified in deposition that Cody did have a schedule
24 for getting ready for school, eating dinner, and going to bed, but they did not require
25 Cody to have a "tight" schedule.  For a six-month period, September 2005 to March 2006,
26 the Parenteaus were separated, and each week Cody slept at one parent's home for several
27 consecutive nights and then switched to the other parent's home.  Before, during, and
28 following this period, Mrs. Parenteau had several surgeries and medication issues.

On October 8, 2003, Cody's IEP Team met and developed a new IEP for the school year 2003-04. The IEP Team meeting participants were Mr. Parenteau, Cody's special education teacher, a District representative, an occupational therapist, and a speech/language therapist. No regular education teacher participated in the IEP Team meeting because Cody was placed in a self-contained special education classroom and not expected to be in a regular education classroom except to visit a regular kindergarten class for story time, accompanied by a special education paraprofessional. Although Mrs. Parenteau did not attend the IEP Team meeting, she gave written consent for Cody's 2003 IEP and educational placement.

In November 2003, the District hired a pediatric psychologist to observe and evaluate Cody to determine the appropriateness of his educational placement and assist with interventions. The psychologist administered thirteen formal assessments. In March 2004, the psychologist provided his evaluation report, which recommended continued placement in special education under the classification of Autism, based on the diagnosis of Pervasive Developmental Disorder. Although the psychologist observed significantly delayed functioning in many areas, he found Cody's nonverbal skills to be much stronger than his verbal skills. He also found Cody's attention and responsiveness varied considerably. Therefore, the psychologist recommended using multiple teaching approaches and to vary instruction to take advantage of Cody's "teachable moments." The psychologist also recommended limited mainstreaming, *i.e.*, including Cody in some activities of a regular education class, to be monitored and adjusted depending on Cody's stress level.

The assessments conducted in November 2003 indicated that five-year-old Cody's cognitive development had an age equivalent of forty months, his overall communication skills had an age equivalent of fifteen months, and his developmental age was twenty-two months. Cody's behavioral functioning measured by the Vineland Adaptive Behavior Scales was below the first percentile and had an age equivalent of fifteen months.

On October 4, 2004, Cody's IEP Team met and developed his IEP for the school year 2004-05. The IEP Team meeting participants were Mr. Parenteau, Cody's special education teacher, a District representative, an occupational therapist, a speech/language therapist, and a regular education teacher. Now six years old, Cody responded to his name, was able to say many words spontaneously, and said individual words and some phrases to express a complete thought. He had learned to respond appropriately to the word "no" and to work in a structured setting for 20-30 minutes. He still demonstrated preschool-level academic skills and a short attention span, but he was beginning to interact with other students to a small degree. He still would run from adults, but was beginning to listen to adults when asked to stop. However, he still showed no sign of fear in unsafe situations. Mr. Parenteau signed the 2004 IEP, which continued to place Cody in the cross-categorical special education program.

The Parenteaus enrolled Cody in the A.S.S.I.S.T. program for the summer of 2005, and the District paid for the summer program. The A.S.S.I.S.T. program was based on Applied Behavioral Analysis. After two weeks, the Parenteaus withdrew Cody from the program. Mr. Parenteau did so because he believed that the staff working with Cody were inadequately trained and because Cody disliked the program so much that he cried and refused to get out of the car.

On October 26, 2005, Cody's IEP Team met and developed his IEP for the school year 2005-06. The IEP Team meeting participants were Mr. Parenteau, Cody's special education teacher, a District representative, an occupational therapist, a speech/language therapist, and a regular education teacher. At this point, Cody, now seven years old, responded to his name, said many words and two or three word phrases spontaneously, and sought attention from adults through communication. His academic skills still were at the preschool level. His coloring skills had improved, but he still did not draw a recognizable picture. He still required assistance from an adult to keep him focused when working at a table with a group of other students, but his attention span had improved. He still was not toilet trained, and he still had a tendency to run from adults. Cody rarely

1  interacted with other students. He now was able to drink from a cup without assistance
2  and was learning to take responsibility, such as for putting things away. He was
3  improving his ability to wash his hands independently. Cody liked to put together
4  puzzles and was becoming skilled at doing so.

5  The District offered to send Cody to the A.S.S.I.S.T. program during the summer
6  of 2006, but the Parenteaus declined the offer. From August to October 2006, Cody did
7  not attend school in the District.

8  In November 2006 the District reevaluated Cody. He continued to have difficulty
9  focusing and sitting. The assessments conducted in November 2006 showed eight-year-
10 old Cody continued to be significantly delayed in comparison to typical children his age.
11 Cody's November 2006 score on the Vineland Adaptive Behavior test was below the first
12 percentile as it was in the October 2003 evaluation.

13 The Parenteaus did not object to the nature and scope of either the 2003 or the
14 2006 educational evaluations the District provided for Cody. The Parenteaus did not
15 request an additional educational evaluation between the 2003 and the 2006 evaluations,
16 and the District did not deny any request for an additional educational evaluation.

17 All of the District teachers assigned to teach Cody during the 2003-04, 2004-05,
18 and 2005-06 school years held State of Arizona special education certification, and two of
19 three of them also were certified in cross-categorical special education. The State of
20 Arizona does not certify teachers specifically for autism, but the certification for cross-
21 categorical special education includes autism.

22 The District used multiple instructional and behavioral methods and strategies to
23 educate Cody, which included Discrete Trial Training, Applied Behavioral Analysis,
24 visual supports, the TEACCH model, one-on-one instruction, and extended-school-year
25 summer programs. These methods and strategies are generally accepted for the education
26 of autistic children and derived from educational theory and research.

27 The Applied Behavioral Analysis method focuses on recording and shaping
28 specific, observable, target behaviors by giving and withholding precisely identified

1  positive reinforcers.  It requires one staff person to record and quantify observations
2  regarding a student's behavior while another staff person interacts with the student.  The
3  Applied Behavioral Analysis method creates an individualized program for each student
4  using a standard, structured approach.  The Parenteaus believe that the Applied
5  Behavioral Analysis method has been effective for decreasing Cody's negative behaviors
6  and increasing Cody's use of language.  During the school years 2003-04, 2004-05, and
7  2005-06, the District incorporated behavior management strategies similar to those used
8  in the Applied Behavioral Analysis method within Cody's educational program, but did
9  not employ its rigorous, quantitative data collection and tightly structured reinforcement
10 scheme.  The District permitted its teachers to adapt and use multiple approaches that in
11 the teachers' opinion were best suited to teach Cody specific behaviors and concepts
12 based on his current individual needs and progress.

13    In addition to classroom instruction, the District provided Cody occupational
14 therapy, speech/language therapy, and paraprofessional services during the 2003-04 and
15 2004-05 school years.  During the 2005-06 school year, the District provided Cody with
16 occupational therapy, adaptive physical education, and paraprofessional services.

17    Cody's IEPs were reviewed and revised annually.  The Parenteaus never objected
18 to the 2003, 2004, or 2005 IEP Team membership.  They never requested that an "autism
19 expert" be made part of the 2003, 2004, or 2005 IEP Teams.  They participated in the
20 development of Cody's 2003, 2004, and 2005 IEPs, never objected to any of those IEPs,
21 and formally consented to Cody's educational placement based on those IEPs.  During the
22 school years 2003-04, 2004-05, and 2005-06, the Parenteaus did not object to the
23 instructional and behavioral methods used to implement Cody's IEPs.

24    Cody's 2003, 2004, and 2005 IEP goals and objectives were based upon
25 assessment data, were individualized for Cody's needs, and were calculated to enable
26 Cody to make educational progress.  In addition to recording daily observations, the
27 District staff who worked with Cody quarterly evaluated Cody's progress toward meeting
28 his IEP goals and objectives using both qualitative and quantitative measures.

Cody made meaningful progress toward each of his annual goals and objectives identified in his 2003, 2004, and 2005 IEPs. Cody exceeded his expected progress, met expected progress, or approached expected progress for each of his IEP goals in each of the 2003-04, 2004-05, and 2005-06 school years. There were no IEP goals in which Cody made no progress or made less than expected progress. Cody, like many autistic children, did not achieve educational progress at a constant rate. Cody's IEP goals and objectives were revised annually based on his educational progress.

The Parenteaus incurred no out-of-pocket costs for education-related services for Cody from August 2003 through November 2006. The Parenteaus did not offer evidence of any compensatory education services that would benefit Cody.

## IV. Conclusions of Law

### A. Applicable Law

The IDEA establishes both procedural and substantive requirements. To determine compliance with the IDEA, courts engage in a two-step inquiry, first to examine procedural compliance, and second to examine "whether the individualized educational program developed through the [IDEA's] procedures was reasonably calculated to enable the child to receive educational benefits." *N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008) (internal quotations and citations omitted). To satisfy the substantive requirements of the IDEA, a school must provide a "meaningful" educational benefit to a student with disabilities. *Id.* at 1212-13.

One of the purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The term "free appropriate public education" means:

> ...special education and related services that—
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;

> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). An "individualized education program" or "IEP" must include "a statement of the child's present levels of academic achievement and functional performance"; "a statement of measurable annual goals, including academic and functional goals, designed to . . . enable the child to be involved in and make progress in the general education curriculum"; "a description of how the child's progress . . . will be measured" and when it will be reported; "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child"; "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class"; "a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments"; and "the projected date for the beginning of the services and modifications . . . and the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C. § 1414(d)(1)(A)(i).

The IEP Team must include the parents of a child with a disability; "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)"; "not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child"; and a school district representative qualified to provide or supervise provision of "specially designed instruction to meet the unique needs of children with disabilities," "knowledgeable about the general education curriculum," and "knowledgeable about the availability of resources" of the district. 20 U.S.C. § 1414(d)(1)(B). The IEP Team must include "an individual who can interpret the instructional implications of evaluation results, who may be a member" of one of the other categories. *Id.* Whenever appropriate, the child with a disability should be included as a member of the IEP Team. *Id.*

After an initial evaluation determining that a child is a child with a disability, as defined in the IDEA, a reevaluation of each child with a disability must be conducted if the child's parents or teacher requests a reevaluation or at least once every three years, unless the parent and the local educational agency agree that a reevaluation is unnecessary. 20 U.S.C. § 1414(2).

The IDEA provides procedures for parents and schools to resolve disputes regarding the provision of educational services to children with disabilities, including opportunity to serve a due process complaint and request an impartial due process hearing. 20 U.S.C. § 1415(f). A parent or agency must request the hearing within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint. 20 U.S.C. § 1415(f)(3)(C). The two-year limit does not apply if the parent was prevented from requesting the hearing by "specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint" or by "the local educational agency's withholding of information from the parent that was required ... to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D).

**B.     Analysis**

The Court has jurisdiction to review the ruling of the ALJ pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

**1.     A Two-Year Limitation Period Applies.**

The IDEA limits the time within which to file a due process complaint to two years with two exceptions. 20 U.S.C. § 1415(f)(3)(C), (D). The exceptions are (i) when the local educational agency made specific misrepresentations that it had resolved the problem forming the basis of the complaint and (ii) when the local educational agency withheld information from the parent that the IDEA requires the agency to provide to the parent. 20 U.S.C. § 1415(f)(3)(D).

The Parenteaus do not allege that the District misrepresented that it had resolved the problem forming the basis of the complaint or that the District withheld information

the IDEA expressly requires the District to provide to the parent. They contend only that the District did not inform them that, allegedly, the District did not have an autism expert, did not properly form Cody's IEP Team, did not have qualified and adequately trained personnel to teach autistic children, and paid for other autistic children to be served at private schools specializing in education for autistic children. The Parenteaus provide no authority that the IDEA would require such disclosures even if they were true. The IDEA does not extend the time to file a due process complaint where, as here, the parents have been fully informed of procedural requirements and rights under the IDEA and have participated in and have been fully informed about all IEP proceedings for their son.

Therefore, the ALJ correctly determined that the exceptions to the two-year limitation period as set forth in 20 U.S.C. § 1415(f)(3)(D) do not apply and properly limited the Parenteaus' claim to those events dating from November 27, 2004. Even if the two-year limitation period did apply, it would not affect the outcome of this case because, as described below, the Court finds no IDEA violation in 2003-04.

### 2. Superintendent Kapp Does Not Have Individual Liability Under the IDEA.

The IDEA authorizes parents to file a due process complaint and requires the local educational agency to respond to the due process complaint. 20 U.S.C. § 1415(c)(2). It refers only to parents and the local educational agency in the context of the administrative proceedings and provides that any aggrieved party "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section." 20 U.S.C. § 1415(2)(A). The IDEA does not provide any procedure for adding individual school officials to the due process complaint that forms the basis for a civil action. *See also S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282, 298 (S.D.N.Y. 2007) (because the IDEA abrogates state immunity under the Eleventh Amendment from claims for violations of the statute, there is no justification to permit IDEA claims against individual defendants).

Therefore, Superintendent Kapp has no individual liability for the Parenteaus' IDEA claim.

### 3. Cody's IEPs Were Reasonably Calculated to Enable Cody to Receive a Meaningful Educational Benefit.

The Parenteaus contend that the District provided "only procedural compliance with the law," but failed to provide Cody with a free appropriate public education. Their challenge relies primarily on allegations that Cody's IEP Team should have included an autism expert; Cody's IEP goals and objectives should have been quantitatively measurable; Cody's progress under the IEPs should have been measured quantitatively; the District should have provided Cody services based on the Applied Behavioral Analysis methodology with intensive, quantitative data collection and precisely structured reinforcement; and the District failed to provide Cody a meaningful educational benefit because, in the parents' opinion, did not make any educational progress in the school years 2003-04, 2004-05, and 2005-06.

The IDEA does not require the District to include an "autism expert" on Cody's IEP Team. The District included all of the people the IDEA requires to be included on an IEP Team. Moreover, because the State of Arizona does not certify special education autism experts, there would be no standard by which a school district could determine who would qualify as an "autism expert."

The District provided Cody with qualified special education teachers. In addition, the District provided qualified paraprofessionals, a qualified speech/language therapist, and a qualified occupational therapist.

The District satisfied the IDEA's requirements for an initial evaluation and reevaluation at least once every three years by providing educational evaluations in 2003 and 2006.

The District satisfied the IDEA's requirements for developing and revising Cody's IEPs with measurable annual goals, including academic and functional goals. The District also satisfied the IDEA's requirements for reviewing Cody's IEPs periodically, but not less frequently than annually, to determine whether Cody was achieving his

annual goals and for revising the IEPs to address any lack of expected progress, the results of any reevaluation, and Cody's anticipated needs.

Educational progress can be measured based on qualitative data as well as quantitative data. Cody's records demonstrate that he made slow, but significant, educational progress during the school years 2003-04, 2004-05, and 2005-06. The IDEA does not make the District a guarantor of each student's educational progress.

The IDEA does not require the District or its teacher to use specific teaching methods, strategies, or curricula. It requires the District to employ qualified educators who make professional judgments regarding the most appropriate teaching methods, strategies, and curricula to use based upon an individual student's needs to deliver an IEP calculated to provide meaningful educational benefit to that student. The District has done so.

### 4. Even If the District Had Violated the IDEA, the Parenteaus Would Not Be Entitled to Any Remedy.

The Parenteaus seek compensatory education for the District's alleged failure to provide Cody a free appropriate public education. The Parenteaus, understandably, would like to somehow make up for progress they believe Cody did not make during a period in which they allege he could have made more progress had he been provided different educational services. However, during the administrative proceedings, pretrial judicial proceedings, and even when asked by the Court during trial, the Parenteaus did not disclose what specific compensatory education they seek for Cody. Even if they had established by a preponderance of the evidence that the District failed to provide Cody a free appropriate public education as required by the IDEA, the Parenteaus concede that the District currently is providing Cody all of the services they have requested.

It would make no sense to order the District to provide additional staff for Cody because the District already provides two paraprofessionals to work with Cody, one to interact with Cody using Applied Behavioral Analysis methods and one to collect data regarding Cody's behavior. Similarly, it would make no sense to order the District to

- 14 -

provide additional training for those working with Cody because it appears the District has provided the autism consultants and training for paraprofessionals the Parenteaus have requested, and the Parenteaus claim to be "ecstatic" about Cody's current progress. The District already provides Cody with summer programs, and the Parenteaus did not produce any evidence that Cody would benefit from school-year services added on to the full-day program the District currently provides him. The District already provides Cody more than the IDEA requires and additional compensatory education would serve no useful purpose.

Even if the District had failed to provide Cody a free appropriate public education in any of the school years 2003-04, 2004-05, and 2005-06, the Court would not order compensatory education for Cody where the Parenteaus did not request any specific compensatory education, did not properly disclose a claim for any specific compensatory education, and did not produce any evidence that such compensatory education likely would enable Cody to make up for "lost time."

### C. Conclusions

The Court finds, by a preponderance of the evidence, that Cody's IEPs for the 2003-04, 2004-05, and 2005-06 school years were reasonably calculated to provide meaningful educational benefit, and the District did not fail to provide Cody a free appropriate public education as required by the IDEA. The Court adopts all of the ALJ's findings and affirms her decision.

The foregoing opinion constitutes findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### V. Remaining Claims

In addition to Count One (Violation of IDEA), Plaintiff's Complaint includes Count Two (42 U.S.C. § 1983 – Violation of IDEA and Section 504 of the Rehabilitation Act of 1973, as amended), Count Three (Violation of Due Process and Denial of Property and Liberty Interests in a Free Public Education), and Count Seven [sic] (42 U.S.C. § 1983, Americans with Disabilities Act (ADA)). Although the IDEA does not restrict

- 15 -

rights and remedies independently available through other sources of law, "where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983–or any other federal statute for that matter–in an attempt to evade the limited remedial structure of the IDEA." *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006). During trial on Count One, Plaintiffs conceded they must withdraw at least one of their claims.

The Complaint does not allege facts beyond the bare minimum to support the IDEA claim, and the Court has determined that the District provided Cody with a free appropriate public education and has not violated the IDEA. The rest of the Complaint does not appear to state a claim upon which relief can be granted on any legal basis. Therefore, the Plaintiffs will be ordered to show cause why the rest of the Complaint should not be dismissed for failure to state a claim.

IT IS THEREFORE ORDERED that Plaintiffs' appeal under the IDEA from the Administrative Law Judge Decision dated May 14, 2007, in No. 07C-DP-07019-ADE, is denied.

IT IS FURTHER ORDERED that Plaintiffs show cause by December 24, 2008, why the remainder of the Complaint beyond Count One (Violation of IDEA) should not be dismissed with prejudice for failure to state a claim upon which relief can be granted. Defendants may file a response by January 16, 2009, and Plaintiffs may file a reply by January 23, 2009.

DATED this 11th day of December, 2008.

_____
Neil V. Wake
United States District Judge