## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| RAYMOND PARENTEAU AND | ) | |
| JOLENE PARENTEAU, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIV 07-8072-PCT-NVW |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 18, 2008 |
| PRESCOTT UNIFIED SCHOOL | ) | 9:04 a.m. |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL TO THE COURT - DAY 1

(Pages 1 through 209, inclusive.)

**APPEARANCES**:
For the Plaintiffs:
            Law Office of Gary L. Lassen
            By:  **GARY L. LASSEN**, ESQ.
            2020 North Central Avenue, Suite 1100
            Phoenix, AZ  85004

For the Defendants:
            Jones Skelton & Hochuli
            By: **GEORGIA A. STATON**, ESQ.
            2900 North Central Avenue, Suite 800
            Phoenix, AZ  85012

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

<u>INDEX</u>

2

<u>SUMMARY OF COURT PROCEEDINGS</u>                                    <u>PAGE:</u>

3

Opening Statement

4                 Plaintiffs                                      6
                  Defendants                                     15

5

6                         <u>INDEX OF WITNESSES</u>

7    <u>WITNESSES FOR THE</u>      <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>
     <u>PLAINTIFFS</u>:

8

     GENTRY, Joseph            23        80        115
9    BURGESS, Carey Ann       124       130        133
     MARTINEZ, Nancy M.       135       151        164
10   PARENTEAU, Ray           168       188        205

11                         <u>INDEX OF EXHIBITS</u>

12

13   <u>EXHIBIT NO.</u>:          <u>DESCRIPTION</u>:                  <u>RECEIVED:</u>

     1    Confidential Psychological Evaluation      23
14   2    Deposition of Ray Parenteau                23
     3    Deposition of Jolene Parenteau             23
15   4    Official Notice of Pupil Withdrawal        23
     5    Capistrano Unified School District Student Profile  23
16   6    7/23/02 Letter from Debbie Perkins to Ray Parenteau 23
     7    Capistrano School District Progress Reports  23
17   8    Capistrano School District Functional Analysis
          Assessment Report dated 6/19/02           23
18   9    Capistrano School District 3-Month Review Form  23
     10   10/8/03 IEP                                23
19   11   IEP Annual Goals Progress Report dated 10/8/03  23
     12   10/6/04 IEP                                23
20   13   IEP Annual Goals Progress Report dated 10/6/04  23
     14   8/18/05 Letter to Parents from Nancy Martinez  23
21   15   10/26/05 IEP                               23
     16   IEP Annual Goals Progress Report dated 10/26/05
22   17   ASSIST Records                             23
     18   5/5/05 Unofficial Transcript of IEP Meeting  23
23   19   7/29/05 Letter to Parents from Nancy Martinez  23
     20   Teacher Certificate of Jana Harlow         23
24   21   Administrative Hearing Transcript          23

25

UNITED STATES DISTRICT COURT

```
 1    EXHIBIT NO.:        DESCRIPTION:                    RECEIVED:

 2       22    Teacher Certificate of Erin Froeschle          23
         23    Teacher Certificate of Kristi Spengler         23
 3       24    PUSD #1 Program Tracking Logs                  23
         25    PUSD #1 Aide Notes for August and September, 2003   23
 4       26    PUSD #1 Aide Notes for October, 2004           23
         27    PUSD #1 Aide Notes for 2005-2006               23
 5       28    2007-2008 PLAY ABA Service Invoices for
                 Carey Burgess                                23
 6       29    2007-2008 SARRC Service Invoices for Dr. Gentry    23
         40    Joseph Gentry, Ph.D., Expert Report            23
 7       41    Carey Burgess Expert Report                    23
         43    Record of Administrative Action                23
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1              THE CLERK:  This is civil case CV 07-8072, Raymond and

2    Jolene Parenteau, versus Prescott Unified School District,

3    et al., on for bench trial.  Counsel please announce.

4              MR. LASSEN:  Gary Lassen for the plaintiffs Ray and

5    Jolene Parenteau.

6              MS. STATON:  Georgia Staton on behalf of Prescott

7    Unified School District and superintendent Kevin Kapp, Your

8    Honor.

9              THE COURT:  All right.  Good morning, counsel, and

10   good morning to the parties.  Let me first address a few

11   threshold subjects.

12             We had allocated two days for this hearing if

13   necessary.  Is it necessary?

14             MR. LASSEN:  Your Honor, we will clearly be done with

15   our portion of the case today, maybe not even the entire day,

16   but most of the day, I think.

17             MS. STATON:  Your Honor, the only scheduling problem I

18   have is that our expert, Joanne Phillips, is prepared to come

19   at 10:00 tomorrow.  She's out doing something today.  I don't

20   recall which.  And she has a doctor's appointment first thing

21   in the morning.  So we only have -- I think Mr. Lassen is going

22   to call Ms. Martinez, so that leaves me with Ms. Phillips.

23             THE COURT:  All right.  Well, what I usually do in

24   civil trials is I put a time limit and keep time.  Now, it

25   doesn't seem to me that's necessary here, but I think I'll keep
```

1    the time anyway, because every once in awhile lawyers surprise

2    me.

3              So we'll allocate five hours to each side.  And my

4    legal assistant, Dr. Skon, will keep the time, and there is no

5    appeal from her ruling.  Dr. Skon has a prior career in

6    education and a Ph.D. in educational psychology, so you're not

7    going to get anything past me in this case.

8              All right.  Now, I have -- Actually I wanted to hear

9    brief opening statements.  I've read your materials, except,

10   Ms. Staton, I just didn't get through all your proposed

11   supporting separate statement of facts.  I'll finish reading

12   it, but I didn't get through all of it.

13             MS. STATON:  Certainly.

14             THE COURT:  What I'd like to -- I'd like to hear

15   anything you'd like to say in terms of an opening, but in

16   particular I'd like to have the summary of the points that you

17   intend to be presenting through the witnesses.  And,

18   Mr. Lassen, in particular, what I would like to know from you

19   is what relief are you seeking?

20             And I want this to be very specific and concrete,

21   because it appears from your proposed findings of fact that all

22   you're seeking is compensatory education, and all the other

23   issues about monetary compensation has gone by the wayside.

24   But, in any event, I would like you to clarify that as to what

25   specifically you're seeking.

1          With that, it's your case, Mr. Lassen.  You may begin.

2          MR. LASSEN:  Thank you.

3          THE COURT:  And we'll start the clock.

4          MS. STATON:  Your Honor, just one point, if I might.

5          Ms. Martinez is diabetic, and she was wondering if we

6   might be able to take a brief five-minute break at 10:30 so

7   that she can get some crackers that she's got.

8          THE COURT:  The answer is yes.  I generally take about

9   a 15- to 20-minute break in the morning and in the afternoon.

10          MS. STATON:  Okay.  Thank you.  Thank you very much.

11          THE COURT:  All right.  Please proceed.

12          MR. LASSEN:  Thank you, Your Honor, and I will address

13   the issue regarding relief.  But I need to remind everyone here

14   that we're here today about really a portion of the lawsuit,

15   the issues regarding this federal statute of IDEA that's become

16   a very frequently litigated matter.  In fact, I would imagine

17   as we sit here today, there are hundreds of due process

18   hearings occurring throughout the country on the exact same

19   issue that presents us here, and that is whether the respondent

20   local education agency, here a school district, provided a free

21   appropriate public education to a child that qualifies for

22   special education.

23          Now -- And I would imagine and one only needs to do

24   some online legal research to know that this is a very frequent

25   area for appeal to the federal courts.  And it is very unusual

UNITED STATES DISTRICT COURT

1    in the sense that it has an odd or different standard of

2    review, quite unlike anything else that I've ever had

3    experience with, having practiced in administrative law much of

4    my career.

5          But it's been described, I think, in the Ninth Circuit

6    cases as like de novo but with the possibility of deference to

7    the administrative law judge, in this case a state

8    administrative law judge.

9          And I would just like to point out that we are here

10   today to present in the main what the administrative law judge

11   we think wrongfully determined was lacking in the

12   administrative hearing as presented by the petitioners, the

13   parents.

14         Now, we will present and it's pretty self-evident that

15   Mr. Parenteau and his wife filed a complaint for the due

16   process hearing.  And I came in about a week or two before that

17   and essentially presented the case for them.  And I think there

18   was some issues there regarding what a plaintiff needed to

19   show.

20         And it clearly became evident to me after reading the

21   administrative law judge's decision that what was lacking on

22   the behalf of the plaintiff was an expert witness, that this is

23   a case really where -- and there have been other cases,

24   particularly in this circuit -- where the school district says

25   this child made progress, and we win because we say he made

1    progress.  And the administrative law judge essentially went

2    along with that.

3           Now, that's one part of the case.  We will present

4    first Dr. Joseph Gentry.  He has a Ph.D. in school psychology.

5    He works for the Southwest Autism Research & Resource Center

6    here in Phoenix.  And he was brought on as a consultant first

7    to the school district.  And he assisted in this last school

8    year with the development of a new IEP.  And he will describe

9    what his roles were with that.  What is remark -- And I need to

10   point out -- and this may create some difficulties here -- this

11   case is about what occurred in years '03-'04, '04-'05, and

12   '05-'06.

13          The administrative law judge dismissed the due process

14   complaint for the '03-'04 year, saying that the petitioner had

15   not met their burden under IDEA that the District withheld

16   information or failed to disclose information that would allow

17   the statute of limitations to be expanded.  There is a

18   provision in IDEA, but that's a question of law.  And we

19   believe she made that determination wrongly.

20          THE COURT:  Let me ask you, Mr. Lassen, if the only

21   relief sought is compensatory education, how does it matter, as

22   a practical issue, whether we're litigating over two years with

23   light to be shed on it from evidence from the prior year or

24   litigating over three years?

25          It seems to be of no practical consequence whether

1    we're looking back two years or three.

2              MR. LASSEN:  Well, that's a good point, and I would

3    agree with you to the extent -- but when I get to the relief we

4    seek, I think it may have a little bit of practical

5    consequence.

6              The '06-'07 school year was resolved between the

7    parties.  Ms. Martinez and Mr. Parenteau resolved it, and there

8    was a memorandum of understanding, and there are no issues

9    regarding that area.  And there is no issue regarding '07-'08.

10    And in fact the Parenteaus are ecstatic about the program and

11    the progress that their child is making under his current IEP.

12    And in fact it is that progress that in part demonstrates what

13    was woefully inadequate.

14              THE COURT:  Is there anything wrong with the program

15    as it is now?

16              MR. LASSEN:  No.

17              THE COURT:  Could it be better in any way?

18              MR. LASSEN:  Yes, it could be.  And I think it will be

19    evident from -- what -- That's a good question, and it's one

20    that I thought of myself.

21              The problem is we have these two experts.  One of them

22    is a Ph.D.  The other is about a master's level.  And they go

23    up about once a week.  And they deal with problems that the

24    staff have observed during the week.

25              What could be better and I think what will become

1    better is as the staff and the local teaching and aide staff

2    become better trained, they will not need the outside

3    resources, and they will be able to make decisions and

4    implement them immediately to the benefit of this child and

5    others.

6           So that's how it could be made better.  Right now if

7    they have a problem, it's like you're calling your mechanic

8    from 100 miles away to come up and fix something that's broken.

9    But that's what could be better.

10          We will call Dr. Gentry.  He will talk about what he's

11   done.  He'll talk about what was wrong with the IEPs in the

12   '03-'04, '04-'05, and '05-'06 years.  Candidly, as the Court

13   observed, it's very similar for all of those years, pretty much

14   the same thing.

15          And, if anything, Dr. Gentry will candidly admit you

16   might give the District -- cut them a little slack for the

17   first year, because that was the first year the child was

18   presented to them.

19          Now, Carey Burgess will testify after him, and she

20   will essentially not provide ultimate expert opinion.  In fact,

21   we had a motion to strike earlier on that case.  But she will

22   testify about her observation.

23          Candidly, if other aspects of this case remain after

24   the IDEA case, she would be a critical witness regarding a

25   Section 504 or ADA claim, because she is a direct witness to

1    really an attitude toward the education of special education

2    that exists in that community that in our opinion is, you know,

3    from a different century.

4         And we would commend Nancy Martinez, who we will call

5    as the next witness, to talk about the program and the

6    struggles she has had to implement appropriate education for

7    this child and others.

8         And finally we'll call one if not both of the parents

9    to discuss some of the matters that they testified to.

10        But I would like to point out to the Court that this

11   is not a case about the parents.  This is not a case about what

12   kind of parents they were.  And we vehemently object to any

13   characterization that their parenting skills or their personal

14   lifestyle in any way is relevant to a determination of whether

15   the school district was appropriate.

16        What the case really focuses on is what is required

17   under IDEA during the relevant time period?

18        The District at the administrative hearing took the

19   position that the Board of Education case called Rowley in 1982

20   is still the law.  And that made reference to a meaningful

21   benefit, but it's oft been described as a floor of opportunity

22   educational standard.  And historically that's been viewed as

23   minimum is okay, some educational progress.

24        Now, many cases in the last six to eight years,

25   particularly after '97 amendments to IDEA, when it actually was

1    called IDEA, I believe, for the first time, and in 2003 have

2    focused on something more.  And really that's where this case

3    really focuses on and why it's, I think, an important case,

4    because it asks the question really what is required?

5         Now, it's our position that it is not required to

6    provide the absolute best education possible, but what is

7    required is for the child to make progress to their potential

8    and what really the critical evidence in our opinion is going

9    to be:  Was the IEP constructed in a way and was it implemented

10   in a way that would allow this child CJP or CP to make

11   meaningful progress?

12        And we would submit that there are basic problems with

13   the way it was constructed and the way it was implemented that

14   prevented that from occurring.

15        And Dr. Gentry will be our key witness in that regard,

16   and the other witnesses will confirm he really is the best

17   expert that you'll hear from on the points in question.

18        Finally, so what?  What if the Court finds that there

19   is a denial of FAPE or free appropriate public education?  This

20   is not a case -- and we concede that -- where under this

21   portion of the case the parents are entitled to damages.  In

22   fact, there's plenty of cases out there where the courts have

23   made that explicitly clear.

24        And typically the cases talk about fashioning a

25   program prospectively to make up for a program that was deemed

```
 1    to be inappropriate.

 2             It is our position that what is required is

 3    compensatory education, the establishment of possibly a fund

 4    based upon the number of hours that were lacking where

 5    inadequate education was provided, where essentially it is

 6    going to be our position that for three years this child sat

 7    there and received essentially glorified babysitting and that

 8    something based upon an hour's computation, much like was

 9    settled upon between the parties directly --

10             THE COURT:  I don't want to hear about settlements.

11             MR. LASSEN:  I don't either.  I'm sorry.  I apologize.

12             -- is what is required, that would allow this child

13    the ability to take advantage of increasing technology,

14    increasing, you know, use of experts to help develop programs.

15             Now, the child does receive summer programs, so the

16    question is how much more education can the child benefit from

17    when he's getting a good education now?

18             And that really is a problem, but it is our position

19    that compensatory education to make up for what was lost is

20    appropriate.

21             Thank you.

22             THE COURT:  All right.

23             Oh, one last thing.  Maybe we can touch on this at the

24    end of the day tomorrow.  How does this IDEA claim play into

25    the other allegations of your complaint?
```

1          MR. LASSEN:  Well, that's a good question.

2          THE COURT:  We talked about this at the case

3     management conference but only roughly touched on it.

4          MR. LASSEN:  Well, the standard under IDEA is whether

5     the education provided is appropriate.  Under Section 504,

6     which I'm more familiar with than ADA, the question is was the

7     District discriminating against based upon this person's

8     handicapped status?

9          So it's really a discrimination analysis as opposed to

10    an appropriateness.  And so that's really the difference.

11    There are cases coming down that say yes, you can have the

12    others without IDEA, although you have to exhaust your

13    administrative remedies before you can pursue the 504 ADA

14    claim.

15         THE COURT:  How does 1983 play into this?  Your

16    complaint is explicit in trying to get a 1983 remedy for the

17    IDEA violation, and a 1983 remedy for the IDEA violation, I'm

18    pretty sure you can't do that.

19         MR. LASSEN:  You can't get a 1983 remedy for an IDEA

20    violation.

21         THE COURT:  So to the extent your complaint alleges

22    that, we are in agreement it fails to state a claim?

23         MR. LASSEN:  Yes, absolutely.

24         THE COURT:  So what's left in this case other than the

25    IDEA claim?

1          MR. LASSEN:  There would be the Section 504 claim that

2     there is a violation of Section 504, and that's a

3     discrimination analysis.

4          THE COURT:  All right.

5          MR. LASSEN:  Thank you.

6          THE COURT:  Ms. Staton.

7          MS. STATON:  Thank you, Your Honor.

8          Your Honor, Prescott Unified School District has done

9     everything in its power to help CP, and I think we're going to

10    use his initials throughout this trial.

11         THE COURT:  Let me drop a footnote on that.  I see in

12    portions of the record there's the effort to maintain that

13    anonymity, but elsewhere the names are fully stated.

14         MS. STATON:  It's a lot easier if I can say Cody.

15         THE COURT:  Let me put that to Mr. Lassen.  How do you

16    wish to proceed?

17         MR. LASSEN:  That's fine with us.

18         MS. STATON:  Okay.

19         THE COURT:  With the parents not objecting then, you

20    can proceed that way.

21         MS. STATON:  Thank you, Your Honor.

22         It's our position that Prescott Unified School

23    District did everything within its power and as is required

24    under the law to assist Cody in his educational process.

25         As you know, he entered the District in August of

1    2003.  At that point he was just over five years old.  He is

2    moderately to severely autistic.

3         At the time he had no ability to effectively

4    communicate.  And I use the term communication in its broadest

5    sense, and I'll amplify in a bit.  He was unable to have even

6    the most minimum of social interactions with others.  He could

7    not, even at five-plus years, engage in eye-to-eye contact with

8    peers or adults.  He wasn't even able to engage in any playful

9    activity with other children.  He couldn't drink from a cup.

10   He wasn't toilet trained.

11        Now, the law required and the mission of the District

12   was to provide Cody with a free and appropriate education.

13        Now, education for an autistic child like Cody is

14   entirely different, has a different meaning than education for

15   a typical child, in the sense that the first thing you do is

16   not teach an autistic child how to read and write.  That isn't

17   going to work.  You've got to begin to train that child almost

18   as if they were a baby and work -- and teach them the steps

19   that babies, typical babies do naturally.

20        Now, one of our witnesses, Joanne Phillips, will

21   testify.  Joanne Phillips is an expert in the area of autism

22   and in teaching autistic children.  She has 30-plus years of

23   teaching not only autistic children but teaching the teachers

24   who teach autistic children.

25        She will tell the Court that an autistic child has a

1    limited understanding of how to relate to others, that they

2    can't engage in those interactions.  They can't understand even

3    non-verbal communication.  And by that they're oblivious to

4    facial expressions.  They don't read body language.  They don't

5    read tone or inflection.

6            And so many of the children like Cody have difficulty

7    even in beginning the process of being educated.  And that's

8    what Nancy Martinez will talk about, because she was the

9    director of special education for the school district.

10           The challenge that teachers have in dealing with

11   autistic children is to break through that neurological

12   disorder, to the extent they can, and to establish those very

13   simple things that we've talked about.

14           Now, Joanne Phillips will testify that the District

15   used best practices in establishing its IEPs or individual

16   educational plans when Cody was first enrolled.  What they did

17   is the smart thing.  They relied on the IEP that they received

18   from the California school from which he came until they could

19   have the opportunity for a month or two to observe him and have

20   personal interaction with him.  They needed time, in other

21   words, to assess him.

22           And so a few months later they gathered, the teachers

23   gathered, the special education teachers, the staff, the

24   representatives from the District, the local educational agency

25   as it's called under the IDEA, along with the parents.  And

1    they put together a plan which outlined the goals and

2    objectives that they were going to try to move Cody toward.

3           And that educational plan in 2003-2004 and the

4    subsequent two years were each approved by the parents.  And so

5    the District used these IEPs to move Cody forward in that

6    process.

7           Now, as I said, Nancy Martinez, as the special

8    education director, will tell you that the goal of the District

9    was to increase Cody's ability to communicate both verbally and

10   non-verbally, to increase his social interactions, which are

11   the building blocks of everything else.

12          And that if you look at not only the IEPs but the

13   progress, the quarterly progress reports, which are stipulated

14   into evidence, you can see over those three educational years

15   that he made slow progress, but it was steady progress.

16          Now, people from different -- educators, in other

17   words, from different disciplines use different approaches to

18   teaching autistic children.  And you will probably hear this

19   repeatedly that there is no one-size-fits-all approach.

20          Now, Dr. Gentry and Carey Burgess are behavior

21   analysts.  They are not teachers.  They've never been certified

22   to teach, and they do not teach.

23          Their focus is behavior modification.  It's almost a

24   Skinnerian way of interacting with the child.  An act will

25   trigger a consequence.

1              It's either a positive consequence:

2              You do this; you get a toy.

3              You do this; you get an M&M.

4              You don't do what I say; you don't get the M&M or you

5      don't get the toy.  I mean, it's very, very regimented and

6      rigid, because behavior compliance is the goal.

7              Now, the school district used a method of a teaching

8      model, if you will, that looked at the underlying deficits of

9      the child, their inability to look at you, their inability to

10     even do what's called joint attention.  You know, as an adult,

11     a father, a mother, you say to a little baby, look, and you do

12     that, the child automatically looks.

13             It doesn't happen with an autistic child.  That simple

14     concept of joint attention doesn't even register with an

15     autistic child.

16             So they used the deficits that they were faced with,

17     and they tried to move him forward.  And they used the behavior

18     analyst approach, the consequence approach, as it was

19     appropriate, because, as Joanne Phillips will say, if you teach

20     one autistic child, you've taught one autistic child.  You

21     cannot generalize.

22             Now, the IDEA requires that the school provide the

23     child with educational benefits from the programs it's

24     established and that he make progress to those established

25     goals.

1    The District met those legal requirements of the IDEA

2   because the IEPs established certain goals.  They're clearly

3   delineated in the IEPs.  The changing -- goals were either

4   changed or the mastery level was changed.

5    For example, instead of saying 25 percent of the time

6   or one out of four times Cody will do A, B, C, it was changed

7   to 33 or a third or maybe to half to constantly move him

8   forward.

9    And the administrative law judge specifically made

10   findings that the parents on each and every occasion consented

11   to the IEPs and were in agreement with them.  And the quarterly

12   reports demonstrate that consistent, albeit slow, but

13   consistent progress.

14    The District provided teachers who were certified by

15   the Arizona Department of Education to teach special education.

16   They provided a sufficient number of aides in that classroom so

17   that Cody had an aide with him virtually the entire time he was

18   at school.

19    They offered and paid for an extended service year or

20   a summer school program for the summer of 2005, at which point

21   Mr. Parenteau, after the school paid for it, he pulled his son

22   out after two weeks and didn't allow him to continue.

23    The District has followed all the necessary procedures

24   during this whole three-year time period.  And it's our

25   position, Your Honor, that the administrative law judge reached

1    the proper factual findings and legal conclusions, because the

2    information which we had at the administrative law judge level,

3    what we have presented to the Court by deposition, what we've

4    presented by live testimony all shows that those findings of

5    facts and conclusions were well stated and should be adopted by

6    this Court.

7           And we would ask that you adopt those findings and

8    find that they, the District, provided Cody with a free and

9    appropriate public education.

10          Let me address one last thing if I might, Your Honor,

11   because you asked Mr. Lassen, you said:  When you address, what

12   is it that you want?  I need to know specifically what is it

13   that you're asking for?

14          And Mr. Lassen said compensatory education.

15          The problem with that, Your Honor, is that

16   Mr. Parenteau and Mrs. Parenteau will tell you that they are

17   ecstatic; they couldn't ask for anything more, because that's

18   what they've testified to previously.

19          There's been no opinions offered by Dr. Gentry or

20   Carey Burgess as to any additional educational program that is

21   needed.  There's nothing in the reports which they prepared or

22   that were disclosed as expert reports.

23          So there's no evidence that can be presented to this

24   Court about additional compensatory education.  For the Court

25   to come up with something, you'd have to make it up.

```
1            THE COURT:  I think it's the plaintiffs' burden to
2   come up with something.
3            MS. STATON:  That's exactly right, and that's what I'm
4   saying, is up to this point in time, it's never been disclosed.
5   It's not part of the expert reports.
6            So, Your Honor, we're going to go through this for
7   perhaps a day and a half to two days, but at the end of the
8   day --
9            THE COURT:  It doesn't matter whether you win or lose.
10           MS. STATON:  Well, yeah, because they don't have the
11  evidence.  They've never presented it.  They've never disclosed
12  it.
13           And so according to Mr. Lassen, he's getting a good
14  education now.  And so -- I guess we'll march forward.  But
15  that's the concern I have, is that we're going to take two days
16  of time with absolutely no remedy available because they have
17  presented no evidence of a remedy to this moment.
18           THE COURT:  All right.
19           MS. STATON:  Thank you.
20           THE COURT:  Mr. Lassen, you may call your first
21  witness.
22           MR. LASSEN:  We call Dr. Joseph Gentry.
23           THE CLERK:  State your name please.
24           THE WITNESS:  Joseph Gentry.
25           THE CLERK:  Spell your last name.
```

1          THE WITNESS:  G-e-n-t-r-y.

2          **JOSEPH GENTRY, PLAINTIFFS' WITNESS, SWORN**

3          THE COURT:  Counsel, do you want to have the Court

4    admit into evidence the documents with respect to your

5    statements -- with respect to which your statements say you're

6    stipulating into evidence?

7          MR. LASSEN:  Yes.

8          THE COURT:  Do you want to do it all at once?

9          MR. LASSEN:  Yes.

10          MS. STATON:  Your Honor, I think I spoke to

11    Mr. Lassen, and the ones that we have not objected to are

12    Exhibits 1 through 29, 40 and 41 and 43.

13          THE COURT:  The other way to do it is to offer them as

14    you proceed.  I don't care.

15          MR. LASSEN:  I would just as soon have them stipulated

16    as stated by Ms. Staton.

17          THE COURT:  It is ordered that Exhibits 1 through 29,

18    40, 41, and 43 are admitted.

19          Please proceed.

20                    **DIRECT EXAMINATION**

21    **BY MR. LASSEN:**

22    Q.  Would you state your name please.

23    A.  Joseph Gentry.

24    Q.  And is it Dr. Gentry?

25    A.  It is.

```
 1    Q.  Where are you employed, Dr. Gentry?

 2    A.  The Southwest Autism Research & Resource Center.

 3    Q.  What is your position there?

 4    A.  I'm the director of school consultation services.

 5    Q.  How long have you worked there?

 6    A.  Since September of 2007.

 7    Q.  What is the Southwest Autism --

 8    A.  It is a local non-profit agency that's basically dedicated

 9    to working with, as the resource part of the title says, and

10    researching causes and cures for autism.

11    Q.  Okay.  And what are the responsibilities of your particular

12    position there?

13    A.  I basically lead the school consultation division or the

14    department.  My department consists of education and training

15    director, who sets up a lot of the trainings we do throughout

16    the community, a music therapist, who provides music therapy to

17    students with autism and in the schools, peer sensitivity

18    programs.

19          And I have a consultant and myself who do a lot of

20    independent educational evaluations and educational behavioral

21    evaluations, functional behavioral assessments, and behavior

22    intervention plans for students in the schools.

23    Q.  Prior to coming to Arizona, you worked elsewhere?

24    A.  I did.  I moved here from Boston where I worked for the May

25    Institute, which is another non-profit, much larger non-profit,
```

1    nationwide non-profit, that does the same thing working with

2    students with autism.

3    Q.  And how long did you do that?

4    A.  Well, it was my pre- and post-doctoral fellowships.

5    Q.  And describe what your education was briefly.

6    A.  I received my Ph.D. in school psychology from Illinois

7    State University and then moved to Boston to finish my -- the

8    two residencies there, the pre- and post-doctoral residencies,

9    where I was an educational consultant doing the same sort of

10   things I'm doing now in the schools working with kids and

11   teachers.

12   Q.  And when did you get your Ph.D.?

13   A.  2007.  I'm sorry.  August, 2006.

14   Q.  And do you consider yourself an expert in educating or

15   dealing with autistic children?

16   A.  I do.

17   Q.  And did you at some point in time develop a relationship

18   with Cody or -- and the Prescott School District?

19   A.  I did, after -- I was initially called in to do an

20   evaluation for -- an educational evaluation for the student,

21   and over time, throughout that evaluation, of course I had to

22   get to know him and know all of the staff and the teachers who

23   work with him.  And then since then I have been on a fairly

24   frequent basis, every other week -- because we split it, Carey

25   Burgess and I -- consulting to the staff and getting to know

1    Cody very well.

2    Q.    Okay.    What is the purpose of you consulting on an every

3    other week basis?

4            THE COURT:    Excuse me.    Mr. Lassen, can you lay some

5    foundation as to these contacts with Cody?

6            MR. LASSEN:    Sure.

7            THE COURT:    As to the time.

8    Q.    (BY MR. LASSEN)    Okay.    When did you first get involved

9    with Cody?

10   A.    November, 2007.

11   Q.    And what was the nature of your initial contact?

12   A.    To do an educational evaluation on -- basically of his

13   educational, everything that's going on with him, which was

14   behavior and education and teaching, all of the things.    So it

15   basically was to look at his educational environment.

16   Q.    Now, what different things did you do in conducting that

17   evaluation?

18   A.    I did a lot of observations, a lot of teacher interviews.

19   I got a records review, so I got to look through his file, look

20   for things that were of importance there.    I got to do a lot of

21   standardized assessments, the ratings scales that teachers and

22   parents filled out about his current behavior and his current

23   educational performance.    But a lot of what we do with kids

24   with autism rests on our observations of the student.

25   Q.    And how much time did you spend doing that?

1   A.   The evaluation I can't remember exactly, but typically they

2   take about 16 hours.

3   Q.   Okay.  And how much of the time did you spend observing?

4   A.   Two full school days, so about ten hours.

5   Q.   Okay.  And then what did you do after that?  Did you create

6   a report of some sort?

7   A.   Yeah.  I wrote a report with all of the findings from the

8   observations and the assessments and had a list of

9   recommendations.

10  Q.   And then what was your next involvement?

11  A.   Through that, we went to an IEP meeting and decided that we

12  would continue consultation to implement some of the

13  recommendation that we had made in the report so that I --

14  Q.   When you said we --

15  A.   We meaning SARRC, the division, myself, that I personally

16  wrote the report, and the recommendations I made were

17  implemented and to be implemented.  The school district

18  required training and consultation regarding the implementation

19  of those recommendations.

20  Q.   You mentioned an IEP team meeting.  What was your role, if

21  any, there?

22  A.   Basically as a consultant, is the way I viewed it.  A lot

23  of the times, because I wrote the report, it's a great way for

24  me to sit down with the team and, you know -- A report is nice

25  written, but to have the person who did it describe the results

1   and to describe the recommendations and what I'm talking about

2   gives a lot more detail to the report itself.

3   Q.  Okay.  And who else -- who were the different persons, not

4   necessarily by name, but what different persons were part of

5   that team?

6   A.  At that meeting?

7   Q.  Yes.

8   A.  Nancy was there, the special ed director, the principal,

9   his regular education teacher, the school psychologist, the

10  speech therapist, the occupational therapist.  Mr. Parenteau

11  was there, myself, and the special -- and I think his aide was

12  there.

13  Q.  And did you at that time or at any point in time provide

14  input into development of a new IEP?

15  A.  At that meeting, I don't -- we didn't -- we weren't

16  necessarily developing an IEP at that first meeting.  It was

17  simply for me to go over the results of my report, which went

18  into an IEP, when his next IEP was up, that's when I got

19  involved as an consultant to the IEP.

20  Q.  So that was a different time?

21  A.  It was.

22  Q.  And how much later was that?

23  A.  A month.

24  Q.  Okay.  And what happened there?

25  A.  Carey Burgess and I --

```
 1   Q.  Carey Burgess is whom?
 2   A.  She's the consultant who goes on the opposite weeks who
 3   consults the program on the opposite weeks that I do.
 4   Q.  Okay.  Continue.
 5   A.  So her and I consulted with the team to come up with, to
 6   take the recommendations in the report -- she's been working
 7   with him for a long time as well -- and to take our
 8   recommendations and devise a plan and implement a plan to
 9   show -- basically to implement the recommendations that we were
10   thinking he needed.
11   Q.  Okay.
12   A.  So at that IEP meeting is when we decided -- we started
13   talking about goals and objectives and ways of measuring
14   progress and continuing -- continued consultation or the need
15   for training for staff.
16   Q.  Okay.  As a result of that, was a new IEP developed?
17   A.  Yes.
18   Q.  Okay.  And did that in any way differ from prior IEPs?
19   A.  I think so.
20   Q.  And how?
21   A.  I, with our consultation, I think what was very
22   important -- and I'm sure we'll talk about later -- in applied
23   behavior analysis, being a behavior analyst and a psychologist,
24   but being a behavioral analyst requires us in the field and the
25   science of behavioral analysis requires data collection to
```

 1   ensure progress and to monitor progress.

 2          So I think one of the biggest differences in the IEP

 3   that we helped write was the addition and -- the addition of

 4   progress monitoring and the focus on goals that were important

 5   to Cody and to his specific needs rather than autism in

 6   general.

 7   Q.  What do you mean by -- Did you identify goals specific to

 8   Cody?

 9   A.  We did.

10   Q.  And how was that different than autism in general?

11   A.  Well, most -- not just autism in general but students in

12   general, the state as well as every other state has

13   requirements on what goals and what benchmarks students have to

14   show to make -- whether -- Through the state for AIMS testing,

15   let's say, there are certain objectives that every student,

16   disability or not, have to meet.

17          And a lot of IEPs, if you look, when you read IEPs,

18   you'll see there are standard goals that are used and sort of

19   picked out of the objectives that need to be met for all

20   students and put in there based on what the child might need.

21          So if a student is putting puzzles together, the

22   next -- you could look at the next more difficult goal and pick

23   from that.

24          But they're not written directly specifically for that

25   student.  They are goals out of a list that you can sort of

1   pull and cut and paste from the list that all students need to

2   have.

3           But they're not specific to the student in general --

4   or the student specifically about what he needs at that current

5   moment.

6   Q.  Okay.  And so how did things change after your

7   consultation?

8   A.  After our consultation, the IEP basically became an IEP

9   that was very specifically geared towards what I and Carey felt

10  was necessary for Cody to make significant -- significant or

11  meaningful progress.

12  Q.  Okay.  Were there certain priorities as far as the goals?

13  A.  Language.

14  Q.  And why was that chosen?

15  A.  The research in autism states that the progress or the

16  outcome, the potential for a student with autism is very

17  closely related to the amount of language the child has.  He,

18  as was stated earlier, when I started working with him, he had

19  very, very little language, meaningful or not, very few spoken

20  words.

21          And so one of the areas of my specialty and Carey's is

22  in communication and teaching children, not just teaching

23  children with autism but teaching children with autism to talk

24  and to communicate, which is very -- It's the most important

25  skill, from my point of view, for a child with autism.

1    Q.   Okay.  So that was one of the priorities.  What other

2    priorities, if any, were there?

3    A.   I think one of the other areas that I'm always pushing too

4    is we need to hit on every area as well.  So communication was

5    a large area.  Of course we need to spend a lot of time and

6    effort on that.  But we can't not forget about his motor skills

7    and his social skills.

8           I think social, when you talk about kids with autism,

9    one of the major -- one of the three major deficits is social.

10   He didn't have friends.  He didn't play with other kids.  He

11   didn't have any interaction time with typically developing

12   students.  And part of that was not having time, but part of it

13   was he didn't have the skill to do it.  And so with

14   communication, it all sort of builds on top of it.  With

15   communication, now you can interact.  You have the ability to

16   interact.

17          So the communication is the basis for all of the other

18   skills that he needed, hence it being the most important.

19   Q.   Now, how -- You had mentioned something in terms of data

20   collection.  How was that different, if it was different, than

21   what had been happening in the past?

22   A.   Data collection, after the IEP and currently, is something

23   that is -- It's database decision making.

24          It's not data to take data.  It's data to make

25   decisions.

33

1    We had to train all of his staff to take daily data on

2    the most -- At the beginning all we were working on was

3    communication, so we had data on how many words he would say,

4    you know, and how many problematic behaviors.  One of the other

5    things with Cody specifically, he showed -- he displayed a lot

6    of problematic behaviors such as falling to the floor and

7    screaming and biting and pinching and throwing tantrums and

8    bolting from the area or from the school itself.

9         So one of the major areas with that, not necessarily

10    with an IEP, is focusing on behaviors, because if you are

11    displaying problematic -- high rates of problematic behaviors,

12    you're not able to learn the skills we need to teach.

13         So concurrently we're working on language and

14    decreasing problematic behaviors.

15    Q.  Was there a lack of a strategy or technique to deal with

16    his problematic behaviors?

17    A.  I think it wasn't a lack of a skill.  It was a lack of

18    training on the staff's part to know how to handle the

19    behaviors.

20    Q.  And is that one of the functions that you performed?

21    A.  We did.  And I say we.  Carey and I performed a day-long

22    training for all of his staff.  And then -- And ultimately

23    every week that I go up and she goes up, we're providing

24    consultation, but it's training.  It's all-day training.

25    Q.  And since we're talking November or December, January, have

1    things changed regarding the problematic behaviors?

2    A.  Well, of course.  I think if you look at the data that I

3    have, the current data from today, from January, his

4    problematic behaviors have significantly decreased.  And one --

5    another research finding with one of the methodologies that

6    we're using called pivotal response treatment to increase

7    communication, you automatically see a decrease in problematic

8    behaviors because the students now can verbalize when they're

9    upset instead of having to throw a tantrum or be aggressive.

10   Q.  Were there -- Did you observe on the part of the staff

11   techniques that actually were creating unintended consequences

12   as far as problematic behaviors?

13   A.  I think what I noticed more was not that they were using

14   techniques that were causing behaviors, but when the behaviors

15   were occurring, they weren't using techniques to rid that

16   behavior or to replace that behavior.

17   Q.  Okay.  Now, since January have there been any modifications

18   to his IEP?

19   A.  To -- Since January of '07?

20   Q.  Well, or since you --

21   A.  Since -- There have been a couple, I'm sure.  I think just

22   most recently, we're always trying to remove goals that we've

23   met or remove goals that I think a lot of times you can put in

24   a goal and see that it's not working or see that -- you know

25   what? -- that's too lofty of a goal.  We need to step it back.

1    Or we need to pump it up a little bit, and we need to make

2    changes within the IEP year.

3             So we have had amendments, not all necessarily

4    pertaining to what we have been doing.  But I think the IEP

5    just recently has changed to change a couple of goals.  I know

6    we have a new occupational therapist who is needed to change a

7    goal.

8    Q.  Now, there was reference earlier to progress reports.  Is

9    that somehow different than data collection?

10   A.  Progress reports are a way, in IDEA, IDEA, progress reports

11   are a way of communicating the amount of progress or the

12   progress on IEP objectives to parents or to staff.  It stays in

13   his record.

14            Data collection should be taken on a daily basis, not

15   a biweekly or a quarterly basis like a progress report.

16            The information that goes into a progress report is

17   the daily data that we're taking to ensure that when we say

18   he's making progress, he actually is making progress.

19   Q.  What consequence, if any, if there is no daily data

20   collection?

21   A.  It's -- It's the difference between objective and

22   subjective decision making.  So if I have data and every

23   decision I make is based on numbers and data that's been

24   collected, that's an objective decision based on data, whereas

25   it's completely subjective if I don't collect data and I say I

1   think he's making progress.

2   Q.  Well, what's wrong with that?

3   A.  You could be wrong.  I think --

4   Q.  What's your experience?

5   A.  My experience is we always take data.  The data -- I don't

6   ever want to make a decision based on my -- any bias I might

7   have or an experience that I might have or an experience

8   somebody else has.  I want to make data completely

9   objectively -- or I want to make a decision completely and

10  objectively from the data.

11  Q.  Why is that?

12  A.  Then we know we're making the appropriate decisions.

13  Numbers, I'll quote, numbers don't lie.  And if I'm making

14  decisions based on numbers, then I'm less likely to make a

15  mistake or to make a wrong decision.

16  Q.  At some point in time you were asked to be an expert on

17  behalf of the parents in this case, correct?

18  A.  Yes.

19  Q.  And that was in addition to or -- I think there was a

20  dilemma as far as using the District's own consultant as an

21  expert, but we got over that dilemma, and you were asked to

22  serve that role, correct?

23  A.  Yes.

24  Q.  And that's the role that you're in here today, correct?

25  A.  Yes.

1    Q.   And when you were asked to serve as an expert, were you

2    given additional tasks or additional items to review?

3    A.   For the case?

4    Q.   Yes.

5    A.   His IEPs and documents from his file.

6    Q.   Now, some of those you'd seen before?

7    A.   Yes.

8    Q.   Okay.  What specifically did you review in addition to what

9    you've reviewed before?

10   A.   I mean, what I reviewed before for the evaluation is

11   typically when I'm doing a behavioral assessment or an

12   educational assessment, I'm not as concerned with things that

13   had happened, IEPs from years past.  What I'm concerned with is

14   the current IEP and what's happening currently in the

15   classroom.  I can't change the past.  What I need to focus on

16   is the current.

17        So I reviewed during the evaluation his most recent

18   IEP, evaluations that were done in the past on the school's

19   part and on the parents' part that were in the file.  Now,

20   since then, for the case, I have reviewed all of the IEPs, 2003

21   through 2006, and then everything that's come after that with

22   the depositions and so on and so forth.

23   Q.   Okay.  So I believe there is available a notebook that has

24   for the witness the exhibits that we have admitted into

25   evidence.

1              THE CLERK:  No.

2              MS. STATON:  No.

3              THE CLERK:  I just have separate documents.  Which one

4    would you like him to see?

5              MR. LASSEN:  I'm sorry.  I forgot we put them in --

6    Exhibit No. 10, I believe.

7    Q.  (BY MR. LASSEN)  Dr. Gentry, do you recognize that exhibit?

8    A.  I do.

9    Q.  And what is it?

10   A.  It's an IEP for the 2003 school year.

11   Q.  Now, have you reviewed that document before?

12   A.  I have.

13   Q.  And have you testified about that at your deposition in

14   this case?

15   A.  I did.

16   Q.  And was this a document that you reviewed in formulating

17   the expert opinions that you have made in your expert report?

18   A.  I did.

19   Q.  Okay.  Let's turn to -- There are several pages.  I think

20   the first page is just a cover page, and the second page has

21   personal information about the student.  Could you look at the

22   third page, Page 3 of 13.

23   A.  Yes.

24   Q.  Do you see that?

25   A.  I do.

1   Q.   Now, what does that page have?

2   A.   The IEP team participants.

3   Q.   And is there any significance to the listing of

4   participants on that particular page?

5   A.   I mean, the significance from my point of view is that

6   there is -- there's no autism -- person with a specific

7   training in autism.

8   Q.   Okay.  But the parent is listed, correct?

9   A.   Yes.

10  Q.   And is it your experience when they have an LEA

11  representative, is that typically the principal?

12  A.   That or a school psychologist typically.

13  Q.   You mentioned there was no autism or a person that's listed

14  as having expertise in autism?

15  A.   Yes.

16  Q.   Why would that be -- Why is that worth noting?

17  A.   Well, I think just like if you had a student who was deaf,

18  you would of course have a deaf ed teacher or a specialist on

19  your team, or if you had a student who had -- who was visually

20  impaired, you would have a visually impaired teacher on your

21  IEP team.  I think it's best practice to have someone who

22  specializes in the disability to be on the IEP team as

23  eventually writing an IEP that will dictate what the child will

24  be taught throughout the school year.

25  Q.   Now, does that necessarily have to be -- Can that be

1    someone who is an employee of the District?

2    A.  It doesn't have to be.

3    Q.  Could it be?

4    A.  It could be, yes.

5    Q.  Is it your experience that that -- Say in Phoenix, Arizona,

6    a large school district, you have an autistic child --

7    A.  Many districts have their --

8          MS. STATON:  Excuse me.  Objection as to what Phoenix

9    might or might not do.

10         THE COURT:  Well, Doctor, please let Mr. Lassen finish

11   his question before you start to answer, and -- Your objection

12   is it's not relevant?

13         MS. STATON:  It's not relevant, Your Honor, as to what

14   school districts in Phoenix do.

15         THE COURT:  What is the relevance, Mr. Lassen?

16         MR. LASSEN:  The relevance is that it can be done with

17   somebody in house, particularly if you have -- and I was going

18   to ask -- if you have multiple school psychologists.

19         THE COURT:  Well, isn't it utterly obvious that it can

20   be done in-house or out-house?

21         MR. LASSEN:  Yes.

22         THE COURT:  So why don't you ask another question.

23   Q.  (BY MR. LASSEN)  Okay.  Is this a function that you perform

24   as a consultant?

25   A.  I do.

1   Q.  Does it necessarily have to be somebody who has a Ph.D.?

2   A.  No.

3   Q.  This page here has no regular ed teacher.  Is there any

4   significance to that?

5   A.  I think typically a regular ed teacher is on the IEP team

6   for, from my point of view, for reasons for inclusion, for

7   reasons of if the child, when we start talking about teaching

8   social skills and social development, the research with

9   children with autism suggests putting that child with -- it

10  doesn't suggest -- it shows the significance of putting that

11  child with typically developing peers.  So a regular education

12  teacher on the team can be someone to make light of that

13  situation and make sure it's in the IEP.

14  Q.  Okay.  Let's turn to the next page.  What does that page

15  deal with?

16  A.  It's the present levels of educational performance, the

17  PLEP.

18  Q.  And what is that?

19  A.  It's the page or two that is -- describes the current

20  performance level of the student.

21  Q.  Okay.  Do you have any problems with the way that is

22  described on those two pages?

23  A.  I don't necessarily have a problem with what's on here.  I

24  think what's missing from a behavior analytic perspective and a

25  psychological perspective is unbiased or, I should say,

1    objective data showing current performance.

2    Q.  So there is not data showing current levels of performance?

3    A.  It's more anecdotal.

4    Q.  Okay.  Now, going on to Page 6 of 13, what is that?

5    A.  It's the measurable annual goals.

6    Q.  And what -- what comments do you have regarding the

7    measurable annual goals that are contained on this IEP?

8    A.  Some of them are not measurable -- written in a measurable

9    manner.  And the -- It's unique that every state that I've

10   worked in, lots of different school districts, have their own

11   IEPs, and they each look a little different.  But they're all

12   the same in a certain way.  The IDEA requires that all goals

13   are measurable, and many of these are not measurable.  Many of

14   them say that they can be measured.  For instance, on the first

15   one, develop appropriate work habits.

16   Q.  What's wrong with that goal?

17   A.  The goal itself is not descriptive.  What is -- I would ask

18   the question, well, what is appropriate, and what is a work

19   habit?

20          It's not -- That is, it's a very broad, broad goal.

21   It's not -- You can't measure that.

22          And then under that it says, "Demonstrate 25 percent

23   as measured by Brigance and class records."

24          And the Brigance is a standardized assessment which

25   would be wonderful to use to measure progress.

1    Q.   So that's a good thing?

2    A.   It is, or maybe not the Brigance itself but some kind of

3    formal objective measurement to monitor progress.

4         THE COURT:   Excuse me, Doctor.

5         Is he going too fast?

6    Q.   (BY MR. LASSEN)  What about class records?  What does that

7    mean?

8    A.   Class records, I don't know exactly what was meant by class

9    records.  I'm assuming it's --

10        MS. STATON:   Excuse me, Your Honor.  I object.  He's

11   answered the question he doesn't know.

12        THE COURT:   Sustained.

13   Q.   (BY MR. LASSEN)  Now, if the Brigance is listed there, what

14   follows from that, if anything?

15   A.   Explain more.

16   Q.   Well, if you have the Brigance, should there be evidence in

17   the record of its use?

18   A.   Typically one of the ways that we would measure goals and

19   progress is to have something like the Brigance, where you

20   could do it before you started the IEP, to get current levels

21   of performance, and then you would do the Brigance again at the

22   middle of the year, at the end of the IEP period, and see the

23   change from beginning to end, and you can have objective data.

24   Q.   Okay.  In your review of the records, was there any

25   evidence in the records of the Brigance being given?

1    A.  No.

2    Q.  At any point in time?

3    A.  No.

4    Q.  Was there any class records that were included in the

5    reports?

6    A.  Not knowing what is meant by class records, I don't know.

7    I didn't see anything that was labeled class records.

8    Q.  Were there any sort of progress reports or reports or data

9    of any kind that were included?

10   A.  They're in his file and the IEPs, there were the quarterly

11   progress notes, but no data.

12   Q.  Okay.  And are quarterly progress reports required by law?

13   A.  Yes.

14   Q.  Okay.  So that is something that's kept for legal purposes?

15   A.  Yes, as part of the IDEA.

16   Q.  As you -- I would call your attention to the second

17   measurable annual goal, the student will increase social

18   skills.  Do you have any problem with that goal?

19   A.  I think it's much like the first.  Social skills, I can

20   think of hundreds of social skills.  So to say, well, the

21   student will increase social skills is not specific enough to

22   measure.

23   Q.  Now turn to the next page.  I think you mentioned the

24   importance of communication.  Here is the second goal on that

25   is the student will improve communication skills.  What's

1   wrong, if anything, with that?

2   A.  And, again, I think the goal itself is communication

3   skills.  There are hundreds of different communication skills.

4   And the goal itself is not measurable.

5   Q.  How would you phrase a goal in the area of communication to

6   be measurable?

7   A.  Something along the lines of Cody will increase his words

8   per minute from baseline levels by 50 percent or from 1.5 per

9   minute to 2.5 per minute.

10  Q.  Okay.  When you say baseline level, what are you referring

11  to?

12  A.  Current performance.

13  Q.  And how would you measure current performance?

14  A.  Using either direct observation, not naturalistic

15  observation data, or a norm referenced assessment.

16  Q.  Okay.  And did you see any of that in your review of the

17  records?

18  A.  I did not.

19  Q.  Okay.  We could go on and on, but I don't want to belabor

20  this point.  Can we show the witness Exhibit 11.  Can you

21  identify that document?

22  A.  It's the progress report.

23  Q.  Yes.  And what is that?

24  A.  It's the quarterly report to the parents and to the file

25  stating progress or lack thereof on the goals and objectives in

1   the IEP.

2   Q.  Okay.  And the first pages is a reiteration of what the

3   goals and objectives are?

4   A.  Yes.

5   Q.  And the same with the second page?

6   A.  Yes.

7   Q.  And the third page?

8   A.  Yes.

9   Q.  Okay.  Now, if I get on to the Page 5 of 6, there seems to

10  be a narrative there.  Okay?  And it says period one, period

11  two.

12          What is your reaction to the narratives that you see

13  on Pages -- on Page 5 of 6 of this progress report?

14  A.  Again, there is some data collected or data presented

15  talking about percent accuracy and numbers of pieces of

16  puzzles.  But, again, most of it is -- most of those data are

17  collected by specialist teachers or professionals like the

18  occupational therapist or the speech and language pathologist.

19  But most of the other comments are, again, anecdotal.

20  Q.  When you say the ones are anecdotal, are those more from

21  the teacher?

22  A.  Yes.

23  Q.  And what's wrong, if anything, with that?

24  A.  I think anecdotes are wonderful to describe in a -- for a

25  parent or for someone else how, what it looks like to give a

1    description of what is going on in the classroom.  But what's

2    missing -- And so I don't disagree with anecdotal.  What is

3    missing is the data proving the anecdotes or supporting the

4    anecdotes.

5    Q.  Why does the data, if it does need to be there, need to be

6    there?

7    A.  To support the anecdotes.  I think the data is something

8    that's not subjective.  It's objective proof of progress.

9    Q.  Now, there are other documents here, and I'm -- that are a

10   log between -- that is sent home to the parents, a progress

11   log.  Is that something you observe in consulting?

12   A.  With this case or in general?

13   Q.  In general.

14   A.  Definitely.  A home school note is what I would typically

15   refer to it as.

16   Q.  Okay.  Now, is that a documentation that would support

17   progress toward measurable goals?

18   A.  It is a document that would support -- could support

19   progress if data was used to describe it.

20   Q.  Can you show the witness Exhibit 12.  And I'll try to speed

21   this up a little bit.  Can you identify that exhibit?

22   A.  It is the IEP from the 2004 school year.

23   Q.  Now, similar question.  Looking at Page 3 of that, do you

24   have any observation about the meeting team participants?

25   A.  The addition of a regular education teacher.

1    Q.   Okay.

2    A.   But still no documented person who has specialized training

3    in autism.

4    Q.   Okay.  Now, would it be your experience that the second

5    year IEP ought to have the same goals and objectives as the

6    first year's?

7    A.   No.  They should -- If he's -- If a student meets a goal,

8    it should of course be changed.

9    Q.   Is it -- When you have -- Before you consulted or assisted,

10   have you seen occasions where goals and objectives are carried

11   over year -- from a prior year to --

12   A.   Occasionally it's warranted for a goal to carry from one

13   year to another year.  I think it's warranted when the student

14   is making progress and will meet that goal.  But it becomes

15   unwarranted when the student is not making progress or

16   appropriate progress to continue to work on a skill for year

17   after year after year.

18   Q.   Why is that?

19   A.   If a student isn't making progress over an IEP year,

20   doesn't meet a goal, the goal was either written wrong or

21   written as too lofty of a goal.  The goal was either written as

22   too lofty of a goal, was taught the wrong way, or the student

23   had the prerequisite skills to make that goal.

24   Q.   What do you mean by that last statement?

25   A.   If I have a goal that says student X will learn to tie his

1    shoe, but he doesn't have the manual dexterity, the

2    prerequisite skill with his hands to tie his shoe, that goal of

3    course will never be met until he has the prerequisite skill.

4    Q.   In your review of Cody's IEPs, was there instances where

5    goals were set forth that prerequisite skills did not exist?

6    A.   I think the social skills goal is a good example that he

7    didn't -- he was displaying such high rates of

8    problematic behavior to have a social skills goal or to talk

9    about maintaining eye contact when he was functionally

10   non-verbal and displaying high rates of problematic behaviors.

11   That is a goal that he didn't have the prerequisite skills to

12   perform.

13   Q.   So what do you do?  Do you deal with the prerequisite

14   skills first?

15   A.   All the time.

16   Q.   So is there a hierarchy on skills that build upon other

17   skills that's important in teaching autistic children?

18   A.   Yes, with not just children with autism but every child.

19   It's developmental progress.  You cannot -- No one can learn

20   certain skills without learning certain skills before it.

21   Q.   What about the number of goals and objectives that are

22   contained on this document?  Do you have an observation about

23   that?

24   A.   I think --

25            MS. STATON:  Excuse me, Your Honor.  Let me just

1    object to the form of the question.  I don't -- I don't know

2    what he's asking --

3            THE COURT:  Well --

4            MS. STATON:  -- does he have an observation.

5            THE COURT:  Ms. Staton, you've been rather generous

6    with some of these questions, which is not to be held against

7    you.  I'll sustain the objection to the form of the question as

8    to observations.

9    Q.  (BY MR. LASSEN)  Is there an appropriate number of goals

10   and objectives that ought to be on an IEP for a child of this

11   age?

12   A.  The number of objectives that is appropriate is dependent

13   on the child.  Typically I think what I would consider best

14   practices for IEP development would be one or two goals in --

15   at a max for each of the main areas of education.  And for a

16   student with autism, we're talking about behavior, social

17   skills, communication.  And then you can throw in, if the child

18   needed speech and language pathology, a goal or two there and

19   occupational therapy if they have motor deficits.

20   Q.  Okay.  So you would have one or two goals in each of those

21   areas?

22   A.  Two at a max.

23   Q.  And why only two?

24   A.  Because as you have more goals, it becomes difficult,

25   again, if you're collecting data and working on 20 goals or 30

1    goals, it's harder to take data on all of those things, for

2    one.  And, two, you're -- if you're working on too many things,

3    you're missing the time it takes -- it could take for one of

4    the goals.  So I think it's, instead of writing a large number

5    of goals for a year, you write what is needed, what we're going

6    to work on, be very specific.  And as the child meets or does

7    not meet those goals, you addend the IEP and change the goal.

8    Q.  And that could occur more than once a year?

9    A.  Anytime.

10   Q.  Okay.  Let's show you what's been marked as Exhibit 15.  I

11   direct you to the third page of Exhibit 15.  And, well, first

12   of all, what is Exhibit 15?

13   A.  It is the IEP from the year 2005.

14   Q.  So this is the third of the three years, right?

15   A.  Yes.

16   Q.  Okay.  Does it have the same problem, if you will, on the

17   list of meeting team participants?

18   A.  Yes.

19   Q.  And as far as present levels of performance or PLEP are

20   there any problems with that beginning on Page 4 of 14?

21   A.  I think it's the same as the first one we looked at in that

22   there is no objective data.

23   Q.  Would you have expected a difference between the first and

24   the third IEPs in that regard?

25   A.  Yes.

GENTRY - DIRECT

1   Q.  Why is that?

2   A.  Because it's the present levels of performance is what's

3   happening occurring at present.  If this is three different

4   years, a child should be making or would be different in some

5   manner of speaking from year to year to year.

6   Q.  Okay.  And what did you observe regarding that in this --

7   A.  Some of it is new, but a lot of it is directly from other

8   earlier forms of the IEP.

9   Q.  And would you say that's a best practice?

10  A.  No.

11  Q.  Why not?

12  A.  Because if it's from -- That's not current.  If you're

13  using data or using anecdotes from earlier IEPs that was

14  written a year ago, this is current levels or present levels of

15  performance.

16  Q.  I asked the question, and Ms. Staton in her opening

17  referenced that term best practice.  What is your understanding

18  of what that term means?

19  A.  Best practice in autism or best practice in education is

20  what I consider it is what has been evidence based or proven by

21  research, scientific research, to be beneficial or work.  So

22  when you're talking about methodology and teaching children

23  with autism, if I use the term best practice, I'm talking about

24  evidence based methodologies that have been proven to work.

25  Best practice in this case is there's no scientific reasoning

1    or scientific evidence that says you have to have data on the

2    PLEP, but it's best practice in that it's the best thing we can

3    do to ensure appropriate communication to the next IEP team who

4    will be looking at this.

5    Q.  And would you say these IEPs and reports that you talked

6    about were written in accordance with best practices?

7    A.  No.

8    Q.  And how were they deficient?

9    A.  The data.  There is -- And that's not necessarily the best

10   practice.  It's more IDEA.  The law says you need to write

11   measurable annual goals and measure -- And the reason they're

12   measurable is so you can measure them to prove objectively that

13   the student has or has not made progress.

14   Q.  And what's wrong with the ones that you've reviewed here?

15   A.  That they're not written in a manner that is necessarily

16   measurable and that there is no measurement took place to

17   measure those goals.

18   Q.  And how do you know that no measurement took place?

19   A.  Well, there's no documentation of measurement in any of the

20   reports or the IEP or the file.

21   Q.  Look at Page 6 of 14.  And I think that's dealing with OT

22   goals.  Correct?

23   A.  Yes.

24   Q.  Now, are there measurable goals and data there?

25   A.  They're more measurable in that "Cody will demonstrate

1    improved fine motor skills according to eight out of ten

2    benchmarks met." So that is more measurable in that it's

3    saying there is ten benchmarks or under the goal there are ten

4    objectives, and it's measurable in that the goal is measurable

5    by saying if he meets eight of ten -- eight of the ten, then he

6    will have met the goal.

7            So that is more objective but not necessarily

8    measurable in that you're going to have to measure each

9    specific objective to make sure he met eight of ten.

10   Q.   Okay.  Could you show the witness Exhibit 16.  Could you

11   identify that document.

12   A.   It's the progress report for the 2005 IEP.

13   Q.   Is that progress report defective, in your opinion?

14   A.   It's, again, not -- It states the goals and says is there

15   sufficient progress, yes or no, but there's no data showing

16   that there's progress being made or not.

17   Q.   The term used in there is benchmarks.  What does that mean

18   or what does -- in your mind?

19   A.   A benchmark is what I refer to as an objective.  There are

20   numbers -- Typically there are multiple objectives to meet a

21   goal, so a benchmark would be like we were talking about

22   prerequisite skills.  There are certain things that need to be

23   taught in order to meet -- to make progress or to meet a goal.

24           So a benchmark would typically be written as benchmark

25   one, you have to say one syllable words before you say two

1    syllable words, which is the second benchmark.

2            And the third benchmark would be putting multiple

3    syllables together to form a word.

4            And the fourth benchmark could be putting words

5    together to form a sentence, which ultimately would meet your

6    goal of Cody will, you know, state three-word sentences as

7    prompted on eight out of ten opportunities.

8    Q.   And then how would you measure that?

9    A.   You would measure it by writing down what he said and

10   looking at the number of words he said and counting.

11   Q.   Now, is there some way to determine objectively if he's

12   obtained the benchmark?

13   A.   I think you have to treat each benchmark like you would the

14   goal and measure each benchmark.

15   Q.   Is there a mastery level that you typically use in those

16   areas?

17   A.   Typically in the research side of the field and in

18   education, I think what you typically see is eight out of ten

19   or 80 percent to be considered mastered.

20   Q.   And you didn't -- And I don't remember seeing 80 percent

21   very often in these areas.

22   A.   Not very often.

23   Q.   Now, we're about at 10:30, and --

24           THE COURT:  Let's go for another few minutes.

25   Q.   (BY MR. LASSEN)  Could you show the exhibit I think it was

```
1    41.
2            Can you identify that exhibit?
3    A.  This is Carey Burgess's --
4    Q.  Oh, I've given you the wrong -- How about giving him also
5    42.
6            THE CLERK:  42 is --
7            MR. LASSEN:  40?  40.  I'm sorry.
8            THE CLERK:  40?  Okay.
9    Q.  (BY MR. LASSEN)  Can you identify 40?
10   A.  This is a letter that I wrote.
11   Q.  Okay.  And was that your initial expert report?
12   A.  It is.
13   Q.  And that's what we made as far as our initial expert
14   disclosure?
15   A.  Yes.
16   Q.  And, again, that is based upon -- did that include a basis
17   upon the IEPs that I just asked you several questions about for
18   these three years in question?
19   A.  Yes.
20   Q.  Okay.  And what conclusion did you reach regarding the
21   sufficiency of the IEPs for those three years?
22   A.  The conclusion that I came to was that those IEPs from
23   those three years were written in a way that was -- that made
24   them unable to be measured in an objective way to ensure and
25   measure appropriate progress.
```

1    Q.  Okay.  And what implications, if any, does that have for

2    whether the education delivered was appropriate?

3    A.  I think if you don't have an IEP that's -- Every student

4    with an IEP, his whole education is based on that document.  So

5    if you have a flawed document or a document that's not written

6    appropriately, it affects all of the child's whole education.

7              Most important, though, is determining progress to

8    enhance the speed at which we need to remedy the problems these

9    kids with disabilities have.  These kids typically, especially

10   with autism -- and we can talk about Cody in specifics -- was

11   developmentally way behind.

12             So we need to be very conscientious of what we're

13   doing and how we're doing it to maximize the rate at which he

14   can learn to make progress, because he's starting off at such a

15   level that's so far behind.

16             So by taking or by not taking data, we're potentially

17   wasting time and effort using a methodology or a skill or

18   teaching a skill that is -- shouldn't be taught or should have

19   been taught and wasn't being taught to maximize his potential.

20   Q.  And what ultimate -- What opinions did you reach regarding

21   the appropriateness of the education provided --

22   A.  During -- I'm sorry.  During those three years, based on

23   the IEPs and the documents I reviewed, he was not being given a

24   free and appropriate education.

25   Q.  And by that, under -- how you determine -- what would --

1          In your mind, what does that mean other than using

2    those free and appropriate education?

3    A.  He did not -- There was no proof or no documentation and --

4    of progress, academic -- meaningful academic and behavioral and

5    emotional educational progress.

6          THE COURT:  All right.  We'll take a 15-minute break

7    at this time.

8      (Proceedings recessed from 10:31 a.m. until 10:47 a.m.)

9          THE COURT:  Let me just advise everyone I'm going to

10   break for lunch at 11:50.  We have the Federal Bar Association

11   lunch today.  I'll break from 11:50 till about 1:15.  You're

12   all welcome to come.  It's in the building.  It's $15.  You get

13   to meet the new dean of the ASU law school is speaking to us.

14   I never see the lawyers show up at the federal bar luncheon

15   when I'm in trial.  Go ahead.

16   Q.  (BY MR. LASSEN)  Dr. Gentry, could you look back at Exhibit

17   13 again.

18         THE CLERK:  Hold on just a second.  I took them away.

19   Q.  (BY MR. LASSEN)  Do you have that?

20   A.  Yes.

21   Q.  I neglected to ask you some more specifics about the coding

22   system that's on there.  If you look at, say, the goals and

23   objectives on the first page of that, just pick any one of

24   those.  Do you have one?

25   A.  Yeah.

1    Q.   Which one is it?

2    A.   We can talk about the first one.

3    Q.   Okay.  What is that goal?

4    A.   Develop appropriate work habits.

5    Q.   And then there's a reference C2, C1, B1, B2?

6    A.   Yes.

7    Q.   And then there's kind of a schedule at the bottom that

8    describes what those things mean.

9    A.   Yeah.

10   Q.   What does that tell you, that coding system?

11   A.   The coding system at the bottom is the kind of progress

12   that's being made.

13   Q.   Okay.

14   A.   So, C, anything with C is approaches expected progress, and

15   a 1 or a 2, sufficient progress to achieve goal within one year

16   or insufficient progress to meet the goal.  So C2 on that one

17   would mean that he's approaching -- approaches expected

18   progress.

19   Q.   Okay.

20   A.   All right.  And the 2 would say but there's insufficient

21   progress to achieve that goal within one year.

22   Q.   Okay.

23   A.   And then it changes.

24   Q.   Okay.  Now, what is there to support that reference there

25   to C2?

60

1    A.  Well, and that is -- that's what I've been talking about

2    not -- There's no objective data taken to make that assumption.

3    Q.  So what, in the absence of data, how is that done?

4    A.  By teacher report.

5    Q.  And so that's just essentially filling out a ranking

6    system?  Is that a best practice?

7    A.  I think the use of data -- The progress report and using

8    this form is good and well intentioned, and using the coding

9    system is appropriate.  It's how you make the decision on what

10   code to put.

11   Q.  What's missing?

12   A.  Data.

13   Q.  And typically in a progress report, will you see something

14   in addition to this form?

15   A.  For a child with autism when we're talking about using

16   applied behavioral analysis and databased decision making, you

17   would have a graph or some table or some kind of number showing

18   baseline versus where he's currently at.  And then you can make

19   the assumption of saying at baseline he was here; currently at

20   quarter one he's here; he's making expected progress.

21   Q.  Okay.  And the last one there on the top is B2, and I think

22   that says insufficient progress to achieve goal within a

23   one-year period.  Does that have any implications for the

24   appropriateness of a goal?

25   A.  If you are going to have a goal at period four or even,

1    like, when we were talking about C2, having a 2 says there's

2    insufficient progress to achieve goal within a one-year period

3    of time.  I would take that to say we should have new goals.

4    If he's not going to meet that goal in an entire year, why are

5    we working on it?  There's a prerequisite skill missing.

6    Q.  And that one is?

7    A.  Develop appropriate work habits.

8    Q.  Now, based upon what you observed in the fall of '07, last

9    part of '07, in terms of Cody's then present level of

10   functioning as you determined, were these goals that we have

11   been talking about in his '04-'05, '05-'06, and '03-'04 IEPs in

12   all cases appropriate?

13   A.  Not in all cases.  Some were.  Some were goals that weren't

14   written well but were good goals to be working on.  But I would

15   say the majority of them were what I would call typical special

16   ed goals and not Cody-specific goals.  And what the biggest

17   change that you saw when Carey and I got involved was that we

18   focused his whole education on what we know as experts in

19   autism is important, which is language development.

20   Q.  Now, in some -- There's a lot of these other goals.  How

21   does language development relate to the presence of these other

22   goals?

23   A.  Explain.

24   Q.  Well, you had mentioned that you focused on language

25   development.  Here there's reference to work habits and social

1  skills.  How does language relate to those?

2  A.  I think language is paramount to all of these other skills;

3  that appropriate work habits and increasing social skills

4  without language, without functional language, it's -- those

5  type of goals like social skills or cooperative play skills and

6  comprehension, self-help skills, are sometimes moot because

7  they don't have the prerequisite skill is language.

8  Q.  So what --

9  A.  So language was the most important, for him, for Cody,

10  language was the most important aspect of his education.

11  Q.  As far as when you did your assessment, what were the level

12  of his skills in the area of work habits or social skills?

13  A.  Few, if any.

14  Q.  So would you say he had met goals and objectives from prior

15  IEPs?

16  A.  Definitely not.

17  Q.  Now, have things changed during the last eight to ten

18  months since the IEP was structured completely differently?

19  A.  Yes.

20  Q.  And how is that?

21  A.  His functional language and meaningful language has

22  increased by hundreds of words per day.  We're at -- His

23  language has just exploded over the last seven, eight months.

24  Q.  What about problematic behaviors?

25  A.  Decreased significantly.

1    Q.   Are they gone completely?

2    A.   No.

3    Q.   Now, we talked about the -- your opinion that these IEP

4    teams were not properly constituted and should have had an

5    expert in autism.  How -- What difference would that have made

6    going back to these years in question?

7    A.   I think the difference that would have been made is the IEP

8    from the outset would have been focused on developing his

9    verbal language.

10   Q.   And what consequence would that have had?

11   A.   It's -- If what we did in 2006 was done in 2003, we would

12   be working with, and seeing the rate of progress he has now,

13   we'd be seeing a totally different child today as far as he

14   could have -- we could be working on these skills today had he

15   had the language that he has now three or four years ago.

16   Q.   Does that have -- Would that have had implications for the

17   future beyond --

18   A.   Definitely, yes.

19   Q.   How would that be?

20   A.   Research points to the fact that the earlier you have --

21   There's specific research showing that the potential for a

22   child with autism is greatly accelerated if he has language by

23   five or six years old.

24   Q.   And what if they don't?

25   A.   If they don't, it's -- data show that the probability of

1   meaningful adulthood working, you know, that the potential is

2   significantly decreased.

3   Q.  Now, given that he's now ten, is there anything that can be

4   done to make up for that?

5           MS. STATON:  Excuse me, Your Honor.  Let me object.

6   That's beyond any expert opinions that have ever been

7   disclosed.

8           THE COURT:  All right.  Mr. Lassen, would you point me

9   to the disclosure here.

10          MR. LASSEN:  I don't know.  I was not thinking in

11  those terms.  I was just asking him a general question.  And I

12  apologize.  I'll withdraw the question.

13  Q.  (BY MR. LASSEN)  Would you say that you build on the

14  existing goals and their reaching and developing new goals?

15  A.  Yes.

16  Q.  Now, based upon review, did you make any conclusions

17  regarding whether Cody received meaningful educational benefit

18  during '03-'04, '04-'05, and '05-'06?

19  A.  Based on the IEPs and seeing where he was when I started to

20  evaluate him, and based on the goals he had, I felt like he had

21  not made meaningful progress.

22  Q.  What about the level of knowledge on the part of the staff

23  that were administering or assisting Cody?

24          MS. STATON:  Object to the form, foundation.

25          THE COURT:  And what is the defect in the question?

1          MS. STATON:  He asked, if I've got it correct, he

2     asked what the -- I don't think he used the term defect but

3     what the deficiency was in the staff that was addressing the

4     goals.  There's no foundation that he knows during the 2003

5     school year to the end of the 2006 that he's ever reviewed any

6     of their educational records and knows or has even met any of

7     the women that taught Cody.

8          THE COURT:  All right.  Sustained.  You may lay a

9     little more foundation.

10    Q.  (BY MR. LASSEN)  Now, in terms of when you were consulting

11    with the staff, did they have any background in the necessary

12    training to provide an education to a child such as Cody?

13         MS. STATON:  Excuse me.  Let me object.  It's

14    foundation, Your Honor, because he's talking about September of

15    2007, not the applicable period.

16         THE COURT:  Sustained.

17    Q.  (BY MR. LASSEN)  Okay.  Have you provided assistance in

18    training the staff?

19    A.  Yes.

20    Q.  And in your opinion, has that made a difference?

21    A.  Yes.

22    Q.  And is that a large portion of what you and Carey Burgess

23    have done?

24    A.  Yes.

25    Q.  Now, can we show the witness I think it's Exhibit 42 or 43,

```
 1    his rebuttal report.
 2              MS. STATON:  It's part of 40.
 3              MR. LASSEN:  Is it appended to 40?
 4              THE COURT:  Ms. Staton, would you please pull the
 5    microphone over closer to you.  It moves.  You can pick it up
 6    and move it.
 7              MS. STATON:  I'm going to move because I can't see the
 8    witness.
 9              THE COURT:  Keep it close, because we can't hear you.
10    That's not close enough.
11    Q.  (BY MR. LASSEN)  Do you have that?
12    A.  I do.
13    Q.  And what is that document?  I'm not talking about your
14    initial report.
15    A.  What I have in front of me open is the rebuttal to the
16    comments made by Mrs. Phillips.
17    Q.  Could you just take a minute and go down.  What is your --
18    You have it kind of in a bullet point format, correct?
19    A.  Yes.
20    Q.  And that may be the easiest way to go forward.  What is
21    your first observation regarding --
22              MS. STATON:  Excuse me.
23    Q.  (BY MR. LASSEN)  Well, what did you do in order to prepare
24    that report.
25    A.  I, to prepare this report, I read Ms. Phillips, her report.
```

```
 1    Q.  And how long did that take you?

 2    A.  An hour.

 3    Q.  And so -- and then you prepared this?

 4    A.  I did.

 5    Q.  Okay.  What is your first observation?

 6            MS. STATON:  Excuse me, Your Honor.  Let me object to

 7    the method by which Mr. Lassen is proceeding.

 8            If the document speaks for itself, if he's simply

 9    going to read the document to the Court, the Court's got the

10    document.

11            THE COURT:  Well, it's stipulated into evidence.

12            MS. STATON:  Exactly.

13            THE COURT:  He may question him about his opinions.

14    Overruled.

15    Q.  (BY MR. LASSEN)  Go ahead.

16    A.  The first one, I talk about how in Ms. Phillips' report she

17    was discussing my evaluation results from the IEE, from the

18    2007 independent educational evaluation.

19            And the first bullet point was I didn't know how those

20    evaluation results related to how previous IEP teams, what I

21    was writing about, what I was discussing about the 2003, '04

22    and '05 IEP teams were developed.

23    Q.  And you were not talking about the 2007, correct?

24    A.  No, I was not.

25    Q.  Okay.  Let's move on to the next point.  What's your next
```

point?

A.   In her statement she noted that I did not use specific

evaluations.  And the reason those evaluations were not used

weren't because -- She listed multiple autism related

assessments.  However, those assessments are used to diagnose a

child with autism, not assess a child with autism.  Therefore,

of course I did not use them because I wasn't diagnosing -- his

diagnosis wasn't in question.

Q.   Okay.  And why was what you used, in your opinion, more

appropriate?

A.   It was more appropriate because it was looking at his

current level of skills and helping determine what skills he

needed to be taught.

Q.   Okay.  Let's move on.  What's your next point?

A.   She -- It might have just been what she said in the report,

that the A-B-L-L-S-R, the ABLLS-R, is not -- she called it an

autism intervention, and it's not.  It's a progress monitoring

tool.

        And she had made reference to the fact that I did not

review it as part of my evaluation.  And I talked about it that

I didn't use it because it wasn't implemented the first time in

the correct manner the way it was supposed to be.

Q.   How did you know it wasn't implemented correctly?

A.   By looking at it.  First of all, when I did review it and I

looked at it, it wasn't filled in the right way, and talking

1    with teachers about how it was administered the first time.  So

2    I disregarded it from the very beginning.

3    Q.  Okay.  So you didn't look at it because it wasn't done

4    right?

5    A.  Yeah.

6    Q.  Move on.  What's your next point?

7    A.  My IEE, which is the independent educational evaluation,

8    consisted of --

9            THE COURT:  Doctor, slow down to five miles an hour.

10           THE WITNESS:  Sorry.

11           The IEE consisted of a social skills assessment and

12   adaptive behavior scale.  That's in reference to her report

13   saying that I didn't use scales that were norm referenced with

14   kids with autism, and the point being that there are very few,

15   if any, normed reference tests that are normed on children with

16   autism that are used -- that are validated to be used with kids

17   in schools.

18   Q.  (BY MR. LASSEN)  So your point regarding that criticism is

19   what?

20   A.  That there are none.

21   Q.  Okay.  Your next point please.

22   A.  Finally, she suggested that a normed reference IQ

23   assessment should have been completed, which I did not

24   complete.  However, there are -- that comes in direct -- it

25   confounds what she had previously said, that no IQ test is

1    normed reference with students with autism either.  And his IQ

2    wasn't in question.  We weren't talking about placement.  We

3    weren't talking about categorization of autism.  It was

4    specifically about skills.  And IQ doesn't point towards

5    intervention.

6    Q.  Okay.  Your next point?

7    A.  That is -- The next point is comments on why parental

8    history wasn't included, because she made the comment that I

9    didn't talk about parental history.  And the goal of my

10   evaluation, the reason that wasn't included was the goal of my

11   evaluation was current behavior and education.  And none of

12   the, in the records and in talking with staff and the parents,

13   nothing that was brought up to me made -- had any relevance to

14   what was currently happening behaviorally in the school.

15   Q.  Okay.  Your next point?

16   A.  Definition of what was completed in the IEE and the FBA

17   components, that I conducted an FBA, a functional behavioral

18   assessment.

19          The report notes that no direct assessment was

20   conducted with Cody during my evaluation.  However -- And the

21   point she was making there was that I did not sit down with

22   Cody at a table and do a test.

23   Q.  Why did you not do that?

24   A.  I didn't need to.

25   Q.  Why not?

1   A.  Because the skills and the rating scales that we use to

2   monitor that, I was having teachers fill out, I was having

3   parents fill out.  And what I did was six to eight hours of

4   observation.  I observed him.  I got to see what he was and was

5   not doing.

6          None of the testing that she would suggest that I did

7   would have been relevant to determining what we should be

8   working on, what skills to work on.

9   Q.  Okay.  And your next point?

10  A.  Comments on the current IEP that Ms. Burgess and I only

11  consulted to the IEP goals.  One of the comments she made was

12  that the current IEP had very inaccurate measurement

13  procedures, like 999 out of a thousand he would have to meet to

14  make progress.  And the point I was making here was that Carey

15  and I did not write the IEP, that we consulted to the team.

16  Q.  Was that a mistake in --

17  A.  I think it was a miscommunication from the meeting.

18  Q.  Okay.  Your next point please?

19  A.  There was no record of any ongoing database, measurable

20  yearly assessment, or ongoing data collection to base whether

21  or not progress was made of any of Cody's measurable IEP goals.

22  Q.  What does that mean?

23  A.  That's basically what we've been talking here, that all of

24  his IEPs from 2003 through 2006, there was no documentation or

25  documented data collected to prove progress or to support the

1    progress reports that were saying he was making progress.

2    Q.   And your next point?

3    A.   That a significant amount of data was collected last year

4    by paraprofessionals and a speech therapist to have accurate

5    baseline figures.  So one of the things that she was talking

6    about was that we didn't collect baseline, and we didn't have

7    any set standard when we started with the IEE.  And that's what

8    I'm saying here wasn't true.  We had data, and we taught the

9    paraprofessionals and the teachers how to collect data.

10   Q.   Okay.  Your next point?

11   A.   More important to the measurement criteria is actually

12   collection of data.  So one of the things we were talking about

13   or she had said was that there was measurement criteria for

14   many of the goals in the IEP.  And my point was that having it

15   in there is one thing, which most of the goals did not have,

16   but having it in there is not enough.  You have to collect the

17   data to prove or to support the documentation, that simply

18   putting in an IEP that you're going to measure using the

19   Brigance does not -- isn't enough.  You have to do the

20   Brigance.

21   Q.   Should there be evidence in the records of doing the

22   Brigance?

23   A.   Yes.

24   Q.   And there was not in this case?

25   A.   And I would say, to clarify, it wouldn't necessarily have

1    to be the Brigance but that there was some formal data

2    collected to ensure support.

3    Q.  Your next point?

4    A.  I'm not aware -- These were comments on claims that she

5    made about children with autism displaying new skills.  And it

6    says that she made a comment that when, quote, when enough of

7    the prerequisite skills have been acquired, children with

8    autism may show a leap in progress.

9              And that's simply not true.  There's no data or

10   evidence scientifically to prove that or to support that.

11             The report is suggesting -- I write that the report is

12   suggesting the significant progress he's made since I and Carey

13   have been involved was not because of what we were doing but

14   because of past -- his 2003, 2004, 2005 academic interventions

15   that he, all of a sudden, since we were involved, he was making

16   progress because of that and not because of what we were

17   teaching.

18   Q.  And you disagree with that?

19   A.  I definitely disagree.

20   Q.  Why is that?

21   A.  Because I have data baseline measurement before we were

22   involved or when we were getting involved until today, and I

23   can -- it proves progress.

24   Q.  I think she used the word shelved skills?

25   A.  That's the next point, that she, quote, says children with

1  autism shelve skills while learning new ones and that these

2  skills reemerge in a more sophisticated, complex rendition.

3  And that, again, is unfounded and un -- There's no research or

4  any evidence documenting that that actually happens.

5       And, if anything, it's opposite, that children with

6  autism, when they don't show a skill, they lose it.  They don't

7  not show it and then happen to show it three years later in a

8  more -- specifically a more complex rendition.

9  Q.  When you say if anything, it's just the opposite, what is

10 that based on?

11 A.  Research.  Kids, it's very, very clear that kids with

12 autism when they -- Many kids with autism, not all, but many

13 kids with autism, when they stop receiving services or they

14 stop using a skill, it goes away.  And it's what we would

15 call -- we could call regression.  They've regressed.  And

16 that's not necessarily with kids with autism.  That's with all

17 kids.

18      Look at -- We look at what typical students over

19 summer break.  They lose skills because they're not using them,

20 and they take time to remedy.  They don't come back from summer

21 break and leaving knowing double digit addition and come back

22 after summer without school knowing multiplication.  And that's

23 essentially what she's saying.

24      The second to last --

25 Q.  Yes.

1    A.   -- bullet point?

2            The report also states that the skills that are most

3    easily acquired in this manner, if possible, are those that

4    require little language and are easily modeled.   However,

5    Cody's made the most recent progress in the opposite areas of

6    language.

7            So what she was saying was things that, if that was

8    true, things that he would make a lot of progress with wouldn't

9    be language, and he is making progress on language.

10   Q.   And what do you draw from that?

11   A.   That he needed the intervention, the methodology we were

12   using to get where he is.

13           And then the final one?

14   Q.   Yes.

15   A.   Cody does not have problems with generalizing skills as

16   noted as a reason for slow skill development.   So she made the

17   point that children with autism have a difficult time -- most

18   kids with autism have a difficult time generalizing a skill

19   from one environment where they were taught, say, school to

20   home.

21           And the point she was trying to make was that that's

22   why he's made such slow progress, because he doesn't

23   generalize.

24           However, again, we have proven that he can generalize

25   and that we've seen him use his new language skills in the

1    classroom, outside, at home, in different environments, so he

2    is generalizing.

3    Q.  So you disagree with that proposition?

4    A.  I do.

5    Q.  Now, you have mentioned that at several points in time that

6    you have an orientation of ABA or applied behavior analysis.

7    What does that mean?

8    A.  Applied behavior analysis is the science of behavior.  It

9    is using basic research, experimental research, and applying it

10   to socially significant issues in the natural context.

11   Q.  Okay.  And what implications does that have for the

12   education of children with autism?

13   A.  Applied behavior analysis or ABA is one of three

14   methodologies or -- ABA is, again, it's difficult to define.

15   It is a science.

16   Q.  Okay.

17   A.  Techniques that are applied behavior analytic are heavily

18   researched and basically the only methodologies that have

19   evidence based, that are considered evidence based or proven to

20   be effective for kids with autism.

21   Q.  You mentioned there was three different --

22   A.  ABA is, in general, ABA, applied behavior analysis, PRT,

23   which is pivotal response treatment or teaching, and discrete

24   trial training, which we would call DTT, are three

25   methodologies all under the umbrella of applied behavior

```
 1   analysis that have been scientifically ruled as evidence based

 2   for children with autism.

 3   Q.   Okay.  What other methodologies are you aware of out there

 4   to educate autistic children?

 5   A.   There's a number.  There are what we would call PECS,

 6   P-E-C-S, picture exchange communication systems.  There is the

 7   TEACCH model, which is out of North Carolina.

 8   Q.   What is that?

 9   A.   It is -- The TEACCH model is -- it falls under what we call

10   structured teaching.  It is -- There is research out there on

11   its effectiveness, but it's not proven to be effective.  But

12   it's a way of setting up, specifically, it's a way of setting

13   up the environment so children with autism are more successful.

14   Q.   Okay.

15   A.   But it's not necessarily a methodology.

16   Q.   What about the term eclectic method?  Are you familiar with

17   that?

18   A.   Well, the term eclectic in the field of applied behavior

19   analysis is a bad word.

20   Q.   Why is that?

21   A.   Because it references using multiple methodologies to teach

22   a child with autism when we know there are certain

23   methodologies that work and certain that don't.

24   Q.   What's wrong with using multiple methodologies?

25   A.   Because if you're using -- Nothing is wrong with using
```

1    multiple methodologies as long as they're all proven to be

2    effective.  When you're using multiple methodologies and one of

3    them or two of them or half of them or all of them aren't

4    effective, then you're wasting time.

5    Q.  What if the teacher prefers a particular methodology?  Is

6    that okay?

7    A.  For me, as long as that methodology --

8           MS. STATON:  Excuse me, Your Honor.  Let me just

9    object as relevance.  The question is it okay?

10          THE COURT:  I'm trying to relate that to our legal

11   standards.

12          MS. STATON:  I am too.

13          THE COURT:  I'll sustain that as an objection to the

14   form of the question.  You can rephrase it.

15   Q.  (BY MR. LASSEN)  If prior teachers during, say, '04-'05 had

16   stated they like to pick and choose methodologies based upon

17   what they personally prefer, would that be an acceptable

18   approach?

19   A.  If the methodologies they chose were proven effective.

20   Q.  Now, in terms of data collection, is that -- how often does

21   data collection need to occur?

22   A.  It depends on the behavior or the skill.  Typically daily,

23   if not every other day.

24   Q.  Okay.  Does it -- Can you -- Do you have to do it

25   contemporaneously with the behavior you're attempting to

1    measure?

2    A.   Yeah.  Data is dependent on the behavior or the skill being

3    taught.  If it's a skill that we know will take a long period

4    of time to master, we want frequent -- I think the word we

5    would use would be frequent and whatever is frequent for that

6    behavior.  If we're talking about problematic behavior that

7    only happens once a month, a tantrum, I'm not going to have to

8    take data every day.  But if I'm teaching a new skill of

9    washing hands, I'm going to take data every time he washes his

10   hands.

11   Q.   Who ought to be taking the data?

12   A.   Whoever is working with the child.

13   Q.   What if the aides are the ones that are working with the

14   child?

15   A.   In our case, we've taught the aides how to take data.

16   Q.   Is that a preferred method as opposed to, say, the teacher

17   at the end of the day doing it?

18   A.   The preferred manner is whoever is directly observing the

19   behavior needs to be recording the behavior.

20   Q.   What if that's not occurring?

21   A.   Then if you're not collecting data, again, you're unable to

22   make databased decisions.

23   Q.   And the consequence of that is what?

24   A.   The consequence could be the -- not making progress or

25   not -- or learning a skill or teaching a skill that can't be

1    taught or teaching a skill that can't be learned and, again,

2    wasting academic engagement time.

3    Q.  Is it your opinion that that happened to Cody in the years

4    in question?

5    A.  I do.

6          MR. LASSEN:  Thank you.  That's all I have.

7          THE COURT:  All right.  Ms. Staton.

8          MS. STATON:  Thank you, Your Honor.

9                        **CROSS-EXAMINATION**

10   **BY MS. STATON:**

11   Q.  Sir, the court reporter may have been able to keep up with

12   you, but I had a struggle.  So I'm going to ask you to slow

13   down so I'm sure I understand what you're saying.

14   A.  Sure.

15   Q.  Sir, you're not certified to teach in the State of Arizona;

16   is that correct?

17   A.  Yes, it is correct.

18   Q.  And you've never been certified to teach in any public

19   school in the country; is that true?

20   A.  Yes.

21   Q.  You don't hold any certificate from the Arizona Department

22   of Education in the area of special education, do you?

23   A.  I do.

24   Q.  In terms of special education to teach in a public school?

25   A.  Not in terms of as a school psychologist.

1    Q.  Let me phrase it and make it very clear.

2            You do not hold any certificate to teach special

3    education students in an Arizona public school; isn't that

4    correct?

5    A.  True, yes.

6    Q.  Now, as I understand from your resume, which I believe has

7    been stipulated into the record, is that you attended Illinois

8    State University?

9    A.  I did.

10   Q.  And that's where you did your graduate work; is that right?

11   A.  Yes.

12   Q.  There was a school that was run by the university; is that

13   right?

14   A.  Yes.

15   Q.  It was a public school?

16   A.  It was a laboratory school.

17           THE COURT:  Excuse me, Ms. Staton.  Where is Illinois

18   State University?

19           THE WITNESS:  Normal, Illinois.

20           THE COURT:  Where is that?

21           THE WITNESS:  Central Illinois, 45 minutes from

22   Champaign-Urbana, where the University of Illinois is.

23           THE COURT:  All right.  Go ahead.

24   Q.  (BY MS. STATON)  Okay.  Sir, it was a laboratory school?

25   Is that what you said?

1    A.   Yes.

2    Q.   It was not a public school?

3    A.   No.

4    Q.   And so during your tenure while you were going through

5    graduate school, you were not teaching in a public school as a

6    part of your work at the University of Illinois; is that right?

7    A.   I was not teaching.

8    Q.   Okay.  And so how -- Let's see.  You've had your Ph.D.

9    since 2007?

10   A.   August of 2006.

11   Q.   Okay.  2006.

12          At any point in your career, sir, have you taught in a

13   public school?

14   A.   No.

15   Q.   I understand from your earlier testimony that from time to

16   time you make recommendations to schools regarding IEPs; is

17   that right?

18   A.   Yes.

19   Q.   That means you attend meetings, true?

20   A.   Yes.

21   Q.   Those are with the parents and with teachers and staff from

22   the respective schools?

23   A.   Yes.

24   Q.   You make recommendations?

25   A.   Yes.

1    Q.   So you're just one of a group of educators -- Along with

2    educators, you're one of a group that then makes

3    recommendations, and an IEP is then developed; is that right?

4    A.   Typically, yes.

5    Q.   You've never actually had the responsibility to write an

6    IEP, have you?

7    A.   I've never had the responsibility to in that I am not -- I

8    do not work or I did not work for the public school.  But I

9    have been asked by the school to write IEPs.

10   Q.   You've never authored an IEP, have you?

11   A.   Not for Prescott.

12   Q.   Well, actually, sir, let me just see if I can refresh your

13   memory for just a second, sir.  Do you remember when my

14   partner, Ms. Love, asked you some questions, and she asked you

15   if "During your career as a licensed school psychologist have

16   you yourself ever authored an IEP?"  And you responded "I have

17   never authored --" and then you asked "What do you mean

18   authored?"  And she said, "Where you actually wrote an IEP."

19   And you responded "No."

20   A.   So to clarify, I have never authored, in those terms,

21   authored an entire IEP, but I have written IEP goals and

22   objectives.

23   Q.   Sir, that wasn't my question.  My question was have you

24   ever authored an IEP, written an IEP?

25   A.   No.

1   Q.  Now, have you ever had the responsibility to teach any

2   child in a public school in conformity with an IEP?

3   A.  Yes.

4   Q.  You've actually taught in a public school in conformity

5   with an IEP?

6   A.  Yes.

7   Q.  Which public school have you taught in, sir?

8   A.  Multiple schools.  When you -- When you say teach --

9   Q.  I mean teach --

10  A.  I'm not certified.  I'm not a teacher.  I'm not hired as a

11  teacher, but I consult to schools, and sometimes that

12  consultation requires me to teach a child.

13  Q.  Sir, it's only in your capacity on a limited basis that you

14  would actually go into a school and, quote, teach, unquote, a

15  child; is that right?

16  A.  Yes.

17  Q.  That means you didn't go there every day, Monday through

18  Friday, for an entire day to teach a specific student?

19  A.  No.

20  Q.  Isn't that right?

21  A.  That is right.

22  Q.  Okay.  Now, the first time you actually saw Cody was in

23  about September of 2007; is that right?

24  A.  Yes.

25  Q.  Now, you don't know -- I mean, that's the first time you

1    saw him.  You never had any contact with Mr. or Mrs. Parenteau

2    or anybody from the school district regarding Cody, fair?

3    A.  Yes.

4    Q.  Prior to that time?

5    A.  Yes.

6    Q.  Now, you don't know how he presented to the school in

7    August of 2003, do you?

8    A.  Only from teacher and parent and administration report.

9    Q.  So based on the written documents?  That's all you had?

10   A.  And interviews.

11   Q.  You didn't interview the teachers from 2003-2004, did you?

12   A.  No.

13   Q.  You don't know what events were occurring in Cody's life

14   between August of 2003 and September of 2007 when you met him;

15   isn't that true?

16   A.  Only what was in the records.

17   Q.  And if home issues were not contained in the records, then

18   you weren't aware of them, right?

19   A.  No.

20   Q.  That would be fair?

21   A.  That would be fair.

22   Q.  Now, the district did make arrangements for you to visit

23   the classroom and observe Cody; is that right?

24   A.  Yes.

25   Q.  You found the staff to be dedicated?

1    A.   Yes.

2    Q.   You saw them making an effort to help Cody?

3    A.   Yes.

4    Q.   You said that they were inviting to you?

5    A.   Yes.

6    Q.   They were willing to listen to recommendations that you

7    made?

8    A.   Yes.

9    Q.   And at the time Cody was demonstrating a number of

10   behavioral problems; is that right?

11   A.   Yes.

12   Q.   One of which was the flopping or dropping to the floor?

13   A.   Yes.

14   Q.   Do you know how long he's had those problems or that

15   particular problem?

16   A.   For as long as I've known him, and using -- from teacher

17   report, when I did my evaluation, for as long as they had known

18   him.

19   Q.   Did you go back and even look at the California documents,

20   the IEPs from California which were part of his educational

21   records at Prescott?

22   A.   I reviewed every document in his -- in his record.

23   Q.   And that would have included the school district?  I think

24   it was Capistrano Unified School District?

25   A.   Yes.

1   Q.  Did you note in there when he was flopping when he was a

2   young boy, two and three years old, at that school district?

3   A.  I don't remember doing it, but it doesn't surprise me.

4   Q.  Now, you actually observed him for about 10 to 12 hours; is

5   that about right?

6   A.  The evaluation -- The whole -- I can't remember exactly.  I

7   would have to go back and look at invoice about how many exact

8   hours I was in the actual school.  But I visited the school for

9   two entire school days.

10  Q.  And that means that you were observing him for probably 10

11  to 12 hours?

12  A.  Approximately.

13  Q.  Now, you never worked directly with Cody; is that right?

14  A.  For the evaluation?

15  Q.  Correct.

16  A.  During the evaluation I never did work directly with Cody.

17  Q.  And when you went into the school district, I think you

18  said you returned every other week for -- and you've been doing

19  that since January of 2008?

20  A.  Yes.

21  Q.  Okay.  You consult with the staff when you go to the

22  district; is that right?

23  A.  Yes.

24  Q.  But you don't ever work directly with Cody?  It's more

25  directed to the staff.  Is that right?

1    A.   No.   I do work directly with Cody.

2    Q.   Well, sir, let me ask you this:  Do you remember the

3    question that was asked by Ms. Love during your deposition?

4    And the question was, at Page 132, "And since we last met, have

5    you had the opportunity to work directly with Cody?"

6         And your answer was "I wouldn't say I ever worked

7    directly with him.  I consult -- I work with him every other

8    week, but I'm training, more training his staff on how to

9    implement."

10        Isn't that what you're doing?

11   A.   Yes.  And part of training staff is to model the skill.

12   And so in that sense, I'm working -- I am having contact with

13   Cody.  I'm not teaching him a skill.  I'm modeling a skill with

14   Cody for staff.

15   Q.   Exactly.  But you're not actually taking responsibility for

16   teaching a skill to Cody; isn't that true?

17   A.   True.

18   Q.   And you've never undertaken personal responsibility to

19   teach Cody any particular skill, have you, sir?

20   A.   No.

21   Q.   That would be correct?

22   A.   Yes.

23   Q.   Now, during the time that you consulted with the school

24   district, you made certain recommendations, is that right, not

25   only to them but also to the parents?

1    A.  Yes.

2    Q.  And one of the recommendations you made to Mr. Parenteau

3    and to Mrs. Parenteau was that they themselves get training?

4    A.  That --

5            MR. LASSEN:  Objection, relevance to what -- the

6    parents' training to the issues here.

7            THE COURT:  Well, I think I see the relevance, but,

8    Ms. Staton, would you state the relevance.

9            MS. STATON:  Well, the relevance is he's talking about

10   the way in which the school was deficient in the lack of

11   training and also his current status.  And so I'm getting to

12   the current status as to how Cody is currently operating and

13   the lack of the parents' involvement in this entire process.

14           THE COURT:  All right.  Overruled.

15   Q.  (BY MS. STATON)  Sir, you recommended that Mr. Parenteau

16   and Mrs. Parenteau get training; isn't that true?

17   A.  In the initial evaluation.

18   Q.  And neither Mr. Parenteau or Mrs. Parenteau attended either

19   of the first two trainings that you gave; isn't that true?

20   A.  Neither the trainings that I gave.

21   Q.  That's what I asked you, sir.

22   A.  Yes.

23   Q.  And as a matter of fact, Mr. Parenteau didn't come to any

24   training, did he?

25   A.  No.

1   Q.  That's true?

2   A.  True.

3   Q.  You suggested that there could be in-home training; is that

4   right?

5   A.  Yes.

6   Q.  And neither asked for in-home training; isn't that true?

7   A.  Neither asked from me.

8   Q.  And you never provided it, did you, sir?

9   A.  I did not.

10  Q.  Even though you recommended it?

11  A.  I'm not aware of recommending in-home training.  I am aware

12  of recommending parent training.

13  Q.  And irrespective of how it's described, they didn't avail

14  themselves of training from you, did they, sir?

15  A.  They did not.

16  Q.  Now, I want to ask you -- Let me just move down here just a

17  second.  Before you wrote your reports, your initial report in

18  June or the supplemental report that you just talked to Judge

19  Wake about in August, you didn't have the benefit of any --

20  either of the Parenteaus' depositions, did you?

21  A.  I did not.

22  Q.  So those reports were written without that information,

23  true?

24  A.  Yes.

25  Q.  Sir, do you agree that when you're dealing with an autistic

1    child, there has to be consistency in the way that child is

2    dealt with between the home and the school?

3    A.  Your question is does there have to be?

4    Q.  Well, let me rephrase it, make it seem more clear.

5           In order to effectively teach an autistic child, does

6    the home and the school need to work together consistently in

7    how they approach that child?

8    A.  It is not -- It is not a must.  It's a -- It's a good

9    practice, but a child with autism can still learn if there's no

10   communication between home and school.  There's nothing about

11   the learning process.

12   Q.  I'm talking about the way the child learns.  If the child

13   is treated in one way at home and another way at school in the

14   way the adults interact with him, that can cause difficulty

15   with the child actually progressing, true?

16   A.  In certain circumstances, yes.  Not always.

17   Q.  The best thing is to have everybody on the same page, and

18   so all the adults are acting in the same consistent manner with

19   the child; is that fair?

20   A.  Typically.

21   Q.  So that means the teachers would interact with the student

22   in a certain way, and hopefully the parents would mirror that

23   same approach?

24   A.  Yeah.  Again, it's typically good, but it's not necessary

25   for learning to take place.

1    Q.  Sir, you don't know what the Parenteaus were doing at home

2    in the way they interacted with their son between 2003 and

3    2006, do you, sir?

4    A.  I do not.

5    Q.  And you don't know if they mirrored the techniques that the

6    teachers were using, do you, sir?

7    A.  I do not.

8    Q.  Do you agree that parents have an obligation to do whatever

9    they can do to make certain that certain social goals are met

10   with the child?

11   A.  Do they have a responsibility as pertains to an IEP?

12   Q.  Well, do they have a respon -- Yes.  Yes.

13   A.  I think they have a responsibility as they are part of the

14   IEP team.

15   Q.  Correct.

16   A.  But currently an IEP is a school-based document, and it

17   doesn't require anything.  IDEA requires parent participation,

18   but it doesn't require parent implementation of anything.

19   Q.  So the parents are only, under the IDEA, are only obligated

20   to show up and participate or at least be invited to

21   participate?

22   A.  True.

23   Q.  But whether they themselves follow through with any of the

24   techniques that are discussed or the goals, the IDEA doesn't

25   even address that?

1    A.   There's no legal obligation for it.

2    Q.   Leaving aside legal obligations, do you agree that they

3    have an obligation to work with their child to meet those

4    social goals such as getting dressed, drinking out of a cup,

5    using the bathroom?

6    A.   I agree to -- that a parent has the obligation to work on

7    those social goals as it pertains to parenting.

8    Q.   Do you agree that the school cannot be the only source for

9    training a child?

10   A.   It should not, but it's not, again, it's not necessary to a

11   child's development.

12   Q.   Well, are you saying, then, the parents do bear some

13   responsibility?

14   A.   No.  I'm saying that the more opportunities a child has to

15   learn a skill, typically the better or faster they can learn

16   that skill.  But it does not, by having fewer opportunities,

17   does not mean they will not gain the skill.  It might mean --

18   And it's very dependable on the skill being taught and the

19   child specifically and the environment he's in.  Everything

20   depends.

21   Q.   Well, what you're saying is that the progress may be much

22   more slow?

23   A.   May be much more slow.

24   Q.   Okay.  Now, I think you testified in response to questions

25   by Mr. Lassen that any child loses some academic progress when

1    they're not in school for a significant period of time.  Is

2    that true?

3    A.  Any child -- It does not happen for every child, but it

4    could happen for any child.

5    Q.  There are peaks and valleys in learning.  You would agree

6    with that?

7    A.  Yes.

8    Q.  For example, like summer school, usually the first week

9    after you come back after summer school, they have to teach you

10   how to add and subtract all over again?

11   A.  For some kids, yes.

12   Q.  And do you agree that that same -- that same situation

13   applies to autistic children that if they're not being

14   constantly taught, they tend to lose skills?

15   A.  Yes.

16   Q.  Sir, did you look at Cody's attendance records during the

17   period of 2003 through 2006?

18   A.  For -- I did not.

19   Q.  So as you sit here, you don't know how often he was

20   actually in school, do you?

21   A.  I do not.

22   Q.  You would agree that continuity of service is extremely

23   important?

24   A.  Yes.

25   Q.  And if there are breaks in that service, then that can

1    affect the progress of a child?

2    A.  Can.

3    Q.  Now, one of the ways to ensure that a child maintains

4    progress that has been achieved is to provide additional like

5    summer school type programs; isn't that true?

6    A.  Summer school programs are typically put in place to

7    maintain a -- the current level of performance.

8    Q.  Right.  And that's the extended service year, right?

9    A.  Extended school year, yes.

10   Q.  And what that means is that a school can recommend that a

11   child be given services during a summer so that they maintain

12   their academic achievements or their social achievements, their

13   communication and language skills, right?

14   A.  That's what ESY is for, yes.

15   Q.  Are you aware that the Parenteaus were given the

16   opportunity in the summer of 2005, during the three-year period

17   we're talking about, to enroll their child in a summer program?

18   A.  I was.

19   Q.  The ASSIST program, are you aware of that?

20   A.  I'm not -- I have heard about it.  I've never visited or am

21   not completely aware of it.

22   Q.  Are you aware if -- strike that.

23        Ms. Burgess, she's someone you met as a result of

24   interacting with the Prescott Unified School District, right?

25   A.  Yes.

1    Q.  Do you know if she's given any training to the folks at

2    ASSIST?

3    A.  I do not know.

4    Q.  Are you aware that the Parenteaus pulled their child out of

5    the program that was offered to them during the summer of June,

6    2005?

7    A.  I am aware.

8    Q.  And you know, do you not, that Cody did not receive any

9    other services during that summer?

10   A.  I did not know if he received services at home or not.  All

11   I know is he was pulled out of the ASSIST program.

12   Q.  You certainly didn't see anything in any educational

13   records that you reviewed that indicated that he was given

14   something other than the ASSIST program?

15   A.  By the school, yes.

16   Q.  If an autistic child loses a substantial amount of time in

17   school, does their progress diminish?

18   A.  Typically.  I think the question is what's substantial?

19   And I think that question is different for each child.

20   Q.  Are you aware that the Parenteaus refused to let Cody

21   attend school in August to September of 2006?

22   A.  I am aware.

23        MR. LASSEN:  Objection.  Relevance.  That's outside

24   the relevant time period.

25        THE COURT:  What's the relevance?

1      MS. STATON:  Because Dr. Gentry has offered the

2  opinion that Cody was at a certain level, and he's attributed

3  it to the type of education he received in '03 through '06.

4  And it's our position that if the Parenteaus had allowed their

5  child to continue with that education, they wouldn't have seen

6  that, quote, drop, unquote, that Dr. Gentry has testified all

7  morning about.

8      THE COURT:  Well, all right.  I think it's relevant.

9  I'll give it the weight it deserves.  Overruled.

10  Q.  (BY MS. STATON)  Sir, you're aware of that, are you not,

11  that is, that the Parenteaus pulled their child out of public

12  education for six weeks?

13  A.  Yes, I'm aware.

14  Q.  Were you aware that the district offered during that time

15  to at least provide at-home services to Cody?

16  A.  I was aware.

17  Q.  Were you aware that the Parenteaus refused even at-home

18  services?

19  A.  I was.

20  Q.  Sir, do you agree that all children are affected by changes

21  to family dynamics?

22  A.  In a loose term, yes, I think everyone is affected by

23  family dynamics, but, again, it depends on the child.

24  Q.  Sure.  For example, if you have a family, and grandma gets

25  sick, and all of a sudden she comes and lives with the family,

1   that can be disruptive, and you can see changes in the child's

2   behavior because of that?

3   A.   Maybe.

4   Q.   Okay.  By the same token, any kind of a stressful situation

5   can affect a child.  Would you agree with that?

6   A.   It can.

7   Q.   Well, for example, if parents are separated, and a child

8   then is shuttled between two homes for an extended period of

9   time, that can affect a child, can it not?

10  A.   In what way?

11  Q.   Well, emotionally.

12  A.   I would say it could.  Again, it could affect them

13  emotionally.

14  Q.   Academically?

15  A.   If your definition of academics is score on a test, yes.

16  Q.   Or behavior problems?

17  A.   Potentially.

18  Q.   You're aware, are you not, that the Parenteaus were

19  separated for a six-month period during the years that's the

20  subject of this lawsuit?

21           MR. LASSEN:  Objection.  That's really irrelevant to

22  the issues in this.

23           THE COURT:  Overruled.

24           THE WITNESS:  I am aware.

25  Q.   (BY MS. STATON)  And because you didn't know Cody at the

UNITED STATES DISTRICT COURT

1    time, you have no idea as to what effect that had on him, do

2    you?

3    A.  I do not.

4    Q.  You talked about applied behavior analysis.  And if I

5    understand your testimony, the ABA -- that's the acronym for

6    it -- is a methodology used to change behavior?

7    A.  It's a --

8    Q.  In its broadest sense?

9    A.  It's a science of behavior.

10   Q.  It's not a teaching model, is it?

11   A.  It is a method -- It is a science under which teaching

12   methods are developed.

13   Q.  Okay.  But it's a behavior modification approach?

14   A.  It is the -- I think you had mentioned the word Skinnerian.

15   It is a science of behavior.  It's not a methodology.  It's a

16   science in its broadest terms.

17        THE COURT:  If I can interrupt, do you endorse the

18   adjective Skinnerian for it maybe in a semi-poetical way?

19        THE WITNESS:  I think the reason I would say

20   Skinnerian is he's considered the father of applied behavior

21   analysis in that he was the first well-known psychologist or

22   researcher to work in experimental behavior analysis, which now

23   has turned into, in our field, in the applied field, applied

24   behavior analysis.

25   Q.  (BY MS. STATON)  But I think you've adopted it.  That's

1    what I understand.

2    A.   I have adopted applied behavior analysis.

3    Q.   Okay.  I understand what you've said.

4             Now, if I understood what you said in response to

5    Mr. Lassen's questions, you said there are other methodologies

6    besides ABA; is that right?

7    A.   Yeah.  There are plenty.

8    Q.   And you talked -- I'm sorry.  There are plenty?

9    A.   I mean, you could -- There are other --

10             For teaching children with autism or methodologies in

11   general?

12   Q.   I'm talking about methodologies for teaching children with

13   autism.

14   A.   There are multiple methodologies, yes.

15   Q.   So ABA is not the only methodology?

16   A.   It is, yeah, it is just one.

17   Q.   And you mentioned some of them, which is the picture

18   exchange communication system?

19   A.   Yes.

20   Q.   And the TEACCH, you said, is a model -- you've described it

21   as a model which is structured?

22   A.   It's -- It falls under the methodology of structured

23   teaching.

24   Q.   And there are others beyond that; is that true?

25   A.   Yes.

Q.  But your training is in ABA, and so you are very firm in

your belief that that's the approach that should be taken?

A.  No.  I'm trained in many of the methodologies.  Again, I

need to clarify for everyone that there is an over -- a broad

definition of ABA as a science of behavior.  There's also a

methodology of ABA by taking some of those --

Q.  I understand.

A.  Right.  The other methodologies utilize that science of

ABA.  So I'm trained in many different methodologies under the

science of ABA, but, yes, under the science of ABA, that's

where I'm trained, and I have worked there.

Q.  And you've talked about some of these other methodologies,

and you've described them to the Court, and we have here today

with the PECS and the TEACCH model and some of these other

models.  Is that fair?

A.  Yes.

Q.  Okay.  And you said -- and I think I wrote it down

correctly -- there's nothing wrong with using multiple

methodologies?

A.  If they are -- If each of the methodologies you're using

are evidence based.

Q.  Now, let me talk to you a little bit about the IEPs that

you discussed here today.  You were critical of the IEPs that

were created for Cody during the 2003-2006 school year; is that

right?

1   A.   Yes.

2   Q.   All right.  One was Exhibit 10.  Sir, do you have that in

3   front of you still?

4   A.   I do not.

5   Q.   Perhaps we could give Exhibit 10 -- Now, one of the first

6   things that Mr. Lassen asked you was in Exhibit 10 to look at

7   the IEP team meeting participants.

8   A.   Yes.

9   Q.   All right.  And Mr. Parenteau was there along with the

10  special education teacher and the LEA representative and the

11  speech and occupational therapist; is that right?

12  A.   Yes.

13  Q.   All right.  The IDEA -- Well, strike that.  Let me back up.

14          The teacher, the special education teacher is Jana

15  Harlow?

16  A.   Yes.

17  Q.   Have you reviewed her educational records?

18  A.   I have not.

19  Q.   Have you ever met Jana Harlow?

20  A.   I have not.

21  Q.   Do you know anything about her experience in teaching

22  autistic children?

23  A.   I do not.

24  Q.   The IDEA does not require a member of the IEP team to be an

25  expert in autism; isn't that true?

1    A.  That is true.

2    Q.  There's no requirement that a Ph.D. be a member of the

3    team?

4    A.  No.

5    Q.  Okay.  All that's required is that the members of the team

6    that are listed be involved in developing the IEP?

7    A.  Yes.

8    Q.  And the IDEA requires that those who develop the IEP use

9    their skills, training, and experience and their best judgment

10   in developing the plan, true?

11   A.  True.

12   Q.  And if we look at the other IEPs for the succeeding two

13   years, you don't know the background of any of the teachers

14   that were involved in developing the IEPs, do you?

15   A.  I do not.

16   Q.  So you don't know what their experience was with respect to

17   teaching autistic children, do you?

18   A.  I do not know their experience to teaching children with

19   autism.  What I --

20   Q.  No, sir.  You've answered the question.  I mean, you don't

21   know their experience; isn't that right?

22   A.  Yes.

23   Q.  Okay.  Now, the goals, let's talk about the goals here for

24   just a second.

25            THE COURT:  Well, before you start, Ms. Staton, maybe

1    this is a good time to break.  We'll take the lunch break until

2    1:15.

3              MS. STATON:  All right.  Thank you.

4              THE COURT:  Thank you.

5         (Proceedings recessed from 11:50 a.m. until 1:15 p.m.)

6              THE COURT:  Ms. Staton, you may continue.

7              MS. STATON:  Thank you, Your Honor.

8    Q.  (BY MS. STATON)  Sir, I understand from your prior

9    testimony that the goals of the IEPs from 2003 to 2006 in your

10   judgment were not measurable goals; is that right?

11   A.  Many of the goals.  I think, as we talked about, there were

12   some that were, but most were not.

13   Q.  Okay.  And one of the examples -- I think you've got

14   Exhibit 10 in front of you, do you not?

15   A.  Yes.

16   Q.  One of the examples that you used was, well, the goal

17   for -- which was the 2000 -- October 8, 2003, IEP at Page 6,

18   where it says develop appropriate work habits, and you said,

19   well, I don't know what develop is, I don't know what

20   appropriate is, and I don't know what work habits are.  Is that

21   right?

22   A.  Yes.

23   Q.  Underneath there there are some very specific things, are

24   there not, which is it's -- that Cody is to assist in or

25   independently accomplish a work task, and he should do it one

1    out of four times?

2    A.  I don't read it -- I don't think -- It's more specific than

3    the goal, but it's not specific enough.  What is a work task?

4    Q.  So you don't understand what the term work task is?

5    A.  It's not defined clearly that anyone other than the person

6    who wrote it would know what a work task is.

7    Q.  So, for example, the teacher would know what a work task

8    was, and so if they meant a work task would be to, you know,

9    pull out your chair, sit down at the table, and you would, when

10   requested, to begin to do some task, that would be a work task

11   that she would be looking for, and she would determine if the

12   child did it one out of four times, right?

13   A.  For that teacher, yes.

14   Q.  Okay.  And Cody had a teacher during 2003-2004, right?

15   A.  Yes.

16   Q.  It was Ms. Spengler?  Do you remember that?

17   A.  Yes.

18   Q.  So Ms. Spengler could observe Cody and can see if he

19   accomplished the work task, which she understood what she

20   meant, and could properly reflect that in the progress notes,

21   the quarterly progress notes, couldn't she?

22   A.  Yes.

23   Q.  Okay.  Now, when -- One of the ways --

24           As I understand, you use the term data collection a

25   lot during your testimony.  And when you use data collection,

1   you mean count, because you said --

2   A.  That's one measurement procedure.

3   Q.  Because I think you said, quote, numbers don't lie?

4   A.  Yes.

5   Q.  So you mean count.  So if, you know, you ask the child one

6   of the goals is to have them interact with another child and do

7   interactive play when they take turns, you would then count the

8   number of times that they would take turns?

9   A.  Yes.

10  Q.  You're not saying that the observation of the teacher

11  didn't occur?  You're just simply saying it wasn't tallied or

12  put down on paper?  Is that fair?

13  A.  I'm not saying it did or did not -- I didn't say it did or

14  did not occur.  I don't know if it did or did not occur because

15  there's no record of it, even observations occurring.

16  Q.  Well, let me ask it this way:  If you're a teacher, and you

17  observe Cody, for example, interact with a student, you know,

18  play back and forth interactively taking turns, and you see

19  during the day that he does it one out of four times, isn't

20  that an observation that the teacher made that he's now

21  engaging in that task one out of four times?

22  A.  I think it is an observation, but it's not counted until

23  it's documented.

24  Q.  Well, no.  It's counted.  It's just not documented.  Isn't

25  that true?

1    A.   Okay.  Yes.

2    Q.   One out of four is one out of four, whether you say it, you

3    think it, or you write it; isn't that true?

4    A.   Okay.  Yes.

5    Q.   Okay.  Now, the IDEA does not require any tally sheets,

6    does it?

7    A.   Specifically tally sheets?  No.

8    Q.   It doesn't require -- I mean, there's nothing in there that

9    says that there has to be a graph, right?

10   A.   Graph specifically, no.

11   Q.   Or charts?

12   A.   Nothing specifically.

13   Q.   Okay.  You are aware, are you not, that the teachers and

14   the aides did in fact make notes tracking the activity of Cody

15   during the applicable time period?

16   A.   Yes.

17   Q.   And you've seen those tracking logs?

18   A.   I've seen examples of the logs that were used, yes.

19   Q.   Okay.  Well, what do you mean examples of the logs that

20   were used?

21   A.   I don't think I've seen every single one, but I've seen --

22   Q.   But you've seen the logs that were used as it relates to

23   Cody?

24   A.   Yes.

25   Q.   And there were specific written notations where teachers

1    and aides wrote down what they observed, true, on a daily

2    basis?

3    A.  What they observed, yes, but not data.

4    Q.  Well, because --

5    A.  Not a frequency count.

6    Q.  They didn't do a frequency count, but we've already talked

7    about.  But you have seen the tracking logs, have you not?

8    A.  Actually I will say I did not see anything titled tracking

9    logs.  I saw anecdotal written observations of teachers.

10   Q.  Okay.  Could we hand, please, Exhibit 24.  Sir, have you

11   seen that document before?

12   A.  Specifically, no.

13   Q.  And what's the title of it, sir?

14   A.  Program tracking log.

15   Q.  What's the student's name, sir?

16   A.  Cody P.

17   Q.  And you've never reviewed this, have you?

18   A.  I may have when -- Not for the case, but I may have for the

19   evaluation.

20   Q.  All right.  So when you testified earlier today, you don't

21   remember having seen these for your testimony here today?

22   A.  These specific tracking logs, no.

23   Q.  Now, the progress report, sir, that you talked about, let's

24   just take an example.  Do you have Exhibit 11 in front of you?

25   A.  No.

1    Q.  Perhaps we could hand it to him.  Now, Exhibit 11 is the

2    quarterly progress reports that you discussed briefly with

3    Mr. Lassen; is that right?

4    A.  Yes.

5    Q.  All right.  And you've described for the Court what the

6    code is on the C1, C2, B1, B2?  You understand what they mean?

7    A.  Yes.

8    Q.  You've seen these in other school districts?

9    A.  Similar.  Like I said, lots of districts are different, but

10   I've seen progress reports from other districts, yes.

11   Q.  And they look similar to this?

12   A.  They're all very different.

13   Q.  Oh, okay.  Well, at least the ones that are used by

14   Prescott, when you look at it, there's a progress report for

15   each of the four quarters; is that right?

16   A.  Yes.

17   Q.  Now, let's take, for example, let's go to the bottom of

18   Page 1.  It says increase cooperative play skills, and then it

19   gives will play games that will involve taking turns, wait for

20   his turn, will cooperate with another child in play.

21          And it shows, does it not, that there is a steady

22   progression in the -- in the amount of time or the number of

23   times, I should say, that Cody played games taking turns and

24   cooperated with other children?

25   A.  I see the code changing.  That's it.

1    Q.   Pardon me?

2    A.   I see the code change, but I see no support for it

3    changing.

4    Q.   We've already talked, sir, about the fact that you hadn't

5    seen a program tracking log for Cody P, right?

6    A.   Yes.

7    Q.   And we've already -- you've already acknowledged that

8    whether it's written or a teacher observes it doesn't mean that

9    it doesn't happen; it just means it's not written down; isn't

10   that right?  We've already discussed that, haven't we?

11   A.   Fine, yes.

12   Q.   So you see that the progress moved from C1 -- excuse me --

13   C2 to C1, and that's an increase.  That is a progress, isn't

14   it?

15   A.   By the definition of the code, yes.

16   Q.   And then from C1 to B2 and B2 to B1, that again is

17   progress, isn't it?

18   A.   Yes.

19   Q.   Now, in the -- And as a matter of fact, sir, in some cases

20   Cody was determined to have, quote, mastered a skill; isn't

21   that true?

22   A.   Yes.

23   Q.   Now, you saw, did you not, in the progress notes for the

24   three subject years that we're talking about that there would

25   sometimes be the same object, if you will, which would be, for

1  example, interactive play 25 percent of the time, but in the

2  next year, it might be increased to 50 percent or some higher

3  percent?

4  A.  Sometimes, yes.

5  Q.  So what that would do would tell the parent that we're

6  going to try to get Cody to engage in activity more frequently

7  this year than he did the prior year, true?

8  A.  Yes.

9  Q.  And so within the parameters of that new frequency, that

10  is, a greater percent of time that he would engage in a skill,

11  they would then measure progress as to that new higher

12  frequency, right?

13  A.  Explain more.

14  Q.  Sure.  In year one if you're supposed to -- the child is

15  supposed to do something one out of four times, and in year

16  two, two out of four times, you're asking the child to do

17  perhaps the same thing but with more frequency?

18  A.  Yes.

19  Q.  And the goal, then, for that year is to move him from 25

20  percent to 50 percent?

21  A.  In that instance, yes.

22  Q.  And that's progress, because you're increasing the

23  frequency of the task at hand?

24  A.  Yes.

25  Q.  Now, could we give Dr. Gentry, please, Exhibit 13.

1    A.  13?

2    Q.  13 please.

3    A.  I have it.

4    Q.  Oh, you do have it.  Thank you.

5            Now, that's the progress note for the year 2004-2005;

6    is that right?

7    A.  It says current IEP data 10-6-04, yes.

8    Q.  Right.  And then period four starts on October of 2005, so

9    that's, like, the beginning of the following year?

10   A.  Yep, yes.

11   Q.  Now, in this particular case on this year, Cody for the

12   first three quarters or three-fourths of the year, if you will,

13   was progressing, at least according to the code, was going C2,

14   for example, C1, and then from C1 to B1, right?

15   A.  In the first objective, yes.

16   Q.  Right.  And then it took a step backward to B2?

17   A.  Yes.

18   Q.  And the same thing for all, almost all -- Everything, I

19   think, but one of those, for example, at least on the first

20   page, there was regression, was there not?

21   A.  Yes, with a code, yes.

22   Q.  And there was regression on the next page as well?

23   A.  With a code, yes.

24   Q.  And that was the fall of 2005, right?

25   A.  Yeah, through 6-02-2005 to 10-4-2005.

113

1    Q.  So the fourth quarter's in the fall of 2005.  That's the

2    one I'm focusing on, sir.

3    A.  Yes.

4    Q.  And that's the time when the Parenteaus were separated;

5    isn't that true, sir?

6    A.  Yes.

7    Q.  Now, you talked about his aides and what he's doing now.

8    Right now does Cody have two aides with him?

9    A.  Yes.

10   Q.  So the school has now given him two aides as opposed to one

11   aide?

12   A.  Yes.

13   Q.  And the one aide, based on your recommendation, is to

14   interact with Cody, and the second aide --

15   A.  It's way more than just interacting with him.

16   Q.  Well, let me put it to you this way:  Don't they switch off

17   tasks between them; one aide is interacting with Cody, and the

18   other is counting?

19   A.  Collecting data.

20   Q.  So what you've got the school doing now is you've got two

21   aides, and at any one time one of the aides is counting; is

22   that right?

23   A.  Not exactly.

24   Q.  Well, they are counting, are they not?

25   A.  They are.

1    Q.   Did you give them a clicker so they could count?

2    A.   Data sheets.

3    Q.   Okay.  So you gave them a piece of paper so they could put

4    tallies down?

5    A.   I gave them the data sheet that they could put tallies

6    down, record duration of tantrums.  They could count frequency

7    rates.  They could do a lot of different data collection

8    procedures.

9    Q.   Okay.  And that's what you mean by data collection?

10   A.   Yes.

11   Q.   All right, sir.  You don't have any information that the

12   teachers or aides from the subject time period, that is, 2003

13   to 2006, were not making observations, do you?  You don't

14   assume they weren't making observations, do you?

15   A.   I don't assume anything because there's no record of

16   anything being done.

17   Q.   Well, there is a record --

18   A.   Track -- the -- I see what you're saying.  With the

19   tracking log, yes.

20           MS. STATON:  All right.  Sir.  Thank you very much.  I

21   appreciate it.  Thank you.

22           THE COURT:  Mr. Lassen, you may redirect.

23           MR. LASSEN:  Thank you, Your Honor.

24

25

**REDIRECT EXAMINATION**

**BY MR. LASSEN:**

Q.  Dr. Gentry, do you still have that Exhibit 24 up there?

A.  I do.

Q.  And that, again, is the program tracking log?

A.  Yes.

Q.  There is a description after the columns and blocks down at the bottom.  Could you read that?

A.  "A generic program tracking log that can be used to track the student's progress for most of the programs in the book."

Q.  Does it identify what book it is?

A.  "Navigating the Social World:  A curriculum for individuals with Asperger's Syndrome, High Functioning Autism, and Related Disorders."

Q.  Is any of that accurate to Cody?

A.  His diagnosis specifically, no.

Q.  Now, can you tell from this who filled this out?

A.  From the first page I'd have to look through, no.

Q.  Can you tell the actual date and year that that was prepared?

A.  Just the month and date, not year.

Q.  Now, you were asked several questions by Ms. Staton about a teacher making observations and reporting progress.  Is that of any -- in the fashion that we've been talking about all day here.

1              Of what benefit is that to a successive teacher?

2              MS. STATON:  I'm sorry.  I missed that, Your Honor.

3              THE COURT:  Could you state that again please.

4   Q.  (BY MR. LASSEN)  Yes.  Ms. Staton asked you several

5   questions about a teacher making observations and putting those

6   down on a quarterly progress report.  Of what benefit is that

7   to a successive teacher in the fashion that it was put down?

8              MS. STATON:  Excuse me, Your Honor.  Objection.  Lacks

9   foundation.

10             THE COURT:  What is missing in the foundation?

11             MS. STATON:  He's never taught.  He doesn't know what

12  other teachers need.  And he's making suppositions about what

13  it might mean to somebody that he doesn't even know.

14             THE COURT:  Well, Mr. Lassen, my understanding is that

15  the quarterly progress report is in the permanent file; is that

16  correct?

17             MR. LASSEN:  That is correct.

18             THE COURT:  It's available for any later teacher to

19  review, right?

20             MR. LASSEN:  Correct.

21             THE COURT:  So I am having trouble understanding the

22  question.

23  Q.  (BY MR. LASSEN)  Let me phrase it in a different way.

24             In the fashion that the quarterly progress report,

25  assuming that it's based on observations of the person filling

1    it out, what information in the fashion that it's in the record

2    does that provide to the subsequent teacher?

3           MS. STATON:  Your Honor, excuse me.  It's the same

4    objection.  The question is just simply rephrased.

5           THE COURT:  Well, if the question is calling for

6    opinions about what inferences are drawn from it by later

7    teachers, perhaps the objection is well taken.  If it's not

8    asking that, it seems to be almost self-evident that the

9    document says whatever it says.  So I'm not trying to quarrel

10   with you, Mr. Lassen.  I'm trying to understand the question.

11          MR. LASSEN:  Okay.  Let me try it one more time.

12          THE COURT:  I'm going to sustain that but give you a

13   chance to ask it again.

14   Q.  (BY MR. LASSEN)  In the absence of any data or graphs,

15   charts, just the mark, if you will, that reflects -- Let's

16   assume there's an observation.

17          What information does that convey to a subsequent

18   teacher that would allow them to build on that, if you will?

19          MS. STATON:  Excuse me, Your Honor.  This is -- I

20   object, foundation, form, speculation.

21          THE COURT:  Well, I'm going to overrule the objection

22   but I'll allow the question to be answered for the weight it

23   carries.  But it seems to me entirely obvious that the

24   quarterly reports say what they say.  Go ahead.  You can answer

25   the question.

1          THE WITNESS:  The progress notes denote progress

2    subjectively -- subjectively decided progress on the IEP goals.

3    So if you're asking if that child moves from one class to

4    another class, what that's going to tell that next teacher is

5    if he met or did not meet that specific goal or objective.

6    Q.  (BY MR. LASSEN)  Okay.  Is that sufficient?

7    A.  It's going to tell them whether he met or did not meet that

8    specific goal based on a subjective opinion of a teacher, not

9    an objective databased decision.  So to me it's -- to me it's

10   not efficient to know whether he truly mastered the skill or

11   not.  And in Cody's case, that's very, very important.

12   Q.  Why is that?

13   A.  Because there are skills on his IEP that -- on progress

14   reports that say that are mastered that he has not still

15   mastered today.

16   Q.  How would that be different if data were collected?

17   A.  There would be support, proof supporting the code C1, B1,

18   A, or whatever the code is put down.

19   Q.  You were asked several questions about that you were not

20   aware of the experience that the various teachers of -- Cody's

21   had in dealing with autism.  Do you remember that?

22   A.  Yes.

23   Q.  Based upon your review of the IEPs that were developed that

24   they assumedly -- let's assume they participated in, can you

25   make any inferences about their expertise?

1          MS. STATON:  Excuse me.  Object.  Lacks foundation.

2    Calls for supposition, conclusions.

3          THE COURT:  I'm going to ask you to ask the question

4    again, because even reading it I can't understand it.

5    Q.  (BY MR. LASSEN)  Okay.  Is there a difference between

6    experience and expertise.

7    A.  Yes.

8    Q.  And you may not be able unless you knew or reviewed the

9    credentials of the teacher to know what their level of

10   experience was, right?

11   A.  Right.

12   Q.  Can you make a determination as to their level of

13   expertise?

14          MS. STATON:  Object to the form, foundation.

15          THE COURT:  Well, the question is whether he can make

16   a determination.

17          MS. STATON:  Okay.

18          THE COURT:  Overruled.  It's a yes or no question.

19   Q.  (BY MR. LASSEN)  How can you make such a determination?

20          MS. STATON:  Well, excuse me, Your Honor.

21          THE COURT:  Well, he didn't answer the previous

22   question.

23          MR. LASSEN:  Right.  I'm sorry.

24          THE WITNESS:  I feel, yes, I can.

25          THE COURT:  Now you can ask that question.

1   Q.  (BY MR. LASSEN)   And how do you make that determination?

2            MS. STATON:   Excuse me, Your Honor.  I object on the

3   basis of foundation.

4            THE COURT:  He's asking for foundation, so overruled.

5            THE WITNESS:   I can -- I feel that I can tell

6   expertise by the way a goal and objective data and all of those

7   things are collected and put in a file.  If you're talking

8   about autism expertise in specifics, an expert in autism is an

9   expert in data collection and goal writing and objection

10  writing and all of those kind of things.  And if they're not

11  there, I can pretty well say they don't have the expertise in

12  autism that they would have if they had expertise in autism.

13  Q.  (BY MR. LASSEN)   Well, let's go a little bit further.

14           What does it take to gain expertise beyond just being

15  exposed or teaching autistic children in autism?

16  A.   I think it's advanced training and education.  I think it's

17  supervision by people who hold board certification in behavior

18  analysis.  I think it is providing teaching classes and getting

19  professional development.  I think it's all of those things.

20  It's more than just experience.  It's the educational

21  foundation and the supervision from a known expert supervising

22  your work to become an expert.

23  Q.  Can you become an expert by going to, say, a four-hour

24  seminar?

25           MS. STATON:  Excuse me, Your Honor.  I'm going to

1    object as to the relevance.  It's beyond the scope of cross.

2          THE COURT:  How is this within the scope of cross,

3    Mr. Lassen -- I mean, redirect?

4          MR. LASSEN:  Well, she was making a distinction about

5    you don't know anything about these teachers.  Kristi Spengler

6    testified at the hearing below.  She went to one four-hour

7    seminar on autism.  That's her level of exposure to the subject

8    matter we've been talking about.

9          THE COURT:  This looks like you're just opening up a

10   new subject about expertise of these people, and I don't recall

11   that in cross.

12         MR. LASSEN:  Well, I'm making a distinction with

13   experience.

14         THE COURT:  I'm going to sustain this objection, but

15   I'll also add it hardly matters whether I sustain it or

16   overrule it because it's rather obvious what the circumstances

17   are.

18   Q.  (BY MR. LASSEN)  When you were asked several questions or a

19   few questions, Dr. Gentry, about whether you actually teach,

20   you described that you actually modeled behavior for the aides

21   or teachers, correct?

22   A.  Yes.

23   Q.  Now, is that a form of teaching?

24   A.  Yes.

25   Q.  And who are you teaching?

1    A.   The staff.

2    Q.   And is modeling a recognized way of teaching adults that

3    are dealing with autistic children?

4    A.   Yes.

5    Q.   Now, if there were difficulties due to family problems and

6    you were asked, you know, say the parents were separated, how

7    could you tell whether there were problems that were affecting

8    the child in school?

9    A.   I would tell by looking at the data and seeing if there was

10   actual decreases or increases in skill and behavior.

11   Q.   Can any determination such as that be made in this case?

12   A.   No.

13   Q.   And why is that?

14   A.   Because no data was collected -- no specific data on skills

15   were collected.

16   Q.   Now, you were asked, again, several questions about

17   observations.  Is it -- Would you consider observations to be,

18   by a teacher that writes them down, to be observations of the

19   aide that are then related to the teacher, or do they have to

20   be observations by the teacher, him or herself?

21   A.   Whoever is making the observation or doing the data

22   collection should be the one that is in the process.  So if

23   you're asking if my notes are -- if I ask someone how did he do

24   today, and I wrote down, and that was my note, then that's not

25   an observation.  That's the observation of somebody else that

1    I'm just writing down.

2    Q.   And what's the consequence of that?

3    A.   You don't know if it actually occurred or not.

4    Q.   Okay.  Is it a best practice for the aides to meet with the

5    teacher at the end of the day and report what they observed and

6    then the teacher make the progress notes or observation notes?

7    A.   No, it's not.

8              MR. LASSEN:  That's all I have.  Thank you.

9              THE COURT:  All right.  Counsel, may Dr. Gentry be

10   excused permanently?

11             MR. LASSEN:  Yes.

12             MS. STATON:  Yes, Your Honor.

13             THE COURT:  All right.  Dr. Gentry, you are excused.

14   Thank you.  You may step down.

15             You may call your next witness.

16             MR. LASSEN:  We are going to call Carey Burgess.  And

17   Dr. Gentry -- She is about eight months pregnant, so she's

18   relaxing on a comfortable chair downstairs.  And as soon as he

19   can go down the elevator and send her back up, we'll be there,

20   probably in about five minutes.

21             THE COURT:  All right.  We'll be waiting.

22             THE CLERK:  State your name please.

23             THE WITNESS:  Carey Ann Burgess.

24             THE CLERK:  Spell your first and last name.

25             THE WITNESS:  C-a-r-e-y B-u-r-g-e-s-s.

1          **CAREY BURGESS, PLAINTIFFS' WITNESS, SWORN**

2              THE COURT:  Please proceed.

3                      **DIRECT EXAMINATION**

4    **BY MR. LASSEN:**

5    Q.  Would you state your name please.

6    A.  Carey Ann Burgess.

7    Q.  Where are you employed?

8    A.  Play ABA and Chrysalis Academy.

9    Q.  And what is that?

10   A.  They're sister companies owned by the same owners.

11   Chrysalis Academy is a school for children with autism in

12   Tempe.  Play ABA is a habilitation approved agency that

13   provides habilitation and respite services to children with

14   developmental disabilities.

15   Q.  Does that include autism?

16   A.  It does.

17   Q.  Do you have any personal, background, and training in

18   dealing with autistic children?

19   A.  Yes, I do.

20   Q.  And what is your education and background in that area?

21   A.  Well, I'm a board certified associate behavior analyst.  I

22   have about 11 years' experience working with children who have

23   developmental disabilities.  As far as my experience goes, I

24   have experience both as a direct care provider early on --

25   that's where my experience came from -- and quite a few years

1    of experience doing consulting.

2    Q.  Is any of that with school districts?

3    A.  Yes.

4    Q.  What is your role if and when you consult with the school

5    district?

6    A.  Well, it depends on, you know, what type of services the

7    school districts are looking for.  At a maximum it would be

8    coming in, observing the child, determining some appropriate

9    objectives for the IEP.  Then to further that would be to

10   provide the school district with a set of procedures that would

11   be the most effective for teaching those objectives; coming up

12   with a data collection system to help the staff monitor the

13   progress for the child and analyze that data on a regular, you

14   know, fairly consistent basis; and then finally helping make

15   sure that the staff and the teachers are implementing those

16   procedures with some degree of fidelity, making sure they're

17   doing those procedures correctly.

18   Q.  And do you have a relationship with Cody and the Prescott

19   School District?

20          THE COURT:  Before you get to that, Mr. Lassen, could

21   you lay some more foundation about Ms. Burgess's education and

22   qualifications.

23   Q.  (BY MR. LASSEN)  Yes.  What is the nature of your

24   educational degree?

25   A.  Well, I have a bachelor's in psychology from Arizona State

1    University.  I'm also currently in a master's program for

2    psychology.  As part of my board certification, I have 135

3    hours in behavior analytic coursework.

4    Q.  What kind of coursework is that?

5    A.  Coursework specific to applied behavior analysis, so

6    everything from assessment to behavior change procedures,

7    principles and concepts of applied behavior analysis, ethical

8    considerations.

9            THE COURT:  Could you slow down just a little bit,

10   Ms. Burgess.

11           THE WITNESS:  I'm sorry.  Yes.

12           THE COURT:  Go ahead.

13   Q.  (BY MR. LASSEN)  How long have you worked for

14   Chrysalis/Play ABA?

15   A.  For Play ABA, I don't know exactly.  I'm going to say 2005.

16   That agency was just formed at that time.  Prior to that I

17   worked under the same individuals that own that company at

18   another agency.

19   Q.  And what did you -- What did you have to do to get that

20   certification that you have?

21   A.  Well, like I said, I needed the coursework hours in applied

22   behavior analysis, so 135 classroom hours in applied behavior

23   analysis.

24           I also did 1,000 hours of independent supervised field

25   work under a fellow behavior analyst.  And then I had to pass

1    the board exams, of course, which I did.  I did that in 2002.

2              Recently, within the last year, I've started filling

3    the course requirements and the supervision requirements to

4    become a fully certified behavior analyst.  I'm about -- Well,

5    I have nine credits left of my master's to go, and I'm about

6    halfway done with the 1,500 hours of independent supervised

7    field work that I need accrued in order to test for my boards

8    in probably June of next year.

9    Q.  How is --

10             THE COURT:  I'm sorry.  Ms. Burgess, I thought you

11   said you are already a board certified associate.

12             THE WITNESS:  I'm a board certified associate behavior

13   analyst, so those two levels of certification.  The associate

14   level requires a bachelor's and a thousand hours of supervised

15   field work.  The master's level requires a master's degree in

16   applied behavior analysis and five courses in applied behavior

17   analysis and 1,500 hours of supervised independent field work.

18   Q.  (BY MR. LASSEN)  And that's what you're working on now?

19   A.  Correct.  So I have the first level, and now I'm starting

20   all over again to go back and get the second.

21   Q.  Okay.  Okay.  Now let's go to your experience with Prescott

22   Unified School District.  What experience do you have with

23   Prescott?

24   A.  Well, I started working with the Prescott School District

25   in 2000 -- end of 2006, beginning of 2007.

1    Q.   And how is it that you came to be -- to work with Prescott?

2    A.   Sure.   Just to give you a timeline, I was first contacted

3    by Cody's father at the end of 2006, I believe, and asked if I

4    had the availability to come do some staff training, which I

5    did.

6         So we had -- we scheduled something, I believe, for

7    January of 2007.   I was then contacted or -- either I contacted

8    or was contacted by Nancy Martinez to come do some staff

9    training, at which point I began traveling up to Prescott and

10   meeting with the one-on-one assistants for Cody as well as

11   meeting with Nancy Martinez and discussing curriculum and plans

12   for Cody and things like that.

13   Q.   At that point in time beginning in January of '07, who was

14   it that you were giving assistance to?

15   A.   Yeah.   Her name first name was Terry.   I can't remember her

16   last name.   I only met with her briefly because she was only

17   Cody's one-on-one assistant for a few months.   It was quite a

18   bit of turnover in terms of the assistants that were working

19   with Cody at that time.   So I was working mainly at that time

20   with Terry, the assistant, and working also with -- very

21   limited, very limited contact with the resource teacher.   Cody

22   was physically being educated off and on in that resource

23   classroom, so I had some contact with that resource teacher too

24   at that point.   And then --

25   Q.   Do you remember who that teacher was?

1          MS. STATON:  Excuse me, Your Honor.  Let me object as

2    to the relevance.  We've established that Ms. Burgess was

3    contacted at the end of 2006 and began training in January of

4    2007, which is not the subject of this lawsuit.  So I'm

5    objecting on the basis that anything that she's talking about

6    is just not relevant.

7          THE COURT:  Well, I'm taking that more as a Rule 403

8    objection as to perhaps the relevance weighed against the

9    value.  So what is the real value of this?

10         MR. LASSEN:  I'm just asking foundation as to when she

11   got more involved in the current year.

12         THE COURT:  Well, to what end?

13         MR. LASSEN:  To what end?

14         THE COURT:  Yes.

15         MR. LASSEN:  Well, what her role was, what she did

16   to --

17         THE COURT:  What does that have to do with the time

18   period that's the subject of this lawsuit?

19         MR. LASSEN:  Okay.  What it has to do with is

20   consistent with what Dr. Gentry did, is she was a participant

21   and is a continuing participant in the 2008 IEP.  And I was

22   just kind of laying some background --

23         THE COURT:  What's the relevance of that?

24         MR. LASSEN:  Well the relevance is that it clearly

25   demonstrates, based upon the amount of progress that he's made

1   this year, that he is capable of learning, and with a properly

2   constituted IEP, that he does receive educational benefit.

3        THE COURT:  Well, in a bench trial, relevance has less

4   risk of prejudice if you go wrong, and I'm going to use the

5   five hours as my control on attenuated evidence.  So I will

6   overrule the objection and allow it in for whatever value it

7   may or may not have.

8        MR. LASSEN:  Well, I'll speed it up.

9        THE COURT:  And you're done in five hours.  So is the

10  other side.

11  Q.  (BY MR. LASSEN)  Ms. Burgess, what have you done since

12  January of 2008 relative to Cody's educational program?

13  A.  My role has changed.  It started out as mainly staff

14  training on the practices and principles that we felt were the

15  most appropriate for him at that time to now more of a role

16  consistent with the things that I described earlier with coming

17  up with objectives for the IEPs, training the staff, developing

18  a data collection system, and making sure they're implementing

19  it with fidelity.  So I work directly with the teachers and the

20  assistants.

21  Q.  Okay.  And how often do you go there?

22  A.  Every other week.

23  Q.  And what do you do when you're there?

24  A.  I usually spend about four hours total, four to five hours

25  total.  I start by observing how Cody's day is going, talk to

1    the assistants, just get a little bit of input from them.  I

2    review all of his data, and see what kind of progress he's made

3    over the last few weeks, and then address any questions the

4    assistants might have.  And then the remainder of the day is

5    typically spent with my modeling procedures for the staff and

6    coaching them as they work with him directly.

7    Q.  Okay.  What role if any have you had with the procedures

8    for data collection?

9    A.  I developed them in conjunction with Dr. Gentry.

10   Q.  And have you taught these persons how to collect data?

11   A.  Yes.  One of my primary functions is to do reliability

12   checks, which means that I'm collecting data as they are

13   collecting data.  And I ensure that at the end of that day our

14   data matches with a certain degree of consistency.

15          So I'm looking to make sure they're accurate observers

16   of Cody's behavior.

17   Q.  And who actually, in terms of what kind of people, have you

18   taught how to collect data?

19   A.  Teachers, parents, assistants, anybody that would have any

20   direct care or direct involvement with a child in such a

21   program.

22   Q.  And what kind of progress has Cody made this year?

23   A.  Very, very good progress.  Problematic behaviors have

24   decreased significantly.  We've cut them in half at least, in

25   some cases even more.  The language acquisition has really

1    improved.  We've got excellent data showing going from very few

2    words per minute up to sometimes two or three words per minute

3    spontaneous, very, very impressive.  Those types of gains and

4    in the amount of time are excellent.

5    Q.  Okay.  Have any of the goals and objectives been changed

6    since January?

7    A.  Yeah.  We just recently did an addendum.  We did an IEP

8    addendum last month.  And because we had made progress on the

9    IEP objectives that we had created in January -- they were

10    irrelevant -- we had to update them and move forward and set

11    higher objectives for him.

12            MR. LASSEN:  Thank you very much.

13            THE COURT:  Ms. Staton, you may cross.

14                        **CROSS-EXAMINATION**

15    **BY MS. STATON**:

16    Q.  Ma'am, it's true that you cannot give an opinion about the

17    quality of the education that was offered by the school during

18    the years 2003 through the end of -- through 2006; is that

19    right?

20    A.  I believe I could give an opinion.

21    Q.  Well, ma'am, did you -- did you write a report?  You did

22    write a report, did you not?

23    A.  Yes, I believe so.

24    Q.  Do you remember saying in your report "As I did not consult

25    with Cody or PUSD prior to January 2007, I cannot give an

BURGESS - CROSS

1    opinion regarding the quality of his instruction"?

2    A.  Well, I didn't directly see his instruction, but I can give

3    opinions about the byproducts of those instructions based on

4    old IEPs, based on --

5    Q.  That's what you wrote when you provided your report in

6    accordance with the Court's order that they be submitted by

7    time certain, isn't it?

8    A.  That's what I wrote.

9    Q.  And at that time you said I cannot give an opinion, didn't

10   you?

11   A.  At that time, correct.

12   Q.  Ma'am, you've never -- you're not certified to teach in the

13   State of Arizona, are you?

14   A.  No, I'm not.

15   Q.  And you don't teach in a public school, do you?

16   A.  Correct.

17          MS. STATON:  Okay.  That's all the questions, Your

18   Honor.

19          THE COURT:  Any redirect?

20          MR. LASSEN:  Just one or two.

21                    **REDIRECT EXAMINATION**

22   **BY MR. LASSEN:**

23   Q.  Ms. Burgess, you indicated you worked at Chrysalis Academy?

24   A.  Chrysalis Academy, correct.

25   Q.  And that is a private school, correct?

BURGESS - REDIRECT

1  A.  Yes.

2  Q.  What do you -- Now, you're not a teacher, correct?

3  A.  No.

4  Q.  What do you do relative to the education of autistic

5  children?  That specializes in autistic children, correct?

6  A.  Yes.

7         MS. STATON:  Let me object, Your Honor.  It's outside

8  the scope of cross.

9         THE COURT:  I don't think this relates to anything she

10 asked.

11        MR. LASSEN:  She asked about, you know, you're not a

12 teacher, and I just wanted to put, you know, clarify that she

13 has a role in a school.  It's a private school, but it's a

14 school.

15        MS. STATON:  Your Honor, I asked if she was a

16 certified teacher to teach in the State of Arizona, and she

17 said she was not.

18        THE COURT:  All right.  I think that's sufficient.

19 Overruled.  You may question her about that.

20 Q.  (BY MR. LASSEN)  Okay.  What do you do at Chrysalis Academy

21 regarding the education of autistic children?

22 A.  Well, because we are an ABA school, I actually train the

23 teachers on how to implement the teaching procedures.

24 Q.  Much like you do when you consult with public schools,

25 right?

UNITED STATES DISTRICT COURT

1   A.   Correct.  We have a very structured tiered system for

2   making sure our staff are well trained, and everyone,

3   regardless, from the direct care staff to the teachers, goes

4   through that training process which I oversee.

5              MR. LASSEN:  Thank you.

6              THE WITNESS:  You're welcome.

7              THE COURT:  Ms. Staton, did you want to ask her

8   anymore questions about what she does?

9              MS. STATON:  No, I do not.  Thank you, Your Honor.

10             THE COURT:  All right.  May this witness be excused

11  permanently?

12             MR. LASSEN:  Yes.

13             THE COURT:  All right.  Thank you, Ms. Burgess.  You

14  are excused.  You may step down.

15             THE WITNESS:  Thank you.

16             THE COURT:  You may call your next witness.

17             MR. LASSEN:  Call Nancy Martinez.

18             THE CLERK:  Good afternoon.  State your name please.

19             THE WITNESS:  Nancy Marie Martinez.

20        **NANCY MARIE MARTINEZ, PLAINTIFFS' WITNESS, SWORN**

21             THE COURT:  All right.  Please proceed.

22                        **DIRECT EXAMINATION**

23  **BY MR. LASSEN:**

24  Q.  Would you state your name please.

25  A.  Nancy Marie Martinez.  And I want to apologize for my voice

1    right off the top.

2            THE COURT:  It's all right.  I'll listen carefully.

3    Go ahead.

4    Q.  (BY MR. LASSEN)  Where are you currently employed?

5    A.  I am currently employed by the Arizona Department of

6    Education, exceptional student services, as a program

7    specialist for Eastern Arizona.

8    Q.  Okay.  And prior to that position, what did you do?

9    A.  I was the last four years with Prescott Unified School

10   District as a special ed director.  I retired after 22 years

11   with the District in June.

12   Q.  And prior to being the director of special education, what

13   did you do there?

14   A.  I taught for seven years at the high school in special

15   education, and the remaining 11 years I was a regular ed

16   teacher with both special needs kids in my class and regular ed

17   students in my class in the middle school and elementary

18   school.

19   Q.  Now, as director of special education, did you have hiring

20   responsibility for the district?

21   A.  My hiring responsibilities consisted of hiring speech

22   pathologist, psychologist, occupational therapist, and physical

23   therapist.

24   Q.  Now, we have had a lot of questions here today about the

25   special education teachers.  Who is the person that interviewed

1   and made the recommendation for hire of those persons?

2   A.  Of the persons involved in the IEPs?

3   Q.  Of the teachers.

4   A.  Of the teachers?

5        The principals of the building where that program or

6   where that special ed teacher is needed.

7   Q.  And did you have any input into that process?

8   A.  I've had input in certain ones, yes.

9   Q.  But not as a routine basis?

10  A.  Not on a routine basis, no.

11  Q.  What about the paraprofessionals or teacher aides?  Did you

12  have any role in their hiring?

13  A.  No, I do not.

14  Q.  Again, was that the principal?

15  A.  It's the principal and with teacher input in that also.

16  Q.  Now, could you show the witness Exhibit 14.  Do you see

17  that exhibit?

18  A.  Yes.

19  Q.  Can you identify that?

20  A.  It's a letter that Mr. Moore and I sent out to the parents

21  of the BEST program for the year '05-'06 to introduce them to

22  Mrs. Spengler, who was our new teacher for the BEST program.

23  Q.  Okay.  And did you participate in any way in her hiring?

24  A.  Yes, I did.  I believe that was Mr. Moore's first year as a

25  principal, and he invited my help on this.

1    Q.   Okay.  And did you in fact interview her?

2    A.   Yes, I did.

3    Q.   You reference in that letter that she had had -- it sounds

4    like she has cross-categorical experience --

5    A.   Yes.

6    Q.   -- of a broad range.  Was she a cross-categorical teacher?

7    A.   She was a cross -- excuse me -- cross categorical teacher.

8    Q.   And included within that experience was teaching autistic

9    children?

10   A.   Correct.

11   Q.   Now, you indicate that she had ABA training?

12   A.   Correct.

13   Q.   Do you know how much she had?

14   A.   That was five years ago, and I can't, off the top of my

15   head, cannot remember.

16   Q.   Now, when did you first deal with Ray and Jolene Parenteau?

17   A.   In May of -- The first year, '03-'04, I was not director at

18   that time.  So I was only director for '04-'05 and '05-'06.  So

19   my first dealings with Mr. Parenteau, I believe, were in

20   December, January of '04-'05, because Mrs. Harlow was leaving,

21   and we hired another teacher.

22   Q.   So Mrs. Harlow was the teacher for the '03-'04 year?

23   A.   Yes, correct.

24   Q.   Who was the teacher for the '04-'05 year?

25   A.   Ms. Harlow was the first semester teacher, and then

1    Mrs. Froeschle or Ms. Froeschle was the teacher for the second

2    half of that school year.

3    Q.  And then during '05-'06 it's Ms. Spengler?

4    A.  It's Ms. Spengler, yes, correct.

5    Q.  Okay.  Now, during that time, Prescott was paying for the

6    tuition of autistic children to outside private schools,

7    correct?

8    A.  I have to think on that for a second.

9           THE COURT:  Well, during what time?

10   Q.  (BY MR. LASSEN)  During '04-'05.

11   A.  '04-'05, my first year there?

12   Q.  Yes, as director.

13   A.  We did pay for two students to go, but I believe that was

14   not until '05-'06.

15   Q.  Okay.  But --

16   A.  To the best -- I just don't remember.  I'm sorry.

17   Q.  Did you ever have any discussion with Mr. or Mrs. Parenteau

18   where you informed that going to a private school at district

19   expense was an option?

20   A.  No, I did not.

21   Q.  Why not?

22   A.  Because we were meeting the needs of his child at that time

23   in the district.

24   Q.  Were the needs of those children for whom you were paying

25   for private school tuition different?

1    A.   Yes, they were.

2    Q.   Were they more severe?

3    A.   More severe.

4    Q.   Now, in January of 2005, you reported to the governing

5    board of the possible need to establish an autism-specific

6    program because of the increase in the census population of

7    children with that disability, correct?

8    A.   Correct.

9    Q.   In fact, you were having many children with disabilities

10   that required really expansion of your programs in special ed?

11   A.   Correct.  I wanted a continuum of services to be increased.

12   Q.   It is true, is it not, that notwithstanding your efforts,

13   that an autism specific program was not, a separate class, if

14   you will, for autism, was not in place during the 2005-'06

15   school year, correct?

16   A.   Correct.

17   Q.   And so to the extent that you or someone at Prescott may

18   have made an offer to Mr. Parenteau of an autism-specific

19   class, that was not a reality or an available reality for the

20   '05-'06 school year, correct?

21   A.   At that point, correct.

22   Q.   Now, did you participate in any of the IEPs, team meetings

23   for Cody?

24   A.   Yes, I did.

25   Q.   At that time -- And do you remember what year that was?

MARTINEZ - DIRECT

1    A.   I'm trying to remember.   I know '05-'06 I was a part of

2    that.   The last part of the '04-'05, in determining his

3    extended school year, I was a part of that meeting.   It may be

4    that I was there, but I did not sign my name on the -- excuse

5    me -- on the IEP because I had to leave for another meeting.

6    Q.   At any time during your participation, were either Mr. or

7    Mrs. Parenteau unhappy or upset with the IEP development for

8    their son during either of those years?

9    A.   No.

10   Q.   When did you first learn that Mr. and Mrs. Parenteau were

11   no longer satisfied with the IEP process and the education

12   being provided their son?

13   A.   In the '06-'07 school year when the autism program started.

14   Q.   Okay.   And would you say that their attitude changed

15   dramatically from being very favorably inclined to being very

16   upset or negative?

17   A.   Yes, I would say so.

18   Q.   And it is true, is it not, that in the fall of '06, they

19   were so upset that they -- or the summer or the fall, beginning

20   of the '06-'07 school year, they were so upset they actually

21   removed Cody from school for I believe it was six weeks?

22   A.   Correct.

23   Q.   And was it your understanding that they felt that Cody had

24   not made any meaningful progress during the prior three years

25   at that point in time?

1   A.  No.

2   Q.  Did they ever say something like that to you?

3   A.  No.

4   Q.  Did they ever complain to you about the amount of progress

5   that Cody made --

6   A.  No.

7   Q.  -- during those three years?

8   A.  No.

9   Q.  At any point in time -- or when was the first point in time

10  that Mr. Parenteau indicated to you that he wanted some other

11  kind of program being provided to Cody?

12  A.  When his son, when Cody came down to the autism program,

13  the program was still under Taylor Hicks umbrella as a school,

14  but it was located with our preschool.  Mr. Parenteau was not

15  wanting to have his son in that program.

16  Q.  And at that point in time, you were -- you had a substitute

17  teacher because you were unable to have a teacher --

18  A.  Of record, yes, correct.

19  Q.  -- of record in place, correct?

20  A.  Correct.

21  Q.  And during that year, just to close this piece, you reached

22  an accommodation, if you will, with Mr. Parenteau relative to

23  one-on-one training for Cody, correct, for the '06-'07 school

24  year?

25  A.  The '06-'07 school year we changed his placement to the

1   resource room with a one-on-one aide, yes.

2   Q.  And you are the one that actually then got or authorized

3   Ms. Burgess to become involved to provide training and

4   assistance, correct?

5   A.  Correct.  We met, yes.

6   Q.  Okay.  Now, you, as I recall, sat through the entire due

7   process hearing?

8   A.  Yes, I did.

9   Q.  At the district offices back in March of '07, correct?

10  A.  Correct.

11  Q.  And you gave actual testimony at that hearing, correct?

12  A.  Correct.

13  Q.  And it is true, is it not, that you testified that you had

14  no one who, during the three years in question, who was a

15  teacher who was an expert in autism, correct?

16  A.  I would have to look at my testimony again.  I don't

17  remember exactly what I said.

18  Q.  Well, your testimony is what it was, right?

19  A.  It is what it was, yes.

20  Q.  But it is true that the teachers in question in all three

21  years were cross -- they had mentally mild and severe mental

22  retardation students as well as autistic students, correct?

23  A.  Correct.

24  Q.  So they had to deal with all the students, correct?

25  A.  Correct.

1    Q.  Now, would it be fair to say that the methodology that was

2    in place for at least '04-'05 and '05-'06 was under complete

3    control of the teacher in charge of the class?

4    A.  Correct.

5    Q.  So the methods and means was entirely up to the teacher,

6    correct?

7    A.  Correct.

8    Q.  Did you recall the phrase eclectic method of teaching used

9    by any of those teachers?

10   A.  Yes, I do.

11   Q.  Okay.  What does that mean to you?

12   A.  It means to use a variety of methods in your teaching.

13   What may work for one person may not work for another person.

14   What may work for one group of students may not work for

15   another group.  If you're not succeeding or seeing progress

16   with one method, you move to another method.  It's a way of

17   taking all of the best practices and using all of them to show

18   progress and gain progress with your students.

19   Q.  You just used the word best practices.  What do you

20   understand that term to mean?

21   A.  The best practices takes a program up to what you would

22   call the Cadillac as opposed to the Chevrolet version.  But

23   it's best practices is how you would do a program, what kind of

24   teachings would you do, and using various methods as part of

25   best practices for students, because not all students, both

1    special needs and regular needs students, learn in the same

2    way.

3    Q.  Now, did you ever supervise or deal with those teachers to

4    oversee their use of methodologies to determine whether or not

5    best practices were being followed?

6    A.  That was part of my responsibilities as the director, yes.

7    Q.  And did you in fact do that?

8    A.  Yes, I did.

9    Q.  Now, you've heard testimony both at the due process hearing

10   and again today about the need to have an empirically based or

11   research based program or methodology being used, correct?

12   A.  Correct.

13   Q.  And do you agree with that?

14   A.  To a certain extent, yes.

15   Q.  But is it your opinion that a teacher should be free to

16   pick and choose from whatever methodologies they prefer for any

17   individual child?

18   A.  My teachers were free to pick and choose from whatever

19   method would work and meet the needs of that specific child.

20   Q.  And how was it determined that the needs of that specific

21   child were being met?

22   A.  Determine?  I'm sorry.  I don't understand.

23   Q.  Well, you indicated that the teachers were free to pick and

24   choose among the various techniques as to what would meet the

25   needs of each particular child.

1   A.  Correct.

2   Q.  How was it determined what the needs of each particular

3   child were?

4   A.  Okay.  You would -- The teachers would do pre-activities or

5   pre -- to see where they were at a certain stage for a certain

6   activity.  They would make note of that.  The Brigance was

7   brought up in earlier testimony.  That's one of the basic

8   skills type of things to figure out where you can start with a

9   child, what do you need to look at.

10  Q.  Is that an assessment technique?

11  A.  It's an assessment technique.  It helps you keep data for

12  preschool and younger kids.  It is an assessment technique.  It

13  deals with can they write all the letters of the alphabet?  Do

14  they have social skills?  Do they know how to play?  Can they

15  interact with other students?  It's a good place to start, and

16  then you work from there.

17  Q.  Now, if the Brigance is administered, it's going to be in

18  the student's educational file, correct?

19  A.  Correct.

20  Q.  So if it's not in the file, it wasn't administered,

21  correct?

22  A.  Not necessarily.

23  Q.  Where would it be?

24  A.  It's probably still in the classroom with the teacher.

25  Q.  What if that teacher's no longer there?

1              Go ahead.  Take some water.

2    A.  Then hopefully somewhere in that room is the records of

3    that Brigance.

4    Q.  Did you ever provide directions to the teachers regarding

5    how to fill out the quarterly progress reports for IEPs?

6    A.  At the beginning of each year, we had a teacher in-service,

7    and we went over all parts of the IEP, what I expected, what I

8    wanted to see.  I would randomly pull IEPs as they came in,

9    look them over.  And if they met the expectation and the

10   minimal compliance requirements by the State of Arizona, they

11   were fine.  If they didn't, it went back to the teacher, and

12   the teacher had to have another meeting.

13   Q.  So you were looking at the IEPs to make sure they met the

14   minimal --

15   A.  Compliance.

16   Q.  -- compliance requirements, not whether they provided a

17   meaningful educational benefit, correct?

18   A.  No.  I was looking for both.  I was looking for minimal

19   compliance.  Then I'm looking for what is it that they're

20   providing for the student.

21   Q.  Now, you heard Dr. Gentry's testimony this morning,

22   correct?

23   A.  Correct.

24   Q.  And I take it you would disagree that the District did not

25   properly constitute the IEP teams in at least '04 and '05 and

1    '05 and '06, correct?

2    A.   Would I disagree with him?  Yes, I would.

3    Q.   And so is it your opinion that it is not required to have

4    an expert in autism as a member to provide input to the IEPs?

5    A.   My experts are my teachers.

6    Q.   Okay.  So those teachers, the cross-categorical teachers,

7    are sufficient to create an IEP for any special ed category,

8    correct?

9    A.   Correct.

10   Q.   What if the child were blind?  Would they have been

11   qualified?

12   A.   To a certain extent, but we would have invited the Arizona

13   School for the Deaf and Blind to come and attend.

14   Q.   What if the child were deaf?

15   A.   The same thing, but then the Arizona School for the Deaf

16   and Blind would be responsible for the IEP.  We would not.

17   Q.   That's for deaf but not for blind?

18   A.   For both.

19   Q.   Would you have ever -- Have you ever brought in an outside

20   consultant to participate in the development of an IEP?

21   A.   Up until Cody's, no, not that I'm aware of.

22   Q.   Well, when you say Cody's, Cody's initial IEP?

23   A.   I don't know about his initial IEP.  I was not there.

24   Q.   Well, Dr. Grimm was a psychologist in private practice,

25   correct?

1    A.  Correct.

2    Q.  So he was an outside consultant that was brought in,

3    correct?

4    A.  But I was not director at that time.

5    Q.  That's right.  I'm sorry.  And you were not involved in

6    that?

7    A.  I was not involved with the initial one, no.

8    Q.  You testified at your -- at the administrative hearing that

9    historically education for autistic children has been lacking,

10   correct?

11   A.  Historically, because we had not seen a rise in the

12   population.

13   Q.  Okay.  But as far as the quality of the education, would

14   you say it had been lacking in the past?

15   A.  That would be hard to give an opinion on as autism has now

16   become suddenly a growing disability area.  It would have been

17   the same as with mental retardation.  So it's finding out what

18   kind of education, what kind of needs each student has, and

19   what you need to do to get them to where they need to be.

20   Q.  Would you agree that historically education for autistic

21   children has often been nothing more than glorified

22   babysitting?

23   A.  Historically in some parts sometimes, yes.

24   Q.  And one of the reasons is the difficulty they have with the

25   high level of problematic behaviors?

1          MS. STATON:  Excuse me, Your Honor.  I'm going to

2     object to the relevance, which seemed to be talking generally

3     about autism in theory, and it doesn't seem to be directed

4     toward the issues here.

5          THE COURT:  Well, it is rather attenuated, but in

6     light of the fact that I don't have to worry about a jury

7     becoming confused and that I have set a time limit, I'll

8     exercise my discretion to allow it under Rule 403.

9  Q.  (BY MR. LASSEN)  Ms. Martinez --

10         THE COURT:  But that's not to encourage you to go

11    beyond what's useful.

12 Q.  (BY MR. LASSEN)  I understand.

13         Do you contend that progress reports by classroom

14    teachers for autistic children can be made on subjective

15    observations that they may have?

16 A.  Yes.

17 Q.  And that would include the subjective observations of the

18    aides that are then related to them?

19 A.  Yes.

20 Q.  And if the practice of Ms. Spengler was to meet with the

21    aides at the end of the day and listen to them and then write

22    down what the observations were, would that be sufficient?

23 A.  That would be very sufficient.

24         MR. LASSEN:  Okay.  Thank you.  That's all I have.

25         THE COURT:  Ms. Staton.

1    MS. STATON:  Thank you, Your Honor.

2                        **CROSS-EXAMINATION**

3    **BY MS. STATON:**

4    Q.  Ma'am, you've covered something about your employment

5    background, but I don't think Judge Wake has been informed as

6    to your educational background.

7         Would you start with your bachelor's degree and

8    explain to him what your educational background is.

9    A.   Certainly.  I received my bachelor of science from the

10   University of Arizona in 1983.  I was a dual major in both

11   elementary education and in special education, but due to the

12   amount of hours my senior year, I dropped the special education

13   part.

14        In 1988 I received my master's degree in special

15   education in the area of learning disabilities and other

16   cross-categorical high and low incident disabilities.

17        THE COURT:  Where did you get your master's degree?

18   Which University?

19        THE WITNESS:  Oh, I'm sorry.  Northern Arizona

20   University.  Then I also received my administrative certificate

21   in 2000 -- in May of 2004.

22   Q.  (BY MS. STATON)  And your teaching, as I understand it, you

23   told us what your teaching background was in Prescott Unified

24   School District, but you also taught --

25   A.  I also taught for a year and a half in a three room

1    schoolhouse.

2    Q.  Okay.  We've got to take turns here.

3    A.  I'm sorry.

4    Q.  You used a phrase that was not defined.  You said that

5    there was cross -- that teachers were certified in

6    cross-categorical teaching or got a cross-categorical

7    certificate.  Can you tell us what that means please?

8    A.  Cross-categorical means that they have received up to 12

9    hours in each and any three or four disability areas, and that

10   includes autism, specific learning disabilities, mental

11   retardation.  And then those are the three main ones that most

12   teachers go for.

13          Then you have your other health impairments.  You have

14   your orthopedic impairment.  You have emotional disability.

15   And there's one other one that I can't think of at the moment.

16   But that's what cross-categorical is.

17          And to receive your bachelor's and even your master's

18   now, you must have up to 12 hours in each of those areas.  It

19   also requires that you learn different methods of how to teach

20   students in those areas, so in autism you would learn about

21   applied behavior analysis, et cetera.

22   Q.  At all times were Cody's teachers properly certified to

23   teach special needs students including students with autism?

24   A.  Yes, they were.

25   Q.  And that would include the three years that are the subject

1    of this lawsuit?

2    A.   Yes, it would.

3    Q.   In the District how many students are there that fall

4    within the special needs category?

5    A.   In that classroom or total?

6    Q.   The District, just District-wide.

7    A.   In the District during that time period there was roughly

8    650, 660.

9    Q.   And as the director -- and you were director starting in

10   2004-2005 school year -- was it your obligation to see that

11   those children received a free and appropriate public

12   education?

13   A.   Yes.

14   Q.   How did you do that?  How did you ensure that the kids, the

15   special needs kids like Cody would receive a free and

16   appropriate public education?

17   A.   As part of the IEP meeting and the team, we would look at

18   all of the different possible least restrictive environments

19   that would adhere to him being able to make progress in the

20   general curriculum.  We do that for all students.  We look at

21   what supports they may need in order to be able to succeed in

22   the general curriculum.  We look at modifications,

23   accommodations, and we look at the program.

24        For a student with autism, depending where on the

25   autism spectrum they fall, will determine what kind of things

1   we will do with the student.

2           If they're on the little bit higher functioning where

3   they have verbal skills, they may have some social skills,

4   we'll be working with them to get them involved and back into a

5   regular classroom for a short amount of time.  That has always

6   been our premise.

7   Q.  And I think you told Mr. Lassen you review the IEPs; is

8   that right?

9   A.  Correct, I do.

10  Q.  As the director of special education, did you know Cody?

11  A.  Yes, I did.

12  Q.  How did you know him?

13  A.  Because I visit my classrooms to see what's going on.

14  That's another way I know what kind of methods are being used,

15  how well the teachers are working, if the students are making

16  progress.  I would visit all of my classrooms at least monthly,

17  sometimes bimonthly.  And that's how I first met Cody, and

18  that's how I first began working with him.

19  Q.  And do you also -- did you participate in meetings with the

20  Parenteaus?

21  A.  Yes, I did.

22  Q.  Have you ever met Mrs. Parenteau?

23  A.  Mrs. Parenteau?

24  Q.  Yes.

25  A.  Not officially, no.

1    Q.   I mean, you just, like, saw her?

2    A.   Just picking up Cody or at other times.

3    Q.   Okay.  But you were in meetings with Mr. Parenteau?

4    A.   Oh, yes, with Mr. Parenteau, all the time.

5    Q.   Were you familiar with Cody's quarterly reports as well as

6    the IEPs?

7    A.   Yes, I am.  Excuse me.

8    Q.   Did you review them as they were developed?

9    A.   Yes.

10   Q.   Okay.  And did Mr. Parenteau attend meetings where the

11   quarterly reports were discussed?

12   A.   Mr. Parenteau requested monthly progress reports with the

13   teacher to see how Cody was doing, and every nine weeks,

14   whatever month that would fall into, they would go over the

15   progress report that -- Mrs. Harlow or Mrs. Froeschle would go

16   over the progress report with Mr. Parenteau at that time.

17   Normally we'd just send the progress reports home with the

18   parents.  If they have questions, they can contact the teacher.

19          So Mr. Parenteau received progress reports on Cody's

20   progress, status, et cetera, on a monthly basis, sometimes

21   weekly.  It just depended on what was going on at the time.

22   Q.   And from time to time you would participate in them?

23   A.   And from time to time I would participate, yes.

24   Q.   During the 2004-2005 or '05-'06, did Mr. Parenteau convey

25   any concerns to you about his son's education or what was

1    happening at the District?

2    A.  No.

3    Q.  Ma'am, we've talked with Dr. Gentry about the codes on the

4    quarterly progress reports, so I don't want to go through all

5    of that again.  You've seen those progress reports?

6    A.  Yes.

7    Q.  And you've seen how they move from one letter and number

8    code in a -- in an upward trajectory?  Would that be fair?

9    A.  That would be fair, yes.

10   Q.  Did Cody show progress in all of the goals and objectives

11   that were set for him?

12   A.  Yes, he did, slow progress but progress.

13   Q.  Are children supposed to master a goal in a very set time,

14   for example, like at the end of the year?  Are they supposed

15   to, under your understanding of the IDEA, show progress toward

16   mastering the goal?

17   A.  My understanding is they show progress toward mastering the

18   goal.  It is not stated that they must master the goal in the

19   year.

20   Q.  You attended the May 2005 IEP meeting?

21   A.  Correct.

22   Q.  Did Mr. Parenteau acknowledge that he was seeing Cody with

23   accelerated speech and language?

24   A.  Yes, he was.  Yes, he did.

25   Q.  That was a statement that he made?

1    A.   That was a statement he made.

2    Q.   Now, we've talked a little bit with Dr. Gentry how teachers

3    at the District tracked progress.   What were the ways that they

4    did that?   How would they -- How would they track progress of a

5    student?

6    A.   Various ways, through observation, through tracking sheets.

7    I know that for speech and language, they did tally marks for

8    certain things, anecdotal notes, continued discussion with the

9    aides, parent home logs of what Cody's day was like, what he

10   succeeded in that day, what maybe they could work on at home

11   that night, et cetera.

12   Q.   Okay.   Now, I think you also used a phrase earlier in your

13   testimony about the BEST program?

14   A.   Correct.

15   Q.   That's B-E-S-T?

16   A.   Correct.

17   Q.   Let me make sure I've got the time frame correct.   During

18   the period in question, that is, 2003-'04 through the '05-'06

19   school year, where was Cody placed?

20   A.   He was placed in the BEST program at Taylor Hicks School.

21   Q.   What does BEST stand for?

22   A.   BEST stands for basic essential skills techniques.

23   Q.   And now what does it mean?

24   A.   It means working with the students in basic skill area,

25   everything from toilet training to how to hold a pencil, how to

1   play with other students, how to communicate, teaching them how

2   to read, how to write, getting the prerequisites under their

3   belt so that we can get them back into the regular classroom.

4              THE COURT:  Mrs. Martinez, would that be the placement

5   for the most fundamental basic skill training in the school, or

6   did you have a program that's even more fundamental than that?

7              THE WITNESS:  We have programs that are even more

8   fundamental.  We have different levels of the BEST program.

9              THE COURT:  All right.  Please continue.

10  Q.  (BY MS. STATON)  Thank you, Your Honor.  At the time Cody

11  was placed in the BEST program in which he was placed, where

12  was it on that continuum?

13  A.  It was on the continuum of above where our more severe and

14  profound students would be.  It was the program where mildly

15  and moderately mentally retarded students were who we were

16  mainstreaming into a regular classroom.  It did deal with a lot

17  of academics for those students but also a lot of similar basic

18  skills that autism students need such as the social aspect of

19  it, the communication, the verbal skills.

20  Q.  When you talk about communication -- that's something

21  Dr. Gentry mentioned -- what do you mean as a special education

22  teacher director when you talk about the word communication?

23  A.  Communication involves all levels, looking at somebody,

24  being able to read facial expressions, being able to verbally

25  communicate or non-verbally communicate your desires, your

1    wants.  For a non-verbal student we use the PECS system, which

2    Dr. Gentry referred to earlier.  It's a picture system of

3    different activities, phrases, et cetera, that you give to the

4    child, and that's one way to start a child off.

5            You use sign language, simple sign language with the

6    student to help them also start communicating.  That was

7    used -- That's used in all the programs all the way up through

8    high school.

9            So communication is my wants, my needs.  How do I tell

10   you what I want, what I need?

11   Q.  When you went into the classrooms on those occasions to see

12   Cody and see how the teachers were doing, was Cody able to

13   communicate in the sense of read facial expressions and engage

14   in conversations or exchange of words?

15   A.  No.  It's very typical of an autistic child.  Cody might

16   say words if he wanted a drink but not on a conversational like

17   you and I are having at this point in time.

18   Q.  Was he able to read expressions?  Would he even attend to

19   you, look at your eye contact?

20   A.  No, he would not.

21   Q.  Are those things that a child has to learn?

22   A.  Those are the things that a child has to learn.  It's

23   basically starting off him being born.  A newborn will attend

24   to its mother and its father.  So now when the autism diagnosis

25   was made, this is the same type of thing.  He has to relearn

1    how to attend to the person speaking to him.  So if Cody was in

2    front of me or to the side of me and I said, "Cody, look here,"

3    he probably wouldn't do it, whereas a normal child would.  You

4    have to teach him to look wherever it is you want him to look.

5    Q.  So those are some of the challenges that the teachers have?

6    A.  Yes, they are.

7    Q.  How many children were in the BEST classroom, the

8    cross-categorical classroom that you described for us?

9    A.  The number varied during that three-year time.  So you had

10   anywhere from 15 to 18 cross-categorical students in that

11   classroom.

12   Q.  And then how many adults were in that classroom?

13   A.  You had one teacher and five aides.

14   Q.  Did Cody have his -- have an aide with him?

15   A.  At all times.

16        THE COURT:  Ms. Staton, just for estimating time,

17   about how long do you think you'll have with Ms. Martinez?

18        MS. STATON:  Not very long.  I'm cutting things out,

19   Judge.  That's why I'm pausing.

20        THE COURT:  We're in good time.  I'm not trying to

21   press anyone.

22        MS. STATON:  Thank you.  I don't want to repeat

23   things, so that's why I'm crossing things out.

24        THE COURT:  Well, let's take the afternoon break now,

25   and you can go through your notes and figure it out.  So we'll

1    be in recess until 3:00.

2         MS. STATON:  Okay.  Thank you.

3         (Proceedings recessed from 2:45 p.m. until 3:03 p.m.)

4         THE COURT:  All right.  Ms. Staton.

5         MS. STATON:  Thank you, Your Honor.

6    Q.  (BY MS. STATON)  Just briefly, Ms. Martinez, Mr. Lassen

7    asked you earlier if the teachers in a classroom were able to

8    use whatever methodologies they thought best to use with a

9    particular student, and you said I believe yes?  Is that --

10   A.  That's correct.

11   Q.  We've talked about ABA, so I don't want to talk about that,

12   but is there such a thing as a TEACCH model?

13   A.  Yes, there is.

14   Q.  Is your microphone --

15        THE CLERK:  I'm sorry.  It's probably me.

16        THE WITNESS:  There we go.

17   Q.  (BY MS. STATON)  I thought I was going deaf.  Tell me what

18   is the TEACCH model?

19   A.  The TEACCH model is a structured program for students with

20   autism.  Autistic students do need structure, so it involves

21   schedules, so that the student knew that once this particular

22   activity was done, we would move on to the next one.  And they

23   would have a picture schedule on their desk, so they knew

24   exactly what was coming.

25             They would have projects that they would have to do,

1    or work products is what they're called.  They use the PECS

2    system, the pictures, to help with communications if they were

3    non-verbal.

4            It's just a very structured type of environment.  It

5    works for some autistic kids, but, again, it doesn't work for

6    all autistic kids.  It may work for one type of skill that

7    you're trying to get a child to do.  It may not work for

8    another skill.

9    Q.  Is that why you said in response to Mr. Lassen that it's

10   eclectic, teachers pick and choose?

11   A.  Correct.

12   Q.  Did -- Excuse me.

13           The last year you were there, the 2007-2008 school

14   year --

15           Is that right?

16   A.  Correct.

17   Q.  -- was Cody assigned to a classroom?  Was he in the BEST

18   classroom, in other words?

19   A.  No.

20   Q.  Did he have classmates that he would interact with like he

21   did in the BEST classroom?

22   A.  Technically, no.

23   Q.  How many aides did he have the last year you were there?

24   A.  The beginning of the school year, he had one.  In December

25   she resigned and moved up to the high school, and then we went

1    through one, two aides before the aide -- well, the aide that

2    was still there when I left in June.  And we hired one other

3    aide to assist that aide.

4    Q.  So there was an aide for Cody and then an aide to the aide?

5    A.  Yes.

6    Q.  What's the aide to the aide do?

7    A.  The aide to the aide collected the data that Dr. Gentry and

8    Ms. Burgess wanted.

9    Q.  How did they do that?

10   A.  They followed the other aide while Cody was doing his

11   various around-school activities, his verbalization.  They

12   accompanied him to his speech and language time.  They

13   accompanied him to his PE time, his extracurricular activities.

14   Computer time.  They accompanied him when he did visit the

15   autistic classroom.

16          So while one was working directly with Cody, the other

17   one was keeping tally of responses and whatever it was that was

18   needed that day.

19   Q.  Okay.  Did Dr. Gentry recommend any additional tutoring or

20   services for Cody?

21   A.  No, he did not.

22          MS. STATON:  All right.  Thank you, Your Honor.

23          THE COURT:  All right.  Any redirect?

24          MR. LASSEN:  Just a few.

25

**REDIRECT EXAMINATION**

**BY MR. LASSEN:**

Q.  Ms. Martinez, Ms. Staton asked you a few questions about the BEST program, and you indicated it focused on the prerequisites for kind of basic skills?  Is that true?

A.  Basically, yes.

Q.  Now, if that's the case, wouldn't that be the goals and objectives that ought to be then reflected in the child's IEP, those basic skills?

A.  It would be the basic skills.

Q.  As opposed to more generic broader goals and objectives, correct?

A.  Correct.

Q.  Now, is it of concern to you or was it of concern to you as a director of special education in Cody's case but -- or others where you see the same goals and objectives in successive years that remain in an IEP?  Is that acceptable?

A.  That's acceptable, yes.

Q.  Nothing wrong with that whatsoever?

A.  Nothing wrong with that whatsoever.

Q.  And there's nothing wrong with having 18 or 20 goals and objectives?

A.  Well, yeah, there is something wrong with that.

Q.  I'm sorry?

A.  Yes, there is something wrong with that.  That's too many

1    objectives for a person to accomplish.

2    Q.  What's a good number?

3    A.  Depends on the child.  Depends on what you're trying to

4    accomplish, what the team feels is the most important at that

5    time.

6    Q.  Now, you describe some of the deficits that Cody had

7    relative to making eye contact.  And that's not atypical for a

8    severely autistic child, correct?

9    A.  I'm sorry.  Say that again.

10   Q.  That deficit that you described regarding not being able to

11   make eye contact is typical for a severely autistic child,

12   correct?

13   A.  Yes, it is, for -- Well, all autistic kids, even

14   high-functioning autistic students or adults, still have

15   problems making eye contact or reading facial --

16   Q.  And basic communications is a hallmark --

17   A.  It's a hallmark, yes.

18   Q.  -- of what autistic children are lacking, correct?

19   A.  Correct.

20   Q.  Now, you heard Dr. Gentry testify this morning, correct?

21   A.  Correct.

22   Q.  And it is true, is it not, that in January of 2008, that

23   they had to focus on those basic prerequisite type skills for

24   Cody's IEP, correct?

25   A.  The team agreed to go that way, yes.

1    Q.  Do you think that was a good decision?

2    A.  It's always a good decision as a team to decide what's best

3    for the child, and at that time the team decided that the

4    communication part was important for Cody.

5    Q.  Now, doesn't it concern you that at ten years old, after

6    being in the District since '03, that you're still dealing with

7    the very basic prerequisites for him?

8    A.  No.  Each autistic child is different from every other

9    autistic child, and how fast they accumulate the skills is

10   based on that child.  You cannot generalize that from student

11   to student.

12   Q.  Now, would you consider 16 to 18 children with one

13   certified teacher as an acceptable ratio?

14   A.  With five aides in the room?  That's acceptable.  That is

15   our cap for Prescott Unified School District.

16   Q.  And those were not -- those were not easy children to deal

17   with, were they?  I mean, they had a lot of demands on the

18   aides and the teacher?

19   A.  Could you clarify what you mean by demands?

20   Q.  Well, they had behavioral problems?

21   A.  No, not all of them.

22   Q.  They had communication problems?

23   A.  No, not all of them.

24   Q.  But many of them?

25   A.  Many of them did.

1    Q.  You described actually with some clarity of memory about

2    your observations of Cody, correct?

3    A.  Correct.

4    Q.  Now, and you also testified there were 660 children at last

5    count when you were there?

6    A.  Well, when I left in '08, there was over 700.  But during

7    the time span you're taking about, there were 650.

8    Q.  Could you make similar observations about each one of those

9    children that were special ed students?

10   A.  All of those students?  I visited every single classroom,

11   so I saw each of them.  Whether it's as specific as I was with

12   Cody, no.

13   Q.  Was there a problem with the high turnover of one-on-one

14   aides?

15   A.  Yes.

16   Q.  And that has nothing to do with Cody, just in general?

17   A.  It had nothing to do with Cody, no, sir.

18   Q.  You've had difficulty keeping those positions filled?

19   A.  Yes, I did.

20             MR. LASSEN:  Thank you.

21             THE COURT:  All right.  Counsel, may Ms. Martinez be

22   excused permanently?

23             MR. LASSEN:  Yes.

24             MS. STATON:  Yes, Your Honor.  Thank you.

25             THE COURT:  Actually she's not going anywhere.

1            MS. STATON:  She's not.  She's going to sit here next

2   to me.

3            THE COURT:  You are excused.  Thank you.  You may sit

4   down.  All right.

5            Your next witness.

6            MR. LASSEN:  We'll call Mr. Ray Parenteau.

7            THE CLERK:  Good afternoon.  State your name please.

8            THE WITNESS:  Ray Parenteau.

9        **RAY PARENTEAU, PLAINTIFFS' WITNESS, SWORN**

10            THE WITNESS:  Sorry.

11            THE COURT:  Go ahead.

12                        **DIRECT EXAMINATION**

13   **BY MR. LASSEN:**

14   Q.  Would you state your name please.

15   A.  Ray Parenteau.

16   Q.  Where do you reside?

17   A.  Prescott Valley, Arizona.

18   Q.  Is that -- You need to speak up, I think, just a little

19   bit.

20            THE COURT:  If you could sit a little closer to the

21   microphone and speak up, it would help.

22            THE WITNESS:  Is that better, Your Honor?

23            THE COURT:  That's better.

24            THE WITNESS:  Can I -- Better posture?

25            THE COURT:  That's fine.  Thank you.

1    Q.  (BY MR. LASSEN)  And you moved to Arizona in 2003?

2    A.  Yes.

3    Q.  And you enrolled Cody in the Prescott Unified School

4    District at that time?

5    A.  Yes.

6    Q.  And how old was he at that time?

7    A.  Five.

8    Q.  Okay.  Now, you participated or attended the IEP meetings

9    for the '03-'04 school year, correct?

10   A.  Yes.

11   Q.  And the '04-'05 school year, correct?

12   A.  Yes.

13   Q.  And the '05-'06 school year, correct?

14   A.  Yes.

15   Q.  Now, you signed off on those IEPs in each of those years,

16   correct?

17   A.  Yes.

18   Q.  Why did you do that?

19   A.  At the time or in hindsight?

20   Q.  Well, no.  Why did you do that at that time?

21   A.  I did it at the time because I had faith in the people that

22   were on the IEP team that they had the expertise and the

23   knowledge that I didn't have regarding how to best educate

24   Cody.

25   Q.  Now, you've heard the testimony all day here today,

1    correct?

2    A.   Yes.

3    Q.   You heard, I believe, Ms. Martinez asked the question about

4    the -- I believe it was the '04-'05 May meeting which you

5    indicated that you were very pleased with his -- Cody's

6    verbalization?  Do you recall that?

7    A.   No.

8    Q.   You don't recall what?

9    A.   I don't recall that meeting and/or any comments that I

10   would have made.

11   Q.   Okay.  Now, what was the level of his verbal skills in May

12   of 2004 as a parent?

13   A.   In May of --

14   Q.   2005.  I'm sorry.

15   A.   In May of -- Okay.  One word utterances, mostly echolalic

16   or not on point.  He would say one or two words, but it may

17   have nothing to do with what was going on at the time.

18   Q.   Did he exhibit problematic behaviors during, say, May of

19   2005 like dropping or bolting?

20   A.   Yes.  Well, at home or at --

21   Q.   Well, if you know, at school?

22   A.   Well, yeah.  I know he was having problems like that at

23   school.

24   Q.   Did he have those problems at home?

25   A.   Yes.

1    Q.  To the same degree?

2    A.  I don't know, because I don't know the exact degree that he

3    had them at school.

4    Q.  Okay.  That's a fair answer.

5            Now, at some point Ms. Martinez testified that you

6    asked for monthly or every six- to eight-week meetings with the

7    teacher and the aides to go over progress.  Do you have a

8    recollection of that?

9    A.  When did she say I requested that?

10   Q.  Well, in one of these years in question.  I think it would

11   have to have been '04-'05 or '05-'06.

12   A.  See, I recall doing it initially in the beginning of the

13   '03-'04 school year.  I don't remember having any additional

14   monthly meetings or regular meetings to review progress until

15   the '06-'07 school year, probably halfway through that.

16   Q.  Why did you not continue that after the first school year?

17   A.  I didn't know the importance of them.  I didn't realize the

18   importance of it at the time.

19   Q.  Now, at one point in time I think it was -- may have been

20   the summer of '05, the District agreed to provide summer school

21   services for Cody at the ASSIST program?

22   A.  Yes.

23   Q.  And you took advantage of that initially, correct?

24   A.  Yes.

25   Q.  But you withdrew Cody from that?

1    A.   Yes.

2    Q.   And why was that?

3    A.   As I explained to Ms. Martinez at the time -- and I put on

4    the record and will tell anybody -- it was damaging to him.

5    Although they utilized some ABA methodologies, the ASSIST

6    program had a huge spike in attendance of students for the

7    summer program as opposed to the normal amount of students

8    during the school year.

9         And so the only way to cover for all the new people or

10   all the new kids coming in for a summer program was to find a

11   bunch of people to hire as paraprofessionals really quickly.

12   So the majority of those, including one of the

13   paraprofessionals that worked for the school district at the

14   time and that was working directly with Cody, were hired.  But

15   they didn't really receive the level of training that was

16   probably necessary to make it be effective.

17        So we pulled him out because we saw basically -- He

18   didn't like going there, is what it came down to.  He was

19   having such a bad experience there that he would cry and not

20   want to get out of the car.  So I'm not going to put my son in

21   that type of environment when he's, you know, because he loves

22   to go to school.  He always enjoyed going to school.  He still

23   enjoys going to school.

24        So I have to assume that if he's crying and I have to

25   drag him out of the car to get him to go in somewhere, he

1    really does not want to go in there for some reason that at

2    that time he could not explain to me.

3    Q.  Now, you never made any complaints about the program that

4    was being offered during -- through June 30th of '06, correct?

5    A.  No, I did not.

6    Q.  And why is that?

7    A.  I didn't know any better.

8    Q.  At some point in time you changed your mind.  First of all,

9    when did that occur?

10   A.  Really the first day of the '06-'07 school year.

11   Q.  And what changed your mind?

12   A.  It was a snowball effect of things that had happened

13   beginning on the first day of school of the '06-'07 school

14   year.  Do you want me to detail it?

15           MS. STATON:  Excuse me, Your Honor.  If Mr. Lassen is

16   going to ask another question, I'll withdraw then.

17   Q.  (BY MR. LASSEN)  Okay.  I don't want you to relay a litany.

18   Something changed your mind.  What was your major concern as of

19   the first day of the '06-'07 school year?

20           MS. STATON:  Let me object on the basis of relevance,

21   because we're now talking about a school year that has nothing

22   to do with the three years at issue.

23           THE COURT:  Well, it may relate to the previous year,

24   and, again, I can give the weight -- the evidence the weight it

25   deserves.  If it turns out to be not worthy of anything,

1    there's no prejudice, so overruled.

2    Q.  (BY MR. LASSEN)  Okay.  Go ahead.

3    A.  Could you repeat the question.

4    Q.  Yeah.  What was the main reason you became upset the first

5    day of the '06-'07 school year?

6    A.  A change of placement without any prior written notice.

7    Q.  And at some point in time you pulled Cody out of school,

8    correct?

9    A.  Yes.

10   Q.  And for about six weeks, correct?

11   A.  Yes.

12   Q.  Ultimately you came to an agreement -- I just want you to

13   acknowledge -- you came to an agreement '06-'07 is not at issue

14   in this case, okay?

15   A.  No.

16   Q.  Okay.  But you came to an agreement with the District for

17   services for that year, period, right?

18   A.  Correct.

19   Q.  But you were upset enough about what had gone on in the

20   prior years to file a due process complaint yourself about the

21   '03-'04, '04-'05, and '05-'06 school years, correct?

22   A.  Correct.

23   Q.  Why did you do that?

24   A.  Because of what I went through, in learning how to try to

25   take care of the problems at the time, it opened my eyes to the

1    fact -- well, to my allegations that I made in the due process

2    complaint that I didn't feel that his education was handled

3    appropriately, that I didn't feel that his IEP was constituted

4    appropriately.

5         I felt that the school district did not provide him a

6    FAPE during those years.  And I wanted to be provided

7    compensatory education for that because those were our very

8    formative years for any child that has autism, as was

9    previously testified to by Dr. Gentry.

10   Q.  Now, do you contend that he did not make progress toward

11   goals and objectives during that three-year period?

12   A.  I don't believe that he made any significant or meaningful

13   progress towards those goals and objectives.  I believe that

14   their weighting system as far as their M1, C1, B2, whatever, is

15   so open to interpretation, is not defined by who made it in

16   that their tracking logs and their other things that they

17   provide are so haphazard and infrequent as to make these

18   decisions that he made progress or did not make progress not

19   viable.

20   Q.  Let me ask you in a different way as far as what you

21   observed.

22        Was his vocabulary increased in -- after the '05-'06

23   school year from what it had been when he enrolled?

24   A.  He stayed very static the entire time.

25   Q.  What about his social skills?

1    A.  They stayed static.

2    Q.  Would that be true --

3    A.  And I think that's reflected in great part in their, you

4    know, the -- the subjective writings of the teacher on what

5    they're observing in the quarterly reports, you know, when they

6    write the little paragraph.

7    Q.  What do you mean by that?  What do you mean?  What does

8    that --

9    A.  I think -- My feeling that his abilities stayed pretty

10   static during those entire three years is reflected as well in

11   the reports, if you read them, that are on the quarterly

12   reports.

13   Q.  Okay.  So is it your contention that he did not make any

14   meaningful progress toward goals during that three-year period?

15   A.  It's my contention that he did not make meaningful

16   progress, that he did not receive a meaningful educational

17   benefit, and that the IEPs now, with hindsight, based on the

18   success that he has made currently, were not geared to his

19   aptitude or his capabilities.

20   Q.  There was a three-year psychological evaluation performed

21   on Cody in the fall of '06, correct?

22   A.  Yes.

23   Q.  Did that cause you any concern?

24   A.  Yes.

25   Q.  And what concern did that cause you?

1           THE COURT:  Is that in the record?

2           MR. LASSEN:  Yes.

3           THE WITNESS:  All the testing that they did on the

4    triennial review, the triennial evaluation, came in lower than

5    the initial testing that they performed when he first attended

6    school in '03.  So his IQ tests, his IQ was lower, his -- I

7    don't remember all the tests, but I think I outlined them in my

8    original complaint.  Everything came in lower after three years

9    of education, including his IQ, which I don't understand how

10   your IQ drops, but --

11   Q.  (BY MR. LASSEN)  Did you hear the term used by Dr. Gentry

12   this morning regression?

13   A.  Yes.

14   Q.  And what do you know that to mean, if you do?

15   A.  I define regression as if you -- the child is not required

16   to use a skill, that they will lose the ability to do it.

17   Q.  During these three years in question, '03-'04, '04-'05, and

18   '05-'06, did you communicate with the teacher or the aides to

19   try to coordinate what was happening in school with what

20   happened at home?

21   A.  During that time period, I was under the impression still

22   that -- We were very happy to be there, quite honestly.  We

23   were happy that we were in the Prescott Unified School District

24   because we assumed as parents -- and I'll include my wife --

25   how lucky we were that we have this whole school district full

1    of experts that know all these things that we don't know about

2    educating kids with autism, obviously to be teachers and to be

3    aides.

4            MS. STATON:  Excuse me, Your Honor.  I think the

5    question -- The answer is not matching the question at all.

6    And I hesitate to interrupt, but I think the only question was

7    do you try to coordinate with the school.

8            MR. LASSEN:  Yeah.  That's what we call,

9    Mr. Parenteau, that's not responsive.

10           THE COURT:  I'll sustain the objection.

11   Q.  (BY MR. LASSEN)  My question is did you try to coordinate

12   with what you and your wife did with Cody at home with what the

13   school staff did during the day?

14   A.  Coordinate like do exactly what they were doing?

15   Q.  Well, was there any communication between the two of you to

16   coordinate what you were doing at home with what happened at

17   school?

18   A.  There was communication.  There was a communication log.

19   That was basically just filled with how his day was.  If they

20   suggested -- I don't recall anymore.

21   Q.  But do you recall any suggestions that you or your wife

22   followed that were given to you by the school personnel?

23   A.  If we were given a direct suggestion, we would try it.

24   Q.  Now, at some point in time, there was reference this

25   morning in questions of the witness to opportunities for

1    training for parents.  Did you or your wife attend any, you

2    know, training sessions?

3    A.  We were not afforded any opportunities at training provided

4    by the District until recently.

5    Q.  Did your wife attend some of those?

6    A.  Yeah.  My wife attended a full-day seminar that was held by

7    Dr. Gentry and by Carey Burgess.

8    Q.  Is that when they were training the staff?

9    A.  Yes.

10   Q.  Now, you were asked questions at your deposition about your

11   self-education, if you will, between August of '06 and when you

12   filed the due process complaint, correct?

13   A.  Yes.

14   Q.  And you took it upon yourself to educate yourself about --

15   A.  Special education.

16   Q.  -- special education law?

17          Why did you do that?

18   A.  Because that was the only option I felt that I had in order

19   to try to rectify the problem at hand.

20   Q.  And what was the problem at hand?

21   A.  What was going on during the beginning of the --

22          THE COURT:  Can you lay some foundation of time?

23   Q.  (BY MR. LASSEN)  Okay.  What was the problem at hand

24   relative to these three years in question?  What was your

25   concern about?

1    A.  My concern was, again, that he was not provided free

2    appropriate public education, that his IEP was not geared

3    toward his individual needs, that the evaluations were

4    insufficient.

5    Q.  Put another way, he didn't learn anything, right?

6    A.  Well, yeah.

7    Q.  I mean, isn't that really what it comes down to?

8         MS. STATON:  Your Honor, you know, I hesitate to keep

9    objecting, but --

10        THE COURT:  The objection is leading.

11        MS. STATON:  It's leading.

12        MR. LASSEN:  I'm trying to get him away from giving

13   legal opinions, to be honest.

14        THE COURT:  In fairness, Mr. Parenteau, I know it's

15   hard when you're testifying, because you have things in your

16   mind that you think the Court should hear about, but it's your

17   lawyer's job to ask the questions to bring out the things that

18   are appropriate and that matter.

19        So please listen to the question, the precise

20   question, and answer that question.  And if there are things

21   that you have in your mind that you know you want to testify

22   about, your lawyer will get to it eventually.  So otherwise we

23   just have a chaotic discussion.  So with that, would you please

24   try to focus on Mr. Lassen's questions and answer them one at a

25   time, and he'll lead them into the right places.

1              THE WITNESS:  Yes.

2    Q.  (BY MR. LASSEN)   Okay.  Without giving me a legalistic

3    answer, what was your concern what had happened for those prior

4    three school years?

5    A.  That he didn't learn anything.

6    Q.  And did you have concern as to whether he could learn?

7    A.  No.

8    Q.  And why not?

9    A.  Because of the other things that he could do when at home.

10   Q.  Now, are you happy with what is being provided currently by

11   the District?

12   A.  Yes.

13   Q.  Now, in your due process complaint and in the moving papers

14   you wrote, you had asked for, under IDEA, compensatory

15   education, correct?

16   A.  Yes.

17   Q.  What do you have in mind, assuming the Court found that the

18   education being provided for those three years in question was

19   inappropriate?

20           MS. STATON:  Excuse me, Your Honor.  I object to the

21   lack of foundation as to this witness has no basis upon which

22   to offer an opinion as to what is needed for this child in

23   compensatory education.

24           THE COURT:  Isn't that a matter of expert expertise?

25           MR. LASSEN:  I think it's a question of what he wants,

1    and I don't know that it's a question of expertise, to be

2    honest.

3            THE COURT:  Well, I would doubt that the Court could

4    order something without a factual basis to conclude that it is

5    in fact necessary or at least helpful, and that's a matter of

6    expertise.

7            MR. LASSEN:  And I'm not disputing that, Your Honor.

8    What I'm concerned about is --

9            THE COURT:  You just want him to say what he wants,

10   and we'll deal later with the question of whether there's a

11   sufficient evidentiary basis for any relief.  Is that what

12   you're saying?

13           MR. LASSEN:  Yes.  Because I think it was pointed out

14   that even if we win, we lose, that there's nothing more that

15   can be done because he's getting everything he wants.

16           THE COURT:  Well, not necessarily.  I'll hear what you

17   want to say, Ms. Staton.

18           MS. STATON:  Quite frankly, I have no idea what

19   Mr. Lassen just said.

20           THE COURT:  Well, let me, before you answer my

21   question, let me restate my comment.

22           I'm understanding the question to ask Mr. Parenteau

23   what he wants, which is different from the issue of the

24   evidentiary sufficiency of any requested relief because of his

25   lack of expertise.  Do you understand how I'm seeing it?

1          MS. STATON:  I understand -- Are you directing it to

2     me, Your Honor?

3          THE COURT:  Yes.  I wonder if that resolves your

4     objection.

5          MS. STATON:  I understand how you're seeing it, but

6     then when you're saying that, I'm thinking then it's not

7     relevant, because what he wants is not relevant.  It's only

8     what is needed, which requires expertise that is relevant.

9          THE COURT:  All right.  I'm going to overrule the

10    objection with the understanding you've articulated that this

11    testimony doesn't necessarily provide any basis to provide

12    relief.  It is just maybe nothing more than foundational to

13    what might yet have to come as to appropriate evidence to

14    support relief.  So with that sort of long-winded ruling, the

15    witness may answer the question.

16    Q.   (BY MR. LASSEN)  Okay.  Mr. Parenteau, what kinds of things

17    would you like as far as compensatory education?

18    A.   I would like compensatory education in the form of

19    additional education for my son to make up for the three years

20    that I feel he was not provided an education, whether that

21    entails additional support in schooling in the summer, whether

22    it entails additional schooling or programming over breaks,

23    whether it includes new computer programs that have become

24    available or some technology that has come available or has yet

25    to become available.  I don't know.  But it's down that venue.

1    Something has to be able to make up for three years of not

2    being educated if that is in fact determined to be the case.

3    Q.  Now, he goes to school from when to when, day, what time to

4    what time?

5    A.  8:30 to 2:45.

6    Q.  And he gets home about what time?

7    A.  3:30.

8    Q.  Okay.  So are you aware that there are what are called

9    after-school programs?

10   A.  Yes, I'm aware of after-school programs.

11   Q.  Could that be one option to provide compensatory education?

12   A.  If developed appropriately.

13   Q.  So those are the kind of things, additional time like what

14   he's now getting during the school day?

15   A.  Yes.

16   Q.  Now, you heard some questions being asked Dr. Gentry about

17   you and your wife's separation.  Can you specify more

18   particularly when that occurred?

19   A.  My separation?

20   Q.  Yes.

21   A.  No, not without referencing the exhibit.

22   Q.  But it was during this three-year period, correct?

23   A.  Yes.

24   Q.  During that three-year period, did you maintain a close

25   contact with Cody?

PARENTEAU - DIRECT

1   A.   Yes.  The only thing that changed is that -- The only thing

2   that changed from his regular schedule was that I was not

3   sleeping at the house any longer.

4   Q.   Okay.  And did both parents spend significant time with

5   Cody during that time?

6   A.   Yes.

7   Q.   Okay.  Now, did you notice any emotional problems or other

8   problems that Cody manifested as a result of you and your wife

9   being separated?

10  A.   No.

11  Q.   Were there any problems, any increase in problems that you

12  became aware of at school during that period of time?

13  A.   No.

14  Q.   Who contacted Carey Burgess regarding whether she would be

15  available to provide assistance to the Prescott School

16  District?

17  A.   I believe it was me.

18  Q.   And how did you come to find out about her or her company?

19  A.   Through my contacts in the autistic or autism community

20  local to my geographic region.

21  Q.   You mean in Prescott?

22  A.   Yeah.

23  Q.   Now, at some point in time did you meet other parents that

24  had their children educated at private schools?

25  A.   Yes.

1    Q.   Was that option ever made available to you?

2    A.   No.

3    Q.   Did you ever -- Were those children more severe than your

4    child?

5           MS. STATON:   Excuse me, Your Honor.  Let me object to

6    the foundation and the relevance of all of this.

7           THE COURT:   This really is pushing relevance.

8    Q.   (BY MR. LASSEN)   Was that option ever given to you?

9    A.   Private school?

10   Q.   Yes.

11   A.   No.

12   Q.   Was it ever discussed?

13   A.   No.

14   Q.   Was there ever a placement, other than the

15   cross-categorical program, the BEST program, ever offered or

16   discussed in the first two years of IEP meetings?

17   A.   No.

18   Q.   Was there discussion at any point in time about

19   mainstreaming Cody for any period of time?

20   A.   The first year in '03.

21   Q.   And what was -- what occurred there?

22   A.   Well, I believe it was a recommendation of the outsource

23   psychologist, the contracted psychologist, that he should spend

24   time in a regular education classroom as well as time in the

25   BEST program.  It was discussed that the entire classroom would

```
 1    probably be doing that, so he would be a part of it.

 2    Q.  Was that put in the IEP?

 3    A.  I don't believe so.

 4    Q.  Did it ever occur?

 5    A.  I don't believe so.

 6    Q.  How about in the second year?  Was he ever -- Was there

 7    ever a discussion regarding being mainstreamed for a period of

 8    time or having access to same aged developmentally normal

 9    children?

10    A.  No.

11    Q.  Now, when you agreed upon a program for '06-'07, that was a

12    feature of it, correct?

13    A.  Yes.

14    Q.  And that's a feature of his current program?

15    A.  Yes, it absolutely is.

16    Q.  You say that with some emphasis.  Why, if that is

17    important, is it to you?

18    A.  This kid from '03 who everybody has described as being

19    severely autistic and not being able to follow directions now

20    with an appropriate education since January spends about two to

21    two and a half hours in a regular education classroom sitting

22    at a desk with the other fourth graders and doing work at his

23    desk without being prompted.

24    Q.  What about his dysfunctional behaviors?

25    A.  He can spend two to two and a half hours a day now in a
```

188

1    regular education classroom, so his dysfunctional or his

2    aberrant behaviors have been greatly reduced and/or eliminated

3    based upon the program that he's had since January of this

4    year.

5    Q.   Could he have done that last year?

6    A.   Could he have done that --

7              MS. STATON:  Your Honor --

8              THE WITNESS:  -- prior to January?

9              THE COURT:  Excuse me.  Wait.

10             MS. STATON:  I'm objecting on the basis of foundation,

11   because now he's trying to offer some type of expert opinion as

12   to what could have been done the year before.

13             THE COURT:  Yes.

14   Q.   (BY MR. LASSEN)  Is this the first time that he's been able

15   to do that?

16   A.   Yes.

17             MR. LASSEN:  Thank you.  That's all I have.

18             THE COURT:  All right.  Ms. Staton, you may

19   cross-examine.

20             MS. STATON:  Thank you, Your Honor.

21                         **CROSS-EXAMINATION**

22   **BY MS. STATON**:

23   Q.   Sir, I think you -- We'll start at the beginning here.

24             When Cody was enrolled at the school district in

25   Prescott, he was about five years old; is that right?

1    A.   Yes.

2    Q.   Let me ask you this:  Do you live currently in Prescott

3    Valley?  Is that what I heard you say?

4    A.   Yes, I do.

5    Q.   Is that in the Prescott School District?

6    A.   I never lived in the Prescott School District.

7    Q.   So you've always enrolled your son outside the District?

8    A.   I guess.  When we moved there in August of '03, we moved to

9    Williamson Valley, and there was just never -- there was never

10   a question of where he would go to school, because I guess all

11   the kids in Williamson Valley go to Prescott Unified School

12   District.  But if you look at -- I found out, I think, two

13   years later when I started looking at my property tax thing

14   that all my property taxes go to Chino Valley --

15   Q.   So you're really --

16   A.   -- School District.

17   Q.   You're in the Chino Valley Unified School District?

18   A.   I was.

19   Q.   Are you still?

20   A.   No.  I live in Prescott Valley now.

21   Q.   So now you're in the Prescott Valley -- Is there something

22   called Prescott Valley Unified School District?

23   A.   I don't know.

24   Q.   You haven't looked into it?

25   A.   I don't know.  I think it's called Humboldt.

1    Q.  Oh, all right.  So irrespective of the name of the

2    District --

3    A.  They do have a school district.

4    Q.  Let me finish the question.  So irrespective of the name of

5    the school district, where you live in Prescott Valley is

6    the -- is not the Prescott Unified School District?

7    A.  Correct.

8    Q.  Did you ever consult with anybody at Humboldt Unified

9    School District with respect to your son's education?

10   A.  No.

11   Q.  Or with the Chino Valley Unified School District?

12   A.  No.

13   Q.  Did you think you were supposed to enroll your son in the

14   right school district?

15   A.  Everybody at Prescott Unified School District knew exactly

16   where we lived and readily accepted him for enrollment.

17   Q.  Okay.

18   A.  We never questioned it.  At the time when we first moved to

19   Prescott, everybody told us if you live in Williamson Valley,

20   you go to Prescott Unified School District.  We never

21   questioned it.  The school district never made an issue of it.

22   And I believe in Arizona or at least up there you can go to any

23   school district you want, because I see in the paper all the

24   time that, you know, they blame the overcrowding of the high

25   school on all the kids that are coming from Chino Valley and

1    Prescott Valley.

2    Q.   So you think you can -- you think it's appropriate for your

3    son to have been enrolled in Prescott all these years?

4    A.   I absolutely think it appropriate.

5    Q.   At the time you -- In the three years -- Let's take the

6    three years between your son's diagnosis of autism and his

7    enrollment in the Prescott Unified School District.   Did you

8    take any classes to learn about special education needs of

9    autistic children?

10   A.   No.

11   Q.   Did you receive any training during that time period, when

12   you were over in California before you came over to Prescott

13   Unified School District, on what the needs would be for an

14   autistic child?

15   A.   Did I receive training?

16   Q.   Yeah, training or classes, attend any seminars.   From the

17   time your child was diagnosed at about age two until age five

18   when you brought him to Prescott, did you try to learn by going

19   to any classes or seminars about the needs, the educational

20   needs, of an autistic child?

21   A.   I did not try to learn by going to classes or seminars.

22   Q.   The -- Up until this last year, the only training or class

23   you attended was a breakout session and one two-day seminar in

24   Phoenix; isn't that right?

25   A.   I attended a two-day seminar in Phoenix.   What was your

1    question?

2    Q.  I'll ask it again.

3           The only training you received up until this last year

4    about autism was a breakout session in one of the two-day --

5    two-day seminar that you attended in Phoenix; isn't that right?

6           THE COURT:  Time frame for that question?

7    Q.  (BY MS. STATON)  I said from the time that he came to

8    Arizona until this last year, during this time that your son

9    was enrolled at Prescott Unified School District, you went to

10   one breakout session in one two-day training that was given in

11   Phoenix; isn't that right?

12   A.  Are you asking me if I attended one breakout session during

13   a two-day seminar?

14   Q.  Yeah, dealing with your son's autism.

15   A.  No.  I attended many breakout sessions at that two-day

16   seminar.

17   Q.  All right.  Is the total time that you spent two days?

18   A.  Is that the question?

19   Q.  Yes.

20   A.  In training?

21   Q.  Yes.

22   A.  In a training session?

23   Q.  Yes.

24   A.  Yes.

25   Q.  One of the things, sir, that you and your wife tried to do

1    was not treat Cody as if he was autistic; is that right?

2    A.  Yes.

3    Q.  And you did not want to make too many of accommodations of

4    what was expected of him; is that true?

5    A.  Yes.

6    Q.  And you expected of him what you would expect of a child

7    who did not have autism, right?

8    A.  In some respects.

9    Q.  You tried not to perpetuate things that children with

10   autism use such as schedules; is that fair?

11   A.  We didn't use a schedule with Cody.

12   Q.  Even if schedules were used by the school, you chose not to

13   use a schedule; is that fair?

14   A.  We used a schedule to the extent that he went to bed at the

15   same time every night.  It depends on -- You made a vague

16   generality towards schedules for a lot of children with autism

17   or every child with autism.

18   Q.  I'm not talking about every child, sir.  My only question

19   to you was you did not have Cody on a very detailed schedule,

20   did you?

21   A.  No, we did not.

22   Q.  And if the school had him on a detailed schedule with

23   respect to his tasks, that would not be duplicated at home

24   because you didn't have him on such a detailed schedule, fair?

25   A.  You said if --

1    Q.   Yes.

2    A.   -- they had him on a schedule.

3    Q.   Correct.

4    A.   We would have if we thought there was good reason for it.

5    Q.   As a matter of fact, sir, you consulted with experts, but

6    basically you decided that you were going to do what you were

7    going to do as it related to your son; is that right?

8    A.   No.

9    Q.   Sir, do you remember me asking you the following question.

10   This is at Page 27.

11        "Did you consult with experts on that topic about, for

12   example, schedule keeping and whether that was a good thing, a

13   bad thing, helpful or not helpful?

14        "Answer:  You know, we thought we consulted with

15   experts, but basically it came down to we're just going to do

16   what we're going to do."

17        Did you give that answer to that question, sir?

18   A.   We thought we consulted with experts --

19   Q.   No, sir.  Did you give that answer to that question?

20   A.   Yes, I did.

21   Q.   Now, when your son was enrolled in Prescott Unified School

22   District, he wasn't toilet trained; is that right?

23   A.   Yes.

24   Q.   And you'd been trying to do that for five years at that

25   point?

```
1    A.  Toilet train him?

2    Q.  Yeah, or four probably might be a better time frame.

3    A.  Two or three.

4    Q.  Okay.  And you continued to try in 2003-2004, '04-'05,

5    '05-'06?

6    A.  Yes.

7    Q.  Weren't successful; is that right?

8    A.  Right.

9    Q.  Did you work with the school in trying to find a way to see

10   that he would -- could be toilet trained, which is one of those

11   social goals that Dr. Gentry referred to?

12   A.  We took our cues for toilet training from the school.

13   Q.  And, well, did you do any study on your own as to how you

14   could assist your child other than simply relying on what the

15   school was telling you?

16   A.  Repeat the question.

17   Q.  Sure.  You said you relied on the school.  I'm asking you

18   did you do anything as his father to learn how to engage your

19   son so that he could at least meet the simple social goal of

20   going to the bathroom?

21   A.  Yes.

22   Q.  And it took -- you weren't successful until, what, 2008?

23   A.  That's right.

24   Q.  When Cody came to the school at Prescott, he wasn't able to

25   drink from a cup consistently, was he?
```

1    A.  I don't recall.

2    Q.  That would all be reflected in Dr. Grimm's reports and in

3    the IEPs, right?

4    A.  If they -- If it is, then it is.

5    Q.  But you as the father as you sit here today, you can't tell

6    us when your son first began to be able to even drink from a

7    cup?

8    A.  Sure, I could tell you that.

9    Q.  Tell us.

10   A.  Four years old or three years old.

11   Q.  Oh, so you're saying that he could drink from a cup when he

12   was enrolled at Prescott Unified School District?

13   A.  He could always drink from a cup prior to when he was

14   enrolled in Prescott Unified School District.  Do you want me

15   to continue, or are you going to ask me something else?

16   Q.  I'm just asking you, sir, is it your testimony that the

17   reports authored by the California authorities, the school

18   district there, and Dr. Grimm all reflect that your son was

19   able to consistently do a simple task such as drink from a cup?

20   A.  It's not my testimony.  It's what I'm telling you.  I'm

21   telling you what I recall.  I'm not telling you what's written

22   in other reports or what other people stated.

23   Q.  All right.  So you're saying that's your memory?

24   A.  Yes.

25   Q.  All right.  I want to make sure I understand.  During the

1   three years that we're talking about, '03-'04, '04-'05,

2   '05-'06, you had open communication to be able to talk to the

3   staff and the teachers?

4   A.  Yes, I did.

5   Q.  And if I understood you correctly, you never complained

6   about the IEP or the progress notes during those three years?

7   A.  No, I didn't.

8   Q.  That would be correct?  You made no complaints?

9   A.  Correct.  I made no complaints.

10  Q.  You saw the IEPs, and you saw the progress, and you lived

11  with your son, but you made no complaints?

12  A.  That's correct.

13  Q.  But it's in 2006-2007, that very first day of that school

14  year, that you decided that the previous three years he was not

15  getting an education?  Is that when the first -- you first

16  determined that?

17  A.  No.

18  Q.  You thought that before?

19  A.  No.  I didn't determine it on that day.

20  Q.  Oh, well, was it sometime in the school year of 2006-2007

21  that you concluded that your son hadn't received an appropriate

22  education for the previous three years?

23  A.  Yes.

24  Q.  But during the three years, you thought he was?

25  A.  Yes.

1    Q.  And you didn't have any concerns about the progress he was

2    showing?

3    A.  Yes, I did have concerns.

4    Q.  You didn't express those to anyone at the school; isn't

5    that true?

6    A.  That's true.

7    Q.  And each year -- Strike that.

8            Each quarter you would meet with the teachers,

9    correct?

10   A.  No.

11   Q.  Monthly?

12   A.  No.

13   Q.  Well, you would meet with them throughout the year during

14   each of those three school years, right?

15   A.  At least annually.

16   Q.  And then sometimes it would be even more frequent than

17   that?  Wouldn't that be correct?

18   A.  I believe initially in the beginning of the 2003 school

19   year.

20   Q.  And you never expressed any concerns at that time either,

21   did you?

22   A.  No.

23   Q.  Now, you signed as having agreed to the goals and

24   objectives?

25   A.  Yes.

1  Q.  You saw how the progress was described in the quarterly

2  reports?

3  A.  Yes.

4  Q.  You never contested that progress at all, did you?

5  A.  Yes, I did.

6  Q.  You never told anybody at the school, you never complained

7  to anybody at the school during those three years that your son

8  was not making progress?

9  A.  Yes, I did.

10  Q.  Who did you speak to, sir?

11  A.  Nancy Martinez and I had a long conversation during the

12  development of the 2005-2006 IEP.  That's why it so

13  dramatically differs from the two previous IEPs.

14  Q.  Sir, if -- Let me see if I can find that.  Sir, is that

15  the -- Here it is.

16          That's the meeting that you had on May 5th of 2005,

17  right?

18  A.  No, I don't believe so.  I think it would have been -- When

19  was the IEP developed?  December or September, October.

20  Q.  So you think it's another meeting?

21  A.  I think it was the meeting that was held to develop the new

22  IEP.

23  Q.  Okay.  Well, sir, can we show Mr. Parenteau Exhibit 8.

24  It's been stipulated into evidence, sir.

25          Do you have that in front of you, sir?

1   A.  Yes.

2   Q.  Do you see the first paragraph it says Ray Parenteau?

3   A.  Yes.

4   Q.  Do you see where it says, about three or four lines down,

5   it says, "Well, I just called this meeting because I wanted

6   just to have a regular IEP review.  I want to talk about what

7   road blocks might be obstructing this current -- this current

8   accelerated pace of learning, because I don't know about you

9   guys, but we're seeing that there's an accelerated pace in the

10  speech and language, particularly and doing real well with some

11  of the behavioral issues."

12          And that's something that you told Nancy Martinez in

13  May of 2005, isn't it?

14  A.  Where did this come from?

15  Q.  Sir, that's what you told Nancy Martinez in May of 2005?

16  It's an exhibit that your counsel has stipulated in.

17  A.  Okay.

18  Q.  There's nothing in there, sir, where you say that you're

19  concerned about his progress; isn't that true?

20  A.  I don't know, because I don't recall this meeting.

21  Q.  All right.  Now, let's talk about a program that was called

22  the ASSIST program.  Okay?

23          That was a summer school program that was given in

24  June of 2005?

25  A.  Okay.

1   Q.  Are you saying okay because of why?  Do you recall that

2   your son --

3   A.  I'm agreeing with you.

4   Q.  Excuse me, sir.  Let me finish the question.

5          Do you recall that your son was enrolled in a summer

6   program called ASSIST in June of 2005?

7   A.  Yes.

8   Q.  Were you the one that found that program?

9   A.  I don't honestly recall.  It was -- I think it was a

10  combination of Nancy and I.

11  Q.  Isn't that the one -- the program that you selected, and

12  she said send me the bill?

13  A.  I think it was selected based on a meeting that we had.  I

14  don't remember who initially brought it up.

15  Q.  So you didn't -- it's your testimony you don't recall that

16  you were the one that brought it to Ms. Martinez's attention?

17  A.  As I recall, they were already sending other students

18  there.

19  Q.  I don't think that was my question.  It was you who brought

20  to Ms. Martinez's attention the ASSIST program for your son?

21  A.  I don't honestly recall.

22  Q.  Your son was enrolled for two weeks?

23  A.  Yes.

24  Q.  You pulled him out?

25  A.  Yes.

1   Q.  Did you tell Mrs. Martinez that you had pulled him out?

2   A.  I don't recall.  I told her later.  I don't recall.

3   Q.  The next school year?

4   A.  I know for sure I told her then.

5   Q.  Did you look for another program for your son?

6   A.  There was no other programs in Northern Arizona.

7   Q.  Did you consult with Ms. Martinez at the time you took your

8   son out of the summer school program?

9   A.  I don't recall.

10  Q.  You didn't pay for those services, did you, sir?

11  A.  The ASSIST program?

12  Q.  Correct.

13  A.  No.

14  Q.  Those are paid for by the school?

15  A.  Yes.

16  Q.  Do you know if the school paid for the entire summer for

17  your son?

18  A.  I don't believe they did, because I don't believe the

19  program lasted the entire summer.

20  Q.  Do you know if they paid for the entire program that was

21  offered during the summer of June of '05?

22  A.  I don't know.

23  Q.  Now, let me ask you about -- Let me ask you, sir, about --

24  You said earlier in response to Mr. Lassen's questions that you

25  don't remember when you were separated from your wife; is that

1    right?

2    A.  I don't recall that being my response.

3    Q.  Well, you do recall that you were separated from September

4    of '05 until March of '06; isn't that correct?

5    A.  No, that's not correct.

6    Q.  You know that you filed for separation on September the

7    16th of '05, don't you?

8    A.  Yes, I know that.

9    Q.  And you know that you were separated for about six months?

10   A.  Yes, I know that.

11   Q.  And you also know that during this time, you filed an

12   emergency petition for an order to gain custody of your son?

13   A.  Yes, I know that.

14   Q.  And in the petition, you stated that you believed that your

15   wife was unable to provide adequate care and custody of your

16   child because she was dependent on prescription medication?

17          MR. LASSEN:  Objection.  It's outside the scope,

18   relevance.

19          THE COURT:  Overruled.

20   Q.  (BY MS. STATON)  Isn't that true, sir?

21   A.  Yes.

22   Q.  That's what you told the Court in order to be able to get

23   custody of your son, true?

24   A.  That's what I told the Court in order to attempt to get

25   custody of my son.

1    Q.  And you told the Court that your wife did not provide the

2    necessary care for your son even for short periods of time?

3    A.  No.  I believe I told them that she may not be able to or

4    could not, not did not.  I'm sure you can read what I wrote.

5    Q.  Well, sir, you do know that your wife would be sleeping --

6    this is what you told the Court -- and that your son would set

7    off emergency panic alarms, fair?

8    A.  Yes.

9    Q.  And that's not the stable home life that you wanted for

10   your son, and that's why you filed that pleading with the

11   Court?

12   A.  No, that's not the reason that I filed the pleading with

13   the Court.

14   Q.  You didn't lie to the Court, did you?

15   A.  No.

16   Q.  So what you put in there was true?

17   A.  Yes.

18   Q.  Sir, do you -- have you looked at the progress notes for

19   the fall of 2005, the period in which you and your wife were

20   separated?

21   A.  Yes, I reviewed them actually about two hours ago.

22   Q.  And you saw, did you not, where the progress declined in

23   October of 2005?

24   A.  In the reporting for October of 2005?

25   Q.  I asked you, sir, simply did you see in the progress notes

```
 1    that covered the period of the fall of 2005 that the progress

 2    declined for your son?

 3    A.  Yes, I did.

 4    Q.  Now, it's your testimony that you're ecstatic with the

 5    education he has been receiving since January of 2008; isn't

 6    that true?

 7    A.  Yes.

 8    Q.  And you have incurred no out-of-pocket expenses during the

 9    three years that are the subject matter of this lawsuit

10    regarding your son's education; is that true?

11    A.  Yes.

12              MS. STATON:  That's all.  Thank you.

13              THE COURT:  All right.  Mr. Lassen, you may redirect.

14                         REDIRECT EXAMINATION

15    BY MR. LASSEN:

16    Q.  Mr. Parenteau, you were asked questions about the

17    separation.  What was the reason that you filed the action and

18    the affidavit?  First of all, was that done with the assistance

19    of counsel?

20    A.  Which?

21    Q.  The temporary custody petition.

22    A.  Yes.

23    Q.  And what was the reason that you filed that?

24    A.  To try to prevent my wife from leaving the state with Cody.

25    Q.  Was that the main reason that you did it?
```

1    A.   Yes.

2    Q.   Now, you said that you had reviewed the progress notes for

3    the fall of 2005.   Could you tell whether progress was in

4    fact -- had declined or he regressed during that period of

5    time?

6              MS. STATON:   Excuse me.   Let me object on the basis of

7    foundation, Your Honor.   If he's talking about reading the

8    document, that's one thing.   If he's asking for some kind of

9    expert opinion as to the progress of each of the objectives,

10   this witness doesn't have the requisite background.

11             THE COURT:   I'll sustain the objection, but I think he

12   can lay more foundation and perhaps get there.

13   Q.   (BY MR. LASSEN)   At any point in time during that -- You

14   were still having daily interactions with Cody, correct?

15   A.   Yes.

16   Q.   Did you see any -- Personally did you observe any

17   regression or -- during that period of time you were separated?

18             MS. STATON:   Let me object, same objection.   There are

19   very detailed objectives and goals, and he's just asking about,

20   quote, regression, and it's not tied to the IEPs in any way.

21             THE COURT:   Overruled.   I'll give it the weight it

22   deserves.

23             THE WITNESS:   Could you please repeat the question.

24   Q.   (BY MR. LASSEN)   Yes.   Did you notice any regression in

25   Cody in his social or behavioral skills during that period of

1    time?

2    A.    I noticed regression because he just got out of summer

3    vacation.    And it's my opinion that that is reflected in the

4    progress report for that fall quarter just as it is in every

5    fall quarter of every year that's in question because there is

6    regression that requires recoupment after every summer break.

7            MR. LASSEN:    That's all I have.

8            THE COURT:    All right.    You may step down,

9    Mr. Parenteau.

10           Well, we only have Ms. Phillips left, correct?

11           MR. LASSEN:    Correct.

12           MS. STATON:    Mrs. Parenteau is not going to testify?

13           MR. LASSEN:    No.

14           THE COURT:    Does the plaintiff rest?

15           MR. LASSEN:    The plaintiffs rest.

16           THE COURT:    Well, why don't we resume at 10:00, then,

17   when she'll be here, right?

18           MS. STATON:    Yes.

19           THE COURT:    About how long do you think she will take?

20           MS. STATON:    40 minutes for me.

21           THE COURT:    Okay.

22           MS. STATON:    Maybe 45.    Short.

23           THE COURT:    I just like to manage things so we do not

24   unnecessarily inconvenience witnesses.    It would be nice if we

25   could finish up with her in the morning.    But here's the

1    complication.  I'm going to the AWLA lunch tomorrow, and I

2    don't recall exactly when I have to leave to get there.  It

3    would be nice if we could recess by 11:30 but certainly by

4    11:45.

5           But we'll take the witness wherever it goes.  The

6    testimony is what matters.  All right.  With that we'll be in

7    recess until 10:00.

8           MS. STATON:  Thank you, Your Honor.

9       (Proceedings recessed at 4:15 p.m. )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

# C E R T I F I C A T E

I, LINDA SCHROEDER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 23rd day of May, 2009.


                                        s/Linda Schroeder
                                    Linda Schroeder, RDR, CRR

UNITED STATES DISTRICT COURT