**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| RAYMOND PARENTEAU AND | ) | |
| JOLENE PARENTEAU, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CIV 07-8072-PCT-NVW |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 19, 2008 |
| PRESCOTT UNIFIED SCHOOL | ) | 10:00 a.m. |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL TO THE COURT - DAY 2**

(Pages 210 through 284, inclusive.)

**APPEARANCES**:
For the Plaintiffs:
        Law Office of Gary L. Lassen
        By:  **GARY L. LASSEN**, ESQ.
        2020 North Central Avenue, Suite 1100
        Phoenix, AZ  85004

For the Defendants:
        Jones Skelton & Hochuli
        By: **GEORGIA A. STATON**, ESQ.
        2900 North Central Avenue, Suite 800
        Phoenix, AZ  85012

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                              INDEX

2

   SUMMARY OF COURT PROCEEDINGS                        PAGE:

3

   Closing Arguments
4          Plaintiffs                                  272
           Defendants                                  275

5

6                       INDEX OF WITNESSES

7  WITNESSES FOR THE        Direct    Cross    Redirect
   DEFENDANTS:

8
   PHILLIPS, Joanne          213      245

9

10                      INDEX OF EXHIBITS

11
   EXHIBIT NO.:        DESCRIPTION:                  RECEIVED:

12
      37    CV of Joanne Phillips                       214
13    38    Expert Report of Joanne Phillips            214

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
1          THE COURT:  Before we begin, there's something I don't
2     want to forget it, so let me bring it up now.
3          As you all know, everything we write now is available
4     on the Internet with Westlaw and Lexus, and therefore I'd like
5     to ask Mr. Lassen:  When I write this order, do you want me to
6     refer to Cody as CP or by his first name?  The issues here are
7     the child's privacy, and I leave it entirely up to you.
8          MR. LASSEN:  It doesn't matter -- Cody would be --
9     Whatever is easiest.  It would be good to be consistent
10    throughout.
11         THE COURT:  All right.  Again, I really defer to
12    Mr. Parenteau on that.
13         RAYMOND PARENTEAU:  Your discretion, Your Honor.
14         THE COURT:  It seems my own sense is that while there
15    is a value to maintaining even the appearances of protecting
16    children's privacy, as a practical matter, there probably is
17    none protected here.  And it does read a little more easily.
18    And, well, this is a matter of style, and I would defer to you.
19    We're talking about a real child here, and he's got a real
20    name, and that means something to me.
21         RAYMOND PARENTEAU:  Unless you're going to, you know,
22    use our initials as the plaintiffs, it really doesn't matter.
23         THE COURT:  I think I'll do it that way, then, with
24    your approval.
25         All right.  Ms. Staton, you may call your next
```

UNITED STATES DISTRICT COURT

1    witness.

2            MS. STATON:  Thank you, Your Honor.  Yes.  Joanne

3    Phillips, Your Honor.

4            **JOANNE PHILLIPS, DEFENDANTS' WITNESS, SWORN**

5            THE COURT:  All right.  Please proceed.

6            MS. STATON:  Thank you, Your Honor.

7                        **DIRECT EXAMINATION**

8    **BY MS. STATON:**

9    Q.  Ma'am, would you please introduce yourself to the Court.

10   A.  Yes.  My name is Joanne Phillips.  I'm a consultant on

11   behalf of the Prescott School District.

12   Q.  You were retained in this case to provide expert opinion;

13   is that true?

14   A.  Yes, I was.

15   Q.  And it was specifically related to the educational services

16   that were provided to Cody Parenteau during the subject years

17   of 2003 through school year 2006?

18   A.  That's correct.

19   Q.  Okay.  Did you reach an opinion with respect to whether he

20   was provided a free and appropriate public education?

21   A.  Yes, I did.

22   Q.  Let me ask you a little bit about your background, and then

23   we'll talk about your opinion and then the bases for it.

24            First of all, Your Honor, I would offer Exhibits 37

25   and 38, which were not objected to, stipulated to, actually, by

PHILLIPS - DIRECT

```
 1    both counsel.
 2              THE COURT:  Haven't we already ordered them in?
 3              MS. STATON:  No.  I inadvertently missed those two.
 4              THE COURT:  Any objection?
 5              MR. LASSEN:  No objection.
 6              THE COURT:  All right.  Exhibits 37 and 38 are
 7    admitted.
 8    Q.  (BY MS. STATON)  Ma'am, Exhibit 37 is your curriculum vitae
 9    or resume, and the Court will have that in the record.  But let
10    me just briefly walk through a little bit of the highlights
11    right now.  What is your current occupation?
12    A.  I'm owner and president of Arizona Education Cadre, LLC,
13    which is a consulting and mentoring firm.
14    Q.  And consulting and mentoring about what and to who?
15    A.  It's consulting regarding matters of special education,
16    general education.  I provide services principally to education
17    agencies, public or private.  It involves consulting, mentoring
18    of administrators of staff, staff development, direct services
19    at times.
20    Q.  And is this a consulting service that is principally in the
21    State of Arizona?
22    A.  Mostly in Arizona.  I have also consulted with New Mexico.
23    Q.  Okay.  Do you -- Who do you use as consultants?
24    A.  A variety of consultants on the Cadre are principally
25    people who are experts in their field who are either retired or
```

1    they have taken time off from teaching or from schools.  Some

2    of them are working part time in schools, and some of them are

3    still employed in schools but then do consulting in their

4    expertise areas.

5    Q.  Do you also personally train school districts?

6    A.  I do.  I provide mentoring and consultation as well as

7    staff development on a variety of topics.

8    Q.  All right.  Let's talk a little bit about your educational

9    background.  Let's start with your bachelor's degree.  Can you

10   tell us when you received it, from where, and in what area?

11   A.  Absolutely.  I received my bachelor of arts in 1975 from

12   Hofstra University, which is a private university in Long

13   Island, New York.  It's a degree in speech and hearing

14   sciences, speech pathology, emphasis in language disorders.  My

15   master's degree was also obtained from Hofstra University in

16   1976.  And that again is in speech pathology with an emphasis

17   in autism.

18   Q.  When you talk about speech pathologist in a school

19   district, a lot of times people think of a consultant or an

20   expert who deals only with children who have difficulty making

21   sounds.  They have a lisp or there's some kind of a speech

22   impediment.  Is that the totality of what a speech and language

23   pathologist does?

24   A.  That's a very small fraction of what I do.

25   Q.  Can you tell us please what it is that someone with a

1    master's degree in speech pathology does in the context of a

2    school.

3    A.   Absolutely.   It might be helpful to know that the

4    curriculum itself is called communication disorders.   So I have

5    a degree in communication disorders.   The degree itself is

6    called speech pathology.

7            In the realm of communication disorders, we talk about

8    receptive language, language that we understand, expressive

9    language, that which we can say, verbal and non-verbal

10   communication.   About 80 percent of communication is

11   non-verbal.   So that's all within the realm of communication

12   disorders.   So it's far more than just a speech elocution

13   articulation.   The greater realm is language.

14   Q.   Let's talk a little bit about your professional background.

15           You've worked with special needs children?

16   A.   I have.

17   Q.   When did you start?

18   A.   Excuse me.   I started actually working with special needs

19   children in 1973.   After I graduate -- Well, throughout my

20   clinical programming and practicums, I became employed in the

21   public school system in 1976 here in Arizona first as a speech

22   pathologist, then as clinical coordinator in the Glendale

23   Elementary, then Deer Valley School District, and then became

24   the assistant director in Deer Valley, and then the director.

25   After that --

PHILLIPS - DIRECT

1    Q.  I'm sorry.  Was the director of what at Deer Valley?

2    A.  I'm sorry.  Director of special education, clinical

3    coordinator of special education services.

4    Q.  How long did you work at Deer Valley?

5    A.  I was there from 1978 to 1991.

6    Q.  All right.  And then in 1991 where did you go?

7    A.  In 1991 I became the director of special education for the

8    Scottsdale Unified School District until 2003.

9    Q.  And in 2003, what did you do?

10   A.  In 2003, I became the state director of special education

11   for the State of Arizona.

12   Q.  All right.  When you were in the school district as a

13   director, both at Deer Valley and Scottsdale Unified School

14   District, what did you do specifically as director with respect

15   to special needs children?

16   A.  When I was in Deer Valley, really starting as supervisory

17   capacity as clinical coordinator, we began bringing back our

18   children from private placements, private day placements,

19   specifically to create an autism program.  That was one of my

20   main focuses in coordinating all of the ancillary staff for

21   those youngsters.

22          We opened two communication disorders programs for

23   children with autism and then two programs specifically honed

24   for children with more significant needs who were autistic.

25   Q.  And when you went to the Scottsdale Unified School District

PHILLIPS - DIRECT

1    as a director, did you do similar type of work?

2    A.  Very, very similar work.  Scottsdale had been without a

3    director for five years.  And so initially it was pulling

4    things back together, and then again the endeavor to start

5    creating appropriate programs for our children, and again

6    started opening up autism programs, training teachers very

7    specifically in working with kids with autism.

8    Q.  When you were with Scottsdale Unified School District, did

9    you provide training for teachers outside of Scottsdale Unified

10   School District?

11   A.  I did.  It was very frustrating to me that when -- many

12   parents were requesting to place their children in our

13   district, and they were not residents.  And it was because we

14   had created programs, had highly trained staff, and very few

15   other districts had programming available.

16          So I began to bring in teams from North Carolina and

17   hosted trainings in Scottsdale for statewide training.

18   Q.  And then when you moved to the Arizona Department of

19   Education in 2003, what was your role there?

20   A.  As the state director, my role was to supervise special

21   education programs statewide, but as the state director, you

22   also have some prerogatives to bring in initiatives.  And one

23   of the continuing initiatives that I brought in was the

24   statewide training and preparation for teachers in autism.

25   Q.  All right.  Now, you've rendered an opinion in this case

1  with respect to whether Cody Parenteau received a free and

2  appropriate public education during the subject time period.

3  Is that fair?

4  A.  Yes, ma'am.

5  Q.  What did you review before you reached the conclusions

6  which you did reach?

7  A.  I think most of the exhibits are listed in roughly Pages 12

8  to 34.

9  Q.  Of your report?

10 A.  Of my report.  And they basically included all of the

11 medical records prior to him being enrolled in the Capistrano

12 School District in California, the records from Capistrano, the

13 California records, all of the evaluations, IEPs, progress

14 reports, notes that were in the file, as well as record logs,

15 test protocols from roughly 2003 through the '05-'06 school

16 year.

17 Q.  Did you also review the depositions given by Mr. and

18 Mrs. Parenteau?

19 A.  Yes, I did.

20 Q.  Now, can you tell us what your opinion is with respect to

21 whether Cody received a free and appropriate public education

22 at Prescott Unified School District during the relevant time

23 period?

24 A.  Basically, to summarize, I absolutely do believe he

25 received a free appropriate public education and basically that

1    he did receive more than minimal progress.  He made meaningful

2    progress, based on those goals and objectives over the course

3    of that time.

4    Q.  All right.  Let's talk just a bit about autism, because

5    Dr. Gentry was testifying yesterday.  Do you know Dr. Gentry?

6    A.  I know -- I've met him briefly, yes.

7    Q.  Now, he's testified generally that autism is a neurological

8    disorder that affects a person's ability to communicate,

9    language and use of language.  Is that a fair generalization?

10   A.  That would be, yes.

11   Q.  Do autistic children then have difficulty in developing

12   language?

13   A.  Absolutely.

14   Q.  What is the difficulty with a child who's autistic in

15   developing language or should I use the term communication

16   skills?

17   A.  Communication would probably be a better descriptor.

18   Children with autism have disconnected wiring is probably the

19   easiest way I can explain.  The wiring is probably there, the

20   rudimentary wiring.  But they have difficulty with the most

21   basic nuances, the most basic cadences of language.  Some

22   children with autism never even learn to speak.  There's no

23   verbal skills ever, about 50 percent in fact.  But generally

24   children with autism have a disconnect.  They don't understand

25   the verbal word, if you will, or sometimes even the written

1    word and what its meaning is.  They don't have anything to hook

2    it to.  They don't even understand that it's a means to get

3    what you want.

4    Q.  Can you give us an example?

5    A.  Sure.  If I -- Just a simple word such as stop or chair,

6    they may not understand that when I say chair, to them it may

7    sound like blah-blah-blah, and they have no connection between

8    that word and that object.  And then worse yet, if I look at

9    that chair and contrast it to one simply without arms, they may

10   not even recognize the two as being chairs, because if I tell

11   you that's chair, it's black, it has a base to it, it's

12   attached to the ground, and now you're telling me that this

13   thing is a chair?  It doesn't look anything like that, so it

14   can't be the same.

15   Q.  So they don't make those generalizations?

16   A.  They don't easily make generalizations at all.  That

17   comprehensive system is lacking.  The attention is lacking.

18   Q.  When you talk about communication, you said that's a better

19   term to use than language.  First of all, why is it a better

20   term to use than language?

21   A.  Well, there are many different communication systems, and

22   when we think about communication, we generally talk about --

23   think about what we're doing right now, a verbal interchange,

24   and we call that communication.  But communication broadly is

25   making other people aware of what your thoughts, your needs,

1    your feelings, your wants, your desires, and then it's two-way.

2    It's understanding what their needs and wants and desires are.

3    And that interchange makes it a very social activity, and we

4    are social beings.  To function, we must be social and interact

5    with other people, and the vehicle for that social behavior is

6    communication broadly.

7    Q.  Now, you mentioned that there's both verbal, which is what

8    we're doing now -- we're having an exchange of words -- but

9    there's also non-verbal.  Do you mean, what, facial

10   expressions?  What do you mean by that?

11   A.  Oh, golly.  Non-verbal communication is gesture.  It's

12   facial expression.  It's vocal inflection.  It is the eyes.  We

13   know that children with autism at their very earliest infancy

14   at six and eight months old fail to look at the eyes.  They

15   look at the mouth because that's where the sound comes from.

16   And the very early stages they don't recognize that so much

17   more meaning is given from the eyes.  We say the eyes are the

18   window to the soul, and that's because of the communication

19   that we get from the expression in the eyes.

20   Q.  So are children who are autistic, are they, what, have

21   difficulty or they can't sometimes or all the time interpret

22   meaning from, like, facial expressions, tone inflection?

23   A.  Not only can they not interpret those features, when they

24   look at someone with a smile on their face, they don't

25   necessarily recognize that that person is happy.  That facial

1    expression doesn't mean anything.  I think of a picture of a

2    youngster who is so incredibly proud of himself.  He had

3    created this wonderful string art masterpiece, and he had spent

4    days on it.  He was so proud he wanted his picture taken right

5    then and there.  And this is a child who had mild to moderate

6    autism.  And when his picture was taken, and we looked at it,

7    his face was totally devoid of any happiness.  In fact, the

8    corners of his mouth were turned down.  And when he looked at

9    the picture, we said are you happy here?  And he looked at it

10   and said yes, because he knew he felt happy inside but could

11   not even recognize in his own face that it did not portray any

12   happiness whatsoever.

13   Q.  You've talked about communication being a social

14   interaction.  Is that fair?

15   A.  Yes.  Yes.

16   Q.  Okay.  Can you -- Do autistic children -- Are they able

17   relate to others at all because of that difficulty that they

18   have?

19   A.  Youngsters with autism have a very difficult time relating

20   to others.  Part of that is because they often lack the ability

21   to share attention, joint attention, meaning we're able to look

22   at the same thing as we play with it.  It engages both of our

23   attention.  I look at it, so you look at it.  But they're

24   unable to take the perspective of the other person, to

25   understand another person's feelings, that they have wants and

1    desires too.  They're very egocentric.  They don't understand

2    the need to engage.  That's not to say they don't want to.

3    Most individuals with autism, when they do develop verbal

4    skills, they tell us they felt so alone because they didn't

5    know how to engage.

6           Older adolescents tell us that the suicidal thoughts

7    become so significant, the anxiety is so significant, because

8    they feel so alone.  They don't know how to interact with other

9    people.

10          And so it becomes very, very important to teach those

11   social skills as early as possible.

12   Q.  When you and I have a conversation, we're able to process

13   fairly rapidly what the other person is saying.  Do autistic

14   children, are they able to do the same thing?

15   A.  No.  In fact, research has told us that there is an average

16   of a seven-second delay in processing.  So if I were to say,

17   Ms. Staton, sit down -- 1,001, 1,002, 1,003, 1,004, 1,005,

18   1,006, 1,007 -- and then maybe Ms. Staton would sit down.

19          People would construe that to be a lack of compliance

20   if they didn't understand the issue with processing such as

21   simple request.  It's not non-compliance.  It's not being able

22   to process the words, to understand the words, and then

23   finally, when I do process them, I'll be compliant, but not

24   because I had any intention of not being compliant.

25   Q.  You've talked about an autistic child's difficulty in

1    interacting with others.  Is play -- use the term play -- is

2    that one of the things that you use as a teacher of an autistic

3    child to train them how to enter into those social

4    interactions?

5    A.    Absolutely.

6    Q.    How -- I'm trying to figure out how play fits in a school,

7    because play sounds like that's what you should do on recess.

8    So explain how play fits into a school setting as it relates to

9    an autistic child.

10   A.    Absolutely.  In the young child especially, if you're

11   looking at a child with autism, there are developmental delays.

12   They're not functioning age appropriately.  And it may be

13   uneven development.  But I look in the case, for example, of

14   Cody where at five years old he was functioning more like a

15   two-year-old.  What do two-year-olds do?  They play.  That's an

16   expectancy.  Within play you learn basic skills.  You learn how

17   to focus attention.  You learn how to engage another's

18   attention appropriately.  You learn how to use language as a

19   tool to get what you want, to engage with other people in a

20   social situation for enjoyment.

21   Q.    Are there stages of play or learned play?

22   A.    Actually there are.

23   Q.    What are they?

24   A.    Well, the very first stage is what we call solo play.  And

25   you see this typically in very young children.  They have an

PHILLIPS - DIRECT

```
1    object.  They're playing with it.  If you come and sit down

2    next to them, they may not even acknowledge you.  By about a

3    year, they're wanting -- they'll give you their toy and maybe

4    jerk it back.  They want some engagement there.  But that's

5    still social play or solo play.

6              And from that solo play, then we go to parallel play,

7    where if, let's say, we both have cars, and you're playing with

8    your car there, and I'm playing with my car here, and we're

9    doing the same kind of activity, but we're not communicating at

10   all, and we're just in the same time at the same place.

11             After that parallel play, then comes shared play.

12             And we may be in the same situation, and maybe we've

13   got one of those wonderful little Playschool parking garages.

14   And you have a turn using it, and you have some time using it,

15   and then I'll have some time using it.

16             And then we have a shared play where we're both going

17   to be using that garage together, but I am going to drive my

18   car down, and then you get to drive your car down.  And that's

19   shared.

20   Q.  Taking turns?

21   A.  Well, not taking turns, because I still have my own car,

22   and you still have your own car.  Then turn taking happens.  We

23   have one car, my turn with the car; I give it up and give it to

24   you.  Now it's your turn with the car.

25   Q.  When you reviewed the IEPs for Cody, did you see references
```

1    to play and turn taking?

2    A.   Absolutely.

3    Q.   And was it appropriate, for example, in those IEPs to

4    specifically refer to play taking turns, shared play, and those

5    kinds of comments?

6    A.   Absolutely.  It's a precursor to academics.  When you're in

7    a classroom, you have to learn to wait your turn.  You have to

8    learn to share materials.  You have to learn to engage with

9    other people.  That's the prerequisite of academic, behavior

10   and performance.  So you have to learn those play activities

11   first and at an age that is developmentally appropriate for

12   you.  Even if you're five, if you're developmentally at a

13   two-year-old level, that's where we need to reach the child,

14   because that's what they can understand.

15   Q.   In terms of Cody in the range, if you will, of autistic

16   behaviors from mild to severe, can you place him on that

17   spectrum?

18   A.   Sure.  Cody, like many children on the spectrum, autism

19   spectrum disorders, in some areas he has mild deficits.  In

20   more areas, they're more severe.  So I would categorize him as

21   a moderate to severe child with autism.

22   Q.   You reviewed the IEPs for the subject here; is that right?

23   A.   Yes, I did.

24   Q.   Let me ask you about the protocol that Prescott Unified

25   School District used in developing the 2003 IEP.  In your view,

1   is it your opinion that they followed the correct protocol?

2   A.  Actually I think they followed more than the correct

3   protocol.  IDEA is very clear when you have a child that

4   arrives from another state, the first thing you need to do is

5   implement that IEP as closely as possible to what the original

6   team had created while you perform an evaluation, so you have

7   an idea of where the child currently is, current status.

8           And then after that evaluation, which has given you

9   some time to observe the child, you then reconvene the team and

10  make any revisions to that IEP.

11          Prescott not only immediately implemented the existing

12  IEP as best and as closely as possible to the Capistrano plan;

13  they took time to observe the child.  They engaged an outside

14  psychologist to evaluate the child and then met back as a team

15  to review the entire body of information to create that IEP.

16  Q.  Was the team properly constituted in 2003?

17  A.  Yes, it was.

18  Q.  I want to address this there was, quote, no autism expert,

19  unquote, on the IEP team.

20          First of all, does the State of Arizona issue any kind

21  of certification that's called autism expert?

22  A.  No, there is no certification for autism.  The closest one

23  would be a cross-categorical certificate.

24  Q.  And cross-categorical certificates are issued to teachers

25  certified to teach special needs children?

PHILLIPS - DIRECT

1    A.   Yes.

2    Q.   And that includes autistic children?

3    A.   Yes, it does.

4    Q.   And it's appropriate to have special education teachers on

5    your IEP team?

6    A.   You must have a special education teacher or professional,

7    yes.

8    Q.   And as well as ancillary professionals such as occupational

9    therapists, physical therapists if that's also required?

10   A.   Yes.

11   Q.   Okay.  When you're fashioning an IEP -- And you've prepared

12   them, correct?

13   A.   Many.

14   Q.   Okay.  And you've actually taught in the schools?

15   A.   Yes, I have.

16   Q.   Does the IDEA require, from your perspective as a speech

17   and language pathologist, that the IEP identify a specific

18   methodology that's going to be used when teaching that specific

19   child?

20   A.   Quite the contrary, in analysis and comment it indicates

21   that the methodology is not a part of the IEP, that it is left

22   to the discretion of the school.  For that matter, so are the

23   materials.

24   Q.   So both the method that is going to be used and what kinds

25   of things are going to actually have the child touch or do,

1    that's all left to the teacher?

2    A.  Yes.

3    Q.  Now, Dr. Gentry testified that the ABA is the only

4    scientifically based method of teaching children with autism.

5    Do you agree with that?

6    A.  No.  That may be the only method that he's aware of the

7    research, but there are many, many methods.

8    Q.  Like what?

9    A.  PECS, which is the picture exchange communication system,

10   Greenspan's Floortime.

11   Q.  Which is what?

12   A.  It's a way of getting down with the child at their level

13   and imitating what they do.  If they spin something, you spin

14   something.  If they jump up and down and hop, then you jump up

15   and down and hop, hoping to get that engagement where you're

16   imitating them.

17         TEACCH, which is a program that was extensively

18   researched by Eric Schopler and Gary Mesibov and others in

19   North Carolina.

20   Q.  What is TEACCH?  What is that method?

21   A.  TEACCH is a model.

22   Q.  I'm sorry.  Is what?

23   A.  It's a model of services, and a generic name would be a

24   structured teaching model.  There are two or three basic

25   premises.

1          One is that you provide structure for the child so

2    that they know what to do, where to be, their actual physical

3    boundaries as well as the boundaries of expectation, visual

4    supports.  We now know from the research that many children

5    with autism, in fact most, require visual supports, things they

6    can see.  They process those much, much better than the

7    auditory or the verbal language.  And that it all be done in a

8    communication context.

9          So the underpinnings are definitely for communication

10   and understanding while providing the structure and the visual

11   supports.

12   Q.  When you reviewed the IEPs, the progress notes, the

13   tracking logs, did you see reference to TEACCH?

14   A.  I did.

15   Q.  As a part of the TEACCH model, when you talk about

16   structure, what does that mean?  Can you give an example of

17   what that means as it relates to an autistic child in a public

18   school, and you're going to use that model?

19   A.  Sure.  The classroom itself would have well-defined areas

20   if we talk about physical structure and environment, so the

21   child would know where they go for specific activities without

22   having to be led by the hand or continually redirected.  They

23   know.

24   Q.  How do you do that?

25   A.  You do that by creating a schedule.  And a schedule

1   identifies what the child is going to do and where they're

2   going to do it.

3          And it's a very simple matter of using this through

4   the visual supports.  It's remarkable within a week's time we

5   can have a child following a schedule fairly independently

6   where they know what activity is next, where to go for that

7   activity within the room.  And when they get to that area of

8   the room, there is a specific schedule that tells them visually

9   what to do, how much of it that they're going to do, how to

10  start it, when they're done, and where they go next.  And

11  that's all done visually on a schedule, so that there's not the

12  need to have an adult Velcroed to the hip, if you will, or

13  leading them by the hand continually.

14         The child very quickly learns what their environment

15  is and how to function in that environment.  And that's one of

16  the toughest things with kids with autism.  Their world is so

17  different how they perceive it than ours.  In using a

18  structured teaching model or TEACCH, the staff almost becomes a

19  translator, if you will, helping to translate this world and

20  our needs and requirements into their autistic perception

21  world.

22         And so that translation -- And once the child

23  understands when I'm doing this, this is what I want you to do,

24  it's okay.  I have yet to see, quote, bad behavior in a child

25  with autism when they understand what I want them to do.

1    Q.  And this structure, you talk about a schedule.  I think of

2    a schedule that's written.  You're not talking about that?

3    A.  No, no, not 9:00, 9:15, no, no.

4    Q.  You're talking about pictures?

5    A.  A picture schedule.  It's an event schedule, an activity

6    schedule, if you will.

7    Q.  And that's the visual support that you were talking about?

8    A.  That's visual support as well as pictures, which may be an

9    object.  I may need to give that as a visual support if they

10   don't understand that a picture of a ball is the same thing as

11   a ball.  Some kids don't have that connection.  It doesn't mean

12   that they're retarded.  It means that they don't understand

13   that communication exchange.

14          Once they learn that photograph and that object are

15   the same, I can take away the object and then move on to a

16   drawing and the photograph, and then ultimately hopefully the

17   word itself in written form, graphic form.  But it's a gradual

18   progression.

19   Q.  So initially an autistic child can't make the connection of

20   a picture of a ball to the actual object itself?

21   A.  They may not be able to.  And it doesn't mean that they're

22   retarded.  It's just that lack of understanding of that

23   communication.  And if you don't even understand what an object

24   is, and even the use of an object -- I've had a child put a

25   tongue depressor between their lips and twap it.  That was

1   their favorite toy.  Totally inappropriate.  Had no

2   understanding.  A ball was simply something to be pushed down

3   on the ground.  No recognition of the object or the function

4   and use of that object.  This child was not retarded.  This

5   child ultimately went on to college.  But it began at that

6   level.

7   Q.  Dr. Gentry talked a lot about ABA.  Do you have training in

8   ABA?

9   A.  Actually I have training in Lovaas, which is the

10  predecessor to the modern ABA.

11  Q.  Okay.  What is ABA?

12  A.  Applied behavioral analysis is basically a contingency

13  reinforcement method, behavior response, where you target a

14  desired behavior, and you condition the child to respond in a

15  certain manner to that stimulus.  It's very clinical, very

16  Skinnerian, and the intent is to get the desired behavior,

17  because you have a motivator that the child will work for, so

18  they're willing to respond.

19  Q.  What's an example?  You're in a public classroom, and

20  you've got an autistic child, and you are using the ABA method.

21  A.  If you want to teach the child the concept of in, we'll

22  say, or the compliance of following a command, you may have a

23  ball, and you may have a cup.  And you may tell them to put the

24  ball in the cup, and you demonstrate that.  And you may

25  demonstrate it again or even a third time.  And if the child

PHILLIPS - DIRECT

1   succeeds in putting the ball in the cup, they get a reward,

2   whatever reinforcer hopefully is important to them or that's

3   motivating to them.

4         And then you have them do that activity nine, ten

5   times, whatever, and you take very specific data on how many

6   times you put the ball in the cup.

7         Very simple example of conditioned response.  If the

8   child does not comply, then you give them an aversive.  You may

9   deny them something.  You may restrain them until they comply.

10  Q.  Is there anything wrong with using more than one technique

11  to reach an autistic child?

12  A.  Absolutely not.  The best practice would indicate you do

13  what is appropriate for that child at that point in their

14  development.  I may use several different methods.  I may

15  switch methods during the same year, depending what the child

16  is responding to, depending upon what other things are

17  affecting them beyond my control, things at home, their medical

18  status.

19        So I may change.  I may incorporate a little more

20  discrete trial training, which is one-on-one teaching very

21  similar to ABA.  You break a task down into its various parts,

22  and you teach each piece and then put them together.

23        But I may vary the amount of time on that.  If a child

24  doesn't require that, then I don't do as much of that.

25        If they respond more so to an intangible, if they

236

1    respond more so to a hug as opposed to play time on the

2    computer, I'm going to vary that.  If they no longer want to be

3    on the computer and want the interaction, I'm going to vary

4    that.  So whatever stage of development they're at and whatever

5    is motivating to them in getting the progress that I'm desiring

6    to see.

7    Q.  You talked about the ABA method as putting -- like putting

8    the ball in the cup.  You said they might keep specific data

9    eight out of ten times the child put the ball in a cup.

10          Do you agree that a school needs to keep information

11   or data on a child's progress?

12   A.  Oh, absolutely.  You have to have some kind of method of

13   data collection.

14   Q.  Do you have to have tally marks --

15   A.  No.

16   Q.  -- eight out of ten with little, you know, how you do the

17   one, two, three, four, and then you do the cross?  Do you have

18   to have that?

19   A.  Not unless you're targeting a very specific precise skill.

20   For example, going back to that area of speech pathology

21   articulation, if I wanted to change a habit of tongue placement

22   in a child with a frontal lisp where the tongue pops out

23   between the teeth, I'm trying to shape a motor behavior, and

24   I'm trying to break a habit.  And so what I might do is have

25   the child have ten opportunities at a word that begins with an

PHILLIPS - DIRECT

1    S, and I may indicate how many opportunities were they able to

2    keep their tongue down in the correct position, because I'm

3    physically trying to retrain muscles.  It's clinical, not

4    educational, but clinical.  I will probably take that kind of

5    data.

6         If I am teaching a concept, however, I'm trying to

7    decide if the child can be taught the concept of in, I may not

8    indeed take data on that.  I may observe.  I may try to teach

9    that and model it, and then I may give them opportunities not

10   only to learn it but then to apply it.

11        And the true test is going to be if I say in the

12   classroom "Okay, everyone.  Let's take your pencils and put

13   them in your desks," is the child able to take his pencil and

14   put it in his desk?

15        That's the proof of the pudding.  I'm not taking hash

16   mark data on that.  I'm looking to see how the child is able to

17   apply in a natural context.

18   Q.  You reviewed, I think you said, the tracking logs for Cody;

19   is that correct?

20   A.  Yes, I did.

21   Q.  And the progress notes, quarterly progress reports?

22   A.  Yes.

23   Q.  In your opinion, did the school keep appropriate data for

24   Cody showing whatever progress he made?

25   A.  Yes, they did.  They did it more so in narrative form, and

1   I did see some evidence of charting as well.

2   Q.  Let's talk a little bit about -- Could we have Exhibit 10

3   please and then, while you're there, maybe 11, 13, and 16.

4           If we could start with number 10, that's just the

5   first IEP for 2003.  Let's turn to Page 6 out of 13.  It says

6   Page 6 of 13 at the bottom.

7   A.  Okay.

8   Q.  It says measurable annual goals.  Do you have that?

9   A.  Yes, I do.

10  Q.  All right.  We discussed this with Dr. Gentry yesterday.

11  And the first one says, "Develop appropriate work habits" and

12  then underneath are two subparts.  And he was critical of that,

13  saying that the IEP was vague and not appropriate.  Do you

14  agree with that?

15  A.  No, I don't.

16  Q.  Tell us why.

17  A.  Well, while I might have not used the same words, and the

18  word develop is a little difficult to assess, because you can't

19  see necessarily develop.  But despite that, the next two

20  benchmarks very clearly indicate what those appropriate work

21  habits are.  And they indicate what development means.  It's to

22  assist in or independently accomplish a work task.

23          Now, that's very observable.  There's nothing vague

24  about that.  Follow schedule of work activities.  There's

25  nothing vague about that.  Either you follow it or you don't.

1    I mean, that's very clear.

2              They're demonstrable, and I can easily take data on

3    that.

4    Q.  Now, you've looked at the other two IEPs, that is, for 2004

5    and then the 2005-2006 school year as well?

6    A.  Yes.

7    Q.  Did you find any criticism with respect to the way those

8    IEPs were prepared?

9    A.  Again, I may not have used the same words, but when I

10   looked at the benchmarks or the objectives beneath the goals,

11   they were very, very clear on the intent of the goal.  And all

12   the goals, as this one is, is measurable, 25 percent.  That's

13   just not the goal but also the objectives, so they are

14   measurable.

15   Q.  Now, you looked at the quarterly progress reports which are

16   Exhibits 11, I think, 13, and 16.

17             Just go to 11, because that's probably the easiest.

18   We've already explained and had testimony, excuse me, about

19   what these codes mean.  So we don't need to go through that.

20             But were you able to determine, based upon all of the

21   information that you had in terms of not only the codes but the

22   narrative that was attached to the end, whether Cody was able

23   to make progress with respect to the various objectives that

24   were outlined?

25   A.  And I did that not only by looking at the codes themselves,

1    which clearly show progress, but the narratives.  The

2    narratives contain quite a bit of information on how those

3    opinions were arrived at.

4    Q.  Now, do autistic children always have steady progression?

5    A.  Oh, my stars, no.  I don't know that any child necessarily

6    with a disability has absolutely steady progression.  Things go

7    real well, and then we hit a stumbling block just due to the

8    nature of the disability.  And I find that across disabilities.

9    So we have progression, but it's not necessarily this nice

10   upward slope that you would like to see.  It's a little bit

11   jagged, not as bad as the stock market, but it's jagged

12   nonetheless.

13   Q.  Do outside factors also have some effect on an autistic

14   child's ability to progress along the objectives that are

15   given?

16   A.  I would be utterly amazed if even minor outside factors did

17   not impact a child with autism.  Someone coming to visit

18   overnight could really disrupt the routine and impact the

19   child.  So any familial circumstance, health circumstance,

20   could absolutely impact the child.

21   Q.  Now, you've had an opportunity to actually see Cody, have

22   you not?

23   A.  Yes, I did.

24   Q.  At the school at Prescott Unified School District?

25   A.  Yes.

1    Q.  When was that, ma'am?

2    A.  October 27th --

3    Q.  Of this year?

4    A.  -- of 2008.

5    Q.  Was he in a classroom?

6    A.  No, he was not, not initially.

7    Q.  How long were you there?

8    A.  Approximately three hours.

9    Q.  And that was coordinated through Mr. Parenteau and

10   Mr. Lassen to allow you to go and observe?

11   A.  Yes, it was.

12   Q.  Now, did he have one aide or more than one?

13   A.  Cody had two aides working with him.

14   Q.  Did you ever see him in a classroom -- and when I say in a

15   classroom, I mean in a classroom setting -- doing classroom

16   type activities?

17   A.  No, not at any point.

18   Q.  Okay.  Did you see Cody using words?

19   A.  I saw him using words only to make verbal sounds.

20   Q.  What do you mean by that?

21   A.  There was no meaning behind his word use.  His phrases,

22   there were some sentences, but they were out of context,

23   inappropriate to the context, and had no meaning.

24   Q.  Could you give us examples of what you saw?

25   A.  He was playing with a toy, and he just gazed up in the air

1   and said thank you very much, tah-dah.  It had absolutely no

2   meaning, no context.

3          In trying to do a task that one of the aides had

4   provided him, utterances like "Help, Spike, come quick," and

5   then a few moments later "Sara, Sara, come here."  And they

6   were just phrases taken from a children's video Land Before

7   Time, that he apparently enjoys.

8          "No, no, no, Cody, don't do that.  That's not right.

9   No," those kinds of phrases popping up erratically.  That's not

10  atypical for a child with autism.  He was sort of like a tape

11  recorder.  All of a sudden someone hits the play button, and

12  these random phrases that he's heard pop out.

13  Q.  There's a phrase that's used I'm going to mispronounce, but

14  it means echoing.

15  A.  Echolalia.

16  Q.  That's it.

17  A.  Echolalia typically is they hear things that others have

18  said, and they repeat them.  I did see echolalia when the aides

19  were prompting him to express himself.  "Cody, does that go

20  around?  Does that go around, Cody?  Could that go around?"

21  And he would echo around, goes around.

22         Now, someone may say he was providing good language.

23  My response is no, he was mimicking, because he's used to being

24  told what to do.  And he knows when you tell him to do

25  something that he needs to do it.  Otherwise, there may be a

PHILLIPS - DIRECT

1    negative consequence.  So he will mimic and echo.

2    Q.  You also had an opportunity to see his behavior over

3    those --

4    A.  I did.

5    Q.  -- three hours?

6    A.  I did.

7    Q.  What did you see?

8    A.  Anytime that they wanted to move Cody out of an area that

9    he should not have been in or something that he did not want to

10   do he would flop.  He flopped three times in that three hours.

11   And it took the two of them, one on each side, and they

12   basically did a dead man lift and got him up again.  There was

13   some pinching behavior while one of the aides reached to give

14   him something, and he turned around and pinched.  And I imagine

15   that was noted.  One of the aides was there functioning as a

16   data collector while the other worked with Cody, and at times

17   they switched off that role.

18   Q.  So Dr. Gentry testified that he has seen an explosion of

19   language of communication with Cody.  Based on what you saw,

20   did you see such explosion of language?

21   A.  I absolutely --

22              MR. LASSEN:  Objection.  Lack of foundation.

23              THE COURT:  Overruled.

24              THE WITNESS:  What I saw was simply not an explosion

25   of language.  What I saw was him doing a more sophisticated

1    babbling, because meaningless language is merely babbling.  A

2    baby may say bah-bah-bah-bah-bah-bah and not meaning anything.

3    Cody was doing something very similar but using words, because

4    he is now going on ten years old.

5          So there was no meaning behind that language.  I would

6    not quantify that as meaningful language and progress.  They

7    were merely verbalizations that were done without meaning.

8          Had he looked at the para or taken her hand and pushed

9    her to look at something and done something interactive,

10   meaning to express intent, and then come out with anything,

11   that would have been in a vast -- anything near it I would have

12   said that was meaningful language.

13         If he was attempting to gain attention or picking

14   things up and holding it and wanting her to look at it and give

15   it a name, I would say that would be communication, even if he

16   didn't say anything.  There was none of that.  There was no

17   desire to interact with them other than when he wanted

18   something he could not have, he demonstrated that physically,

19   not verbally.  And if there was this communication explosion, I

20   would have expected to have seen, then, some verbal

21   interaction, showing me that he understood the power of

22   language.

23         MS. STATON:  Thank you, Your Honor.

24         THE COURT:  All right.  Mr. Lassen.

25

**CROSS-EXAMINATION**

**BY MR. LASSEN:**

Q.  Good morning, Ms. Phillips.  We know each other, don't we?

A.  Yes, we do.

Q.  From 1985 till 1991, I was your lawyer, right, as director

of special education in Deer Valley?

A.  Well, you were one of several attorneys, yes.

Q.  And one of the things that you did at Deer Valley was

attempt to bring kids that were placed outside in private

placements to be able to provide a program in Deer Valley,

right?

A.  Yes.

Q.  And you did that and then some when you became director of

special ed in Scottsdale, correct?

A.  Yes.

Q.  In fact, Scottsdale had a lot more students in private

placements than Deer Valley did, right?

A.  When I first arrived in Scottsdale, yes.

Q.  In fact, one of the major challenges was to establish a

program for emotionally handicapped kids, because Scottsdale,

prior to you being involved there, had placed a lot of

emotionally handicapped children in private placement, correct?

A.  Actually, no.  We had quite a few programs for emotionally

disturbed youngsters at the elementary, middle, and high school

levels.

PHILLIPS - CROSS

1    Q.  Now, in 2003 to 2006, you became the -- essentially state

2    special ed director, right?

3    A.  Yes, sir.

4    Q.  And that was the deputy associate for special education for

5    the Arizona Department of Education?

6    A.  Yes, it was.

7    Q.  And really that is the ultimate person that's responsible

8    in the State of Arizona for the provision of a public -- free

9    appropriate public education for each child, correct?

10   A.  Not for the provision of services but for the supervision

11   and implementation of programs, yes.

12   Q.  Well, if the district doesn't provide a program, at least

13   as it relates to the federal government, the state is

14   responsible, correct?

15   A.  Yes, if the district fails to.

16   Q.  And part of the -- You succeeded a series of predecessors

17   that performed the same function, correct, that you did at the

18   state department?

19   A.  Yes, in essence.

20   Q.  And many of the administrators of special education like

21   yourself were not teachers, right?

22   A.  Probably not.

23   Q.  In fact, many of them if not most of them came from speech

24   rather than any other discipline?

25   A.  That I couldn't say.

PHILLIPS - CROSS

1    Q.  Well, a lot --

2    A.  Diane Peterson had come from a background of speech

3    pathology.  Kay Lund did not, nor did Lynn Busenbark, nor Steve

4    Misheloff.

5    Q.  Well, when I was representing the state department, Diane

6    Peterson was my client, and I noticed a lot of similarities in

7    your orientations.  Would you say that's fair?

8    A.  No.

9    Q.  Well, that's an aside.  Let's move on.

10           But one of the responsibilities as the state

11   department, department of special education, is to determine

12   whether a local district has complied with IDEA as far as the

13   procedural requirements of having all the paperwork in order,

14   correct?

15   A.  Yes, that is.

16   Q.  And you do auditing of that, correct?

17   A.  We do monitoring.

18   Q.  Monitoring.  And there are specific requirements of IDEA

19   and its predecessors that the state department staff look for

20   to determine compliance as far as you have the right things in

21   the file, correct?

22   A.  That is true.

23   Q.  And that would include an evaluation every three years?

24   A.  Yes.

25   Q.  And the prior written notices to the parents?

1    A.   Yes.

2    Q.   But you don't really get into the details of whether a

3    particular IEP is designed to provide a meaningful educational

4    benefit to a child, do you?

5    A.   There are some situations we indeed would look at that.

6    Q.   Now, would that happen in the case of where there's a

7    complaint filed with the state department?

8    A.   That would be one situation.

9    Q.   Now, you've testified about autism as a broad spectrum

10   disorder, and you've described generally some of the conditions

11   that may be present for a child that has a diagnosis of autism,

12   correct?

13   A.   Yes.

14   Q.   Now, would you agree that those may be the same conditions

15   that a pediatric neurologist would examine for their presence

16   to make a diagnosis initially of autism?

17   A.   A pediatric neurologist?  No.

18   Q.   They would not?

19   A.   No.

20   Q.   Who would?  A school psychologist?

21   A.   A school psychologist might.  A clinical psychologist

22   might.  A pediatrician might.

23   Q.   Well, I don't mean to argue with you, but I would think

24   that a pediatric neurologist and a pediatrician might be almost

25   the same thing in that regard?

1    A.   A neurologist is going to look at CAT scans, MRIs,

2    clinical, and they're unfortunately -- I wish we could just put

3    the kid on a CAT scan and say, okay, there's the autism.

4    Q.   Now, when you develop an autism -- Did you develop at Deer

5    Valley an autism specific program?

6    A.   Yes, we did.

7    Q.   And how many -- you would have, what, ideally six to eight

8    kids or students per teacher in a class?

9    A.   We had -- I'm just trying to think of both programs -- we

10   had between six and eight youngsters and two paraeducators and

11   a teacher.

12   Q.   And what happened when you would get more than eight?

13   Would you get another teacher?

14   A.   We would open up another classroom.

15        THE COURT:   Mr. Lassen, I'm not clear.  Is this

16   question about a special program where all the students are

17   autistic, or is it special education in general?

18   Q.   (BY MR. LASSEN)  Good question.  I asked you a question,

19   and it wasn't precisely clear.  Would that apply to an autism

20   specific program?

21   A.   For the responses I gave, yes, that was specific to the

22   autism program.

23   Q.   How about a cross-categorical, or did you have

24   self-contained cross-categorical programs at Deer Valley?

25   A.   At that time we did not have self-contained cross-cat.  We

1   had the cross-cat youngsters in the resource program, which is

2   part-time special ed.

3   Q.  Now, for -- I think you've answered the question.  Thank

4   you very much.

5           Now, when you went to Scottsdale, did they already

6   have autism specific programs in place?

7   A.  They did not.

8   Q.  And during your tenure there, did you develop such

9   programs?

10  A.  Yes, I did.

11  Q.  Now, during your tenure at Scottsdale, did you have similar

12  class sizes per certified teacher in your autism specific

13  program, six to eight students per certified teacher?

14  A.  Depending upon the severity of the children.  The children

15  who were more severe we may have had four or five.  Those who

16  were less severe and maybe older kids who were more

17  independent, it could have gone up to eight to ten with

18  additional paraeducator support.

19  Q.  Let's talk about that last category where you might have up

20  to eight to ten.  Would those children also be children that

21  would typically spend some time with same age peers that were

22  not autistic in a regular classroom setting or for physical

23  education or some other activity?

24  A.  There would be a few that were mainstreamed into what we

25  call specials, or elective classes, art, music, PE, those kinds

1   of things.

2   Q.   And was there always an attempt to increase the exposure to

3   those electives dealing with same age appropriate peers?

4   A.   Yes.

5   Q.   And in fact during the '90s, is it not true that one of the

6   functions of the state department of special education was to

7   ensure that, in the development of IEPs, the local school

8   district complied with the requirement of least restrictive

9   environment?

10  A.   Yes.

11  Q.   And in fact you look at the IEP in the annual meeting to

12  make sure that that has been a consideration, that the

13  placement isn't just automatically continued in the prior

14  setting, correct?

15       MS. STATON:   Excuse me, Your Honor.  I kind of let

16  this go for a while.  There has never been a complaint, as far

17  as I can tell from the complaint or an appeal under the

18  administrative law judge's decision, that dealt with Cody's

19  placement or mainstreaming.  I do not recall that.

20       THE COURT:   And I don't recall in either party's

21  separate statement of issues to be tried that that appears

22  either.

23       MR. LASSEN:   It doesn't specifically appear as a

24  statement of issues.  It was in the original complaint, and I

25  didn't --

1          THE COURT:  I directed you to give me a statement of

2    issues to be tried, and you both gave separate ones.  But maybe

3    it's there, but I don't recall reading that.  Is it there?

4          MS. STATON:  I don't -- I'm trying -- I was reading it

5    as quickly as I could while Mr. Lassen was questioning

6    Ms. Phillips, and I don't see it.

7          THE COURT:  If you want to take a minute, Mr. Lassen,

8    and look it up.

9          MR. LASSEN:  Well, I don't have -- I can say we do not

10   have a separate issue that the child was not educated in the

11   least restrictive environment.  But I'm questioning as to the

12   point of compliance with the requirements of IDEA.  Whether or

13   not that was an issue, there's an issue of technical compliance

14   with IDEA.

15         THE COURT:  I mean, I fear that this is just becoming

16   pure trial by ambush, because that's the whole point of the

17   statement of issues, so the other side can anticipate what to

18   present.  And I didn't see anything there about least

19   restrictive environment.

20         Now if it's there, point it out to me, and we'll keep

21   going.

22         MR. LASSEN:  Well, I think we're miscommunicating, and

23   I will move on.

24   Q.  (BY MR. LASSEN)  Now, you have described several

25   methodologies or interventions for the treatment of autistic

1    children that have support, scientific support, correct?

2    A.  Yes.

3    Q.  And you would agree, would you not, that one of those is

4    applied behavior analysis?

5    A.  Yes.

6    Q.  And would you agree also that discrete trial teaching that

7    could be used under ABA and also even under some other systems

8    has scientific support?

9    A.  Yes.

10   Q.  And would that also apply to pivotal response training?

11   A.  Yes.  That's an offshoot of ABA.

12   Q.  Now, you've mentioned something named Prizant?

13   A.  Barry Prizant.  Actually I did not mention Prizant, no, but

14   I know who Barry Prizant is.

15   Q.  Are you familiar with a technique called joint action

16   routines?

17   A.  Yes, under the SCERTS model.

18   Q.  That's under the SCERTS model?

19   A.  Yes, S-C-E-R-T-S.

20   Q.  Now, you would agree, would you not, that while that is a

21   promising technique, it is not scientifically or empirically

22   based, correct?

23   A.  There is peer reviewed research on it.  It's relatively

24   new.

25   Q.  And you even for matters other than consulting with autism

1    have interacted with professors at the University of North

2    Carolina?

3    A.  Yes, I have.

4    Q.  And that is where the TEACCH method originated?

5    A.  Schopler's work was originally in North Carolina, yes.

6    Q.  And that is a structured teaching model?

7    A.  Model.

8    Q.  And you -- how -- Would you also say that UCLA has

9    historically been a pioneer, if you will, in the treatment of

10   autism in the educational environment?

11   A.  With Lovaas, yes.

12   Q.  And you had actually been exposed to Lovaas methodology?

13   A.  I was trained in Lovaas methodology in the '70s.

14   Q.  I think we're both showing our age here.

15           Now, that was also the institution that was

16   responsible for the development of Essential Elements of

17   Instruction, correct?

18   A.  Yes, Madeline Hunter.

19   Q.  And it is true, is it not, that many of the techniques that

20   were used in the Essential Elements of Instruction were almost

21   borrowed directly out of what was already used in special

22   education, correct?

23   A.  I think it's a little bit -- I think EEI definitely had its

24   basis in simply good instruction, which is all special

25   education is.  It's good, sound practices of instruction.

1   Q.   In terms of evaluating instruction, though, a lot of the

2   techniques were, if you will, pioneered in the special

3   education arena?

4   A.   Yes.

5   Q.   And would you -- Did you know a gentleman named Edgar Sims?

6   A.   Oh, yes, I remember Ed Sims.

7   Q.   Who was he?

8   A.   He was the superintendent in Deer Valley School District

9   while I was there.

10  Q.   Would you agree if he made the statement that his special

11  education people did better teacher evaluations than his

12  regular principals --

13          MS. STATON:   Excuse me, Your Honor.   I object as to

14  the relevance of this.

15          THE COURT:   Tell me what the relevance is.

16          MR. LASSEN:   I'm going to get to the relevance.   Just

17  one more question, if you'd indulge me.

18          THE COURT:   One more question.

19  Q.   (BY MR. LASSEN)   Okay.

20  A.   Yes, Ed would have said that.

21  Q.   But that was, in the main, taking techniques that may have

22  had empirical bases and putting them together in a structured

23  program called EEI, correct?

24  A.   I would imagine it could be described that way.   I don't

25  know that I've ever heard anyone do that.

1    Q.   And that's exactly what TEACCH is, isn't it?

2    A.   No, I don't believe that's what TEACCH is at all.

3    Q.   TEACCH is actually only a promising practice that has

4    absolutely no empirical scientific basis, correct?

5    A.   That's absolutely not true.

6    Q.   Are you familiar with Richard Simpson of the University of

7    Kansas?

8    A.   No, I'm not.

9    Q.   Are you familiar with the literature that evaluates the

10   efficacy of various methodologies for instructing autistic

11   children as to whether they have an empirical scientific basis?

12   A.   There have been quite a few articles written by quite a few

13   researchers over the years, 30-odd years.

14   Q.   And you would agree, would you not, that the methodology

15   that has the most scientific and empirical support is ABA,

16   correct?

17   A.   I have never put the amount of research on a scale to weigh

18   them, so I could not really answer that.

19   Q.   Now, you indicated that it is important to teach children

20   language as early as possible, correct?

21   A.   Yes, I would.

22   Q.   And there was, back in the '60s and '70s, there was even

23   the thought that if you didn't acquire language by a certain

24   age, you may never acquire it, correct?

25   A.   Some people put -- advanced that theory, yes.

PHILLIPS - CROSS

1    Q.   Noam Chomsky?

2    A.   Noam talked about language templates and critical learning

3    stages, yes.

4    Q.   Now, some of the evidence with education of autistic

5    children has come out to show that you can actually learn

6    language beyond the critical stage of, say, two to five or six,

7    correct?

8    A.   Critical stages were pretty much abandoned years ago in

9    that philosophy.

10   Q.   And so a child who is ten years old can begin -- who is

11   non-verbal can still be taught to speak, correct?

12   A.   Absolutely.

13   Q.   And that maybe 30 years ago was thought not to be the case?

14   A.   Not typically, true.

15   Q.   But it is important, is it not, that one needs to focus on

16   language and communication as early as possible in their

17   education?

18   A.   Yes.

19   Q.   And that is one of the fundamental building blocks that

20   allows you to get to more complicated skills?

21   A.   Yes.

22   Q.   Now, whether or not there is meaning, if a child is putting

23   together four words to create a valid sentence, that's doing

24   something more than babbling or non-meaningful utterances,

25   correct?

1    A.  No, I would not say that at all.  If there was -- If the

2    child had self-generated, if they had thoughtfully created to

3    express an emotion, a feeling, a want, a desire, I would call

4    that a linguistic phrase.  If it's merely repeating something

5    they have heard, I mean, I can -- I've never studied Hebrew;

6    however, I can say Menachem Begin with a fairly decent accent.

7    I can say mahiya (phonetic).  I have no idea what it means.

8    I'm not even sure what Bar Mitzvah means.  I can say those

9    words, but there's no meaning behind it.

10   Q.  Understood.  Now, the best way to ascertain it, though,

11   whether or not, would be to observe over a period of time and

12   collect data over that period of time, correct?

13   A.  To see if the child is using language effectively and

14   meaningfully.

15   Q.  And one of the measures would be to actually chart and

16   count the number of meaningful utterances or sentences they

17   were able to generate, correct?

18   A.  That would be one method.

19   Q.  Now, you, based upon your experience, were able to

20   supervise or evaluate special education teachers, correct?

21   A.  Yes.

22   Q.  And that was even though you weren't a teacher yourself,

23   correct?

24   A.  True.

25   Q.  And you were even able to decide whether they should be

1   hired, correct?

2   A.  Yes.

3   Q.  Now, in Paradise Valley or -- I'm sorry -- in Scottsdale,

4   did you actually -- did you participate in the hiring of

5   special education teachers?

6   A.  Yes, I did.

7   Q.  So that was not a function that was relegated only to the

8   campus level principal?

9   A.  No.  We did principally most of the hiring.

10  Q.  So the special education department hired the special

11  education teachers?

12  A.  For the most part.

13  Q.  And were you -- did you feel that you were more qualified

14  to make a decision regarding their qualifications than a

15  regular campus level principal?

16  A.  Yes.

17  Q.  Would the same be true in Deer Valley?

18  A.  Yes.

19  Q.  And you evaluated the special education teachers?

20  A.  Yes.

21  Q.  That was even though you weren't a teacher yourself?

22  A.  I possessed my principal certification.

23  Q.  Would you agree that it would be inappropriate for

24  one-on-one aides, paraprofessional aides, to not be aware of

25  the goals and objectives that were assisting the child in

1    meeting those goals and objectives?

2    A.   They would need to be aware of the specific goals and

3    objectives they were expected to reinforce.

4    Q.   Now, at any point in time when you reviewed the educational

5    records of Cody, did you see evidence of the administration of

6    the Brigance assessment measure?

7    A.   I did not see a protocol for Brigance.

8    Q.   Now, when a teacher makes a report of progress regarding a

9    student, be it subjective or objective, should that be based on

10   their own personal observation?

11   A.   Most of the time if they're the person working with the

12   child, it would be an observation.

13   Q.   But should it be the teacher that makes that observation?

14   A.   If you're evaluating a goal, for example, an IEP goal, the

15   teacher may make that evaluation or there may be someone else,

16   a case manager, who does some kind of an assessment to see if

17   that behavior is actually there, that skill.

18   Q.   But will the teacher rely upon -- Should the teacher in

19   some instances rely on their own personal observation of

20   whether that skill is present?

21   A.   Yes, that would certainly be a component.

22   Q.   And it would be inappropriate, would it not, for the

23   teacher to rely solely upon what the aides reported to the

24   teacher as being present or not?

25   A.   I would typically not expect that to happen.

1    Q.  Now, when you were the director of special education at

2    Scottsdale Unified School District, you testified that you

3    faced a problem -- you were one of those districts that people

4    from smaller districts, I presume, wanted to enroll their

5    children because you had better programs, correct?

6    A.  Smaller and larger districts.

7    Q.  But during the time you were the director of special

8    education, for whatever reason, you combined with Fountain

9    Hills, Cave Creek, and Paradise Valley to do joint training of

10   your special ed staffs?

11   A.  Initially it wasn't joint training.  It was to help provide

12   more options, placement options for children.  That was the

13   original intent and purpose.

14   Q.  But it also allowed at one point in time -- at some point

15   in time for your teachers to get more continuing education, if

16   you will?

17   A.  Not as part of that consortium, not while I was involved in

18   that.

19   Q.  But it is true, is it not, that one of the things that you

20   wanted to see is that your teachers had training and experience

21   with teaching the population that they were teaching, correct?

22   A.  Yes.

23   Q.  And you made sure that they got continuing education or

24   went to seminars or whatever was required to do so, right?

25   A.  Yes.

PHILLIPS - CROSS

1    Q.  And one of the things that you've done with the TEACCH

2    model is participate in some of that intensive training for

3    teachers of autistic children, correct?

4    A.  Absolutely.

5    Q.  And those programs are either three days long or five days

6    long, correct?

7    A.  The training program?

8    Q.  Yes.

9    A.  Yes.

10   Q.  So they're not two hours long?

11   A.  No.

12   Q.  And why are they at least three days long?

13   A.  Well, the initial training is three to five days long, and

14   then follow-up training certainly may be of shorter duration

15   for specific learning objectives.

16          For people who have never been trained in autism or in

17   a structured teaching model, it takes time to have people

18   understand to get a commonality of what autism is and

19   understanding the autism, which is akin to an iceberg.  What

20   you see is the tip of the iceberg.  What you don't see is

21   everything below the surface.

22   Q.  For one of your teachers of the, say, six to eight

23   students, how many courses or hours of instruction would you

24   want them to have before you felt comfortable that they knew

25   enough to teach that class of autistic children?

1    A.   If there was a solo class of solely autistic children, as a

2    matter of practice, within our system, the teacher would be

3    trained in the TEACCH model or structured teaching model for a

4    minimum of three to five days, which make it three days at one

5    point, and they may gain another two days during the course of

6    that first semester.

7              That would be -- That was our typical since about 1999

8    when we opened our programs.

9    Q.   Now, when you had, say, a relatively new inexperienced

10   teacher, did you have mechanisms in place for them to gain

11   experience from more experienced teachers within the District?

12   A.   Yes.  We have autism consultants within the District

13   because we were over 25,000 students.  We had that luxury.

14   Q.   So when you say you had an autism consultant, what is an

15   autism consultant?

16   A.   It was an individual, several actually, that had a high

17   level of training and experience in autism and various

18   methodologies of autism.

19   Q.   Would that person typically be selected to be placed on an

20   IEP team to help determine the initial IEP for a child that

21   carried the diagnosis of autism?

22   A.   They were rarely on the IEP team.

23   Q.   Did they consult?

24   A.   They participated in the evaluation of the child,

25   administration of Pep-3, helped to structure goals, those kinds

1   of things.  And they were there as a support person when the

2   child was in the program to help the teacher shape the program,

3   create learning environments, materials, those kinds of things,

4   but not as a member of the IEP typically, no.

5   Q.  But they were available to the District, correct?

6   A.  To consult with, sure.

7   Q.  You have developed over your career a lot of expertise in

8   the various iterations of IDEA and its predecessors, correct?

9   A.  Every one of them.

10  Q.  And in your expert report, you indicated that not only did

11  the IEPs in question here comply with the original law, but you

12  mentioned specifically that there was compliance with the '97

13  amendments and the '04 amendment.  What additional factors or

14  obligations were added by the '97 law that you sought

15  compliance with?

16  A.  Added by the '97 or the 2004?

17  Q.  Let's start with the '97.

18  A.  In the '97 amendments, basically we saw language that

19  really addressed the need for the IEP team membership.  In one

20  of those it said at least one regular education teacher, at

21  least one special education.  And I don't know how you can get

22  less than one.  But in the 2004 amendments, it said no less

23  than one.  I'm not quite sure what the difference in verbiage

24  was.

25          But there was compliance regardless.  And the

PHILLIPS - CROSS

1    involvement of the regular ed teacher was specifically

2    highlighted if there was an intent of the child to be in the

3    general education classroom.  If there was no intent, then you

4    would not need the presence, for example, of a general

5    education teacher.

6    Q.  And that references which amendment?

7    A.  In both amendments.  It was specific -- It was more so

8    highlighted in 2004, but it was a part of '97.

9    Q.  Okay.  Would you agree that in '97, the congressional

10   record statement about the intent of the amendments reflected,

11   you know, something to the effect that historically there have

12   been low levels of expectation as far as progress in the

13   teaching of special education students?

14   A.  That was both in '97 and 2004.

15   Q.  And that there was a recognition that under the first 20

16   years -- 25 years of the law, that a lot of the focus was on

17   procedural compliance, correct?

18   A.  Yes.

19   Q.  And that beginning in '97, there was more emphasis on

20   substantive --

21   A.  On outcomes.

22   Q.  -- on outcomes, correct?

23         Now, in 2001, No Child Left Behind was enacted,

24   correct?

25   A.  Yes.

PHILLIPS - CROSS

1   Q.  Now, how did that relate as far as obligations for special

2   education children if at all during '03-'04, '04-'05, and

3   '05-'06?

4   A.  The intersection of NCLB and IDEA principally was the area

5   of testing, for one, with all special education children

6   needing to be tested on state tests.

7   Q.  Norm-referenced tests?

8   A.  Exactly, the state testing.  Prior to that, special

9   education kids could be excluded from testing if that's what

10  the IEP team determined.  So that exclusion was taken away

11  through NCLB.

12  Q.  I don't want to stop you, but I may forget if I don't.  If

13  you're relying upon an assessment or testing, does the test

14  have to be administered correctly according to the appropriate

15  protocol for the test for it to be valid?

16  A.  For it to be valid, yes.

17  Q.  So if you reviewed a file or a test protocol and saw that

18  it was administered incorrectly, what would you do?

19  A.  I would feel that was not valid, and I would determine if

20  that test could be readministered or something similar to it

21  administered.

22  Q.  That's not something the state in its monitoring of the

23  local school district would check, would it?

24  A.  It's possible, because in the monitoring, we monitor

25  specific children's files.  It's a random sampling of files.

1    And we look at if all the evaluation components were there, if

2    it was administered by someone qualified to administer the test

3    appropriately trained, if the evaluation results were

4    quantified, if they were written in the report, if all the

5    components were there, if the evaluation data were used to

6    create the IEP.  And we would track that flow in those specific

7    files that were being monitored.

8    Q.  Okay.  Would you agree that the goals and objectives in an

9    IEP need to be measurable?

10   A.  Yes, they do.

11   Q.  And does that need to be an objective measurement?

12   A.  That's not what the law says.  It says it needs to be

13   measurable.  And some things are not paper pencil quantifiable.

14   Q.  You indicated that many of the progress notes in the case

15   of Prescott were more in a narrative form?

16   A.  Yes.

17   Q.  Would that be more in a narrative form than what you were

18   used to seeing in either -- in, say, Scottsdale?

19   A.  Actually it was fairly typical of what I was used to

20   seeing, something called SOP notes, standard operating

21   procedure notes.  And therapists and teachers would typically

22   keep logs in narrative form.

23   Q.  Now you're talking about SOP notes.  You're talking about

24   kind of almost a medical model of notetaking?

25   A.  Yes, and typical OT/PT/speech would use SOP notes.

1    Q.  And that was one of the things that was borrowed, was it

2    not, by Madeline Hunter in developing EEI from special ed,

3    right?

4    A.  It was one of the things she looked at, yes.

5    Q.  And you would agree with the proposition that teacher

6    training and support by district consultants or outside

7    consultants is necessary to provide for the efficacy of a

8    program for autistic children?

9    A.  If the teachers don't have those skills, of course.

10   Q.  Now, when you were -- Now, you said that in Scottsdale you

11   implemented the TEACCH program?

12   A.  Structured teaching model.  You cannot call it TEACCH

13   unless it is a TEACCH center administered by North Carolina.

14   Q.  Okay.  So when you implemented that program in Scottsdale,

15   you followed the structured program set up by and administered

16   by North Carolina, correct?

17   A.  No, it was not administered by North Carolina.

18   Q.  But it was set up by?

19   A.  It was not set up by North Carolina.  It was set up by a

20   consultant who was an independent consultant with TEACCH.

21   Q.  But the teachers were not free to pick and choose, well,

22   we're going to do some of it but not all of it?

23   A.  True.

24   Q.  So they had to follow the model directly down the line,

25   correct?

UNITED STATES DISTRICT COURT

1   A.  Well, we call it structured teaching model.  If you were to

2   have an -- an instructor from TEACCH come, they would tell you

3   it is not the TEACCH model.  It is not as regimented as the

4   TEACCH model.  They have resource centers that we didn't have

5   access to, so we adapted.

6   Q.  You had an adapted model?

7   A.  Adapted model.

8   Q.  But every teacher that was implementing this adapted model

9   was implementing in the exact same fashion, correct?

10  A.  Yes, that's true.

11  Q.  So you didn't allow your individual teachers to pick and

12  choose what portions of the model they would use or not use?

13  A.  The model was intact, and then they infused other methods

14  as appropriate, for example, PECS.

15  Q.  Additional -- The model itself or the protocol is intact at

16  all times?

17  A.  Yes.

18  Q.  But you might add to it?

19  A.  Yes.

20  Q.  And that's really important, is it not?

21  A.  We felt it was.

22  Q.  And it's important if you're ever going to do research to

23  determine its effectiveness, correct?

24  A.  If you're looking to do clinical research, you wouldn't

25  have done it on the type of model that we established.

1    Q.   You would have had even a more strict model?

2    A.   Yes, we would have.   We would have controlled for all kinds

3    of variables.

4    Q.   But you still felt it was necessary to control for --

5    across teacher to make sure they were all doing things the

6    same?

7    A.   Within the parameters of the program, yes.

8    Q.   Now, that is somewhat different than eclectic model,

9    correct?

10   A.   You know, I would characterize myself as being eclectic,

11   because structured teaching model is a model.   It's not a

12   method.   So within the model, if you have the structure, you

13   have the visual supports, you have the communication, you can

14   do pretty much anything within that model.   Just as SCERTS is a

15   model, it's not a method, it's an umbrella, and within that

16   umbrella you can fill things in.

17   Q.   I guess it's assumed, but in order to do these things, the

18   teachers have to have training in these methodologies, correct?

19   A.   Yes, they do.

20   Q.   And if they were given the freedom to pick and choose like

21   you described yourself as being eclectic, they would have to

22   have training in the various models upon which they were

23   relying on, right?

24   A.   Yes, and a rationale for using it.

25   Q.   Would that rationale be reflected in the student records?

1    A.  It may or may not necessarily be.  It just may be how the

2    child is responding to certain things.

3            MR. LASSEN:  Thank you very much.  That's all I have.

4            THE COURT:  Ms. Staton, any redirect?

5            MS. STATON:  No, Your Honor.  Thank you.

6            THE COURT:  All right.  Ms. Phillips, thank you.  You

7    are excused.  You may step down.

8            All right.  Now, counsel, would either of you like to

9    have closing?  I'm not discouraging it if anybody wants to.

10           MR. LASSEN:  Your Honor, I would --

11           THE COURT:  And we have plenty of time.

12           MR. LASSEN:  Your Honor, I would prefer to have a

13   brief written closing of --

14           THE COURT:  We had a trial brief, and I'm ready to

15   work on this.

16           MR. LASSEN:  Well, then, I would like to make a -- I

17   would like to address the issue the Court raised at the outset

18   regarding compensatory education.  I don't necessarily want to

19   rehash all the evidence, but I would like to address that

20   issue.

21           THE COURT:  All right.  Ms. Staton, what would you

22   like to do?

23           MS. STATON:  I certainly have -- I have given you a

24   very large trial memorandum.  I have no intention of repeating

25   anything.  I'll wait to see what he, Mr. Lassen, says about

1    compensatory education.

2            THE COURT:  All right.  Mr. Lassen, then, I'll hear

3    closing.

4            MR. LASSEN:  Your Honor, I am not going to,

5    particularly in a bench trial, particularly where you have such

6    able assistance, I'm not going to bore you with rehashing what

7    the testimony is and records that are admissible in the record

8    that clearly speak for themselves.

9            And I would, first of all, like to commend Ms. Staton

10   and Ms. Martinez.  This has been -- You know, it's never much

11   fun for the clients in these kinds of cases, but it's --

12           THE COURT:  I don't know any lawsuit that's fun

13   for anybody.

14           MR. LASSEN:  But it's a pleasure when you can focus on

15   the issues, and I appreciate that the District has acted in a

16   very lawyerly fashion in this case, and I appreciate that.  And

17   I hope we have framed the issues in a way that's helpful.

18           Now, the Court yesterday raised this issue about

19   compensatory education.  And it's a dilemma.  And I would

20   submit there are two things, and I say this with some

21   reluctance, to my client, because I know he's not going to like

22   what I say, but I --

23           THE COURT:  Have you cleared it with him?

24           MR. LASSEN:  Well, I sort of have, candor to the

25   Court.

1          And that is the first issue we take as far as what

2    we're entitled to is what we ask for at the administrative

3    hearing.  That's really the time in question that really is

4    relevant to this inquiry.

5          And Ms. Staton mentioned yesterday, you know, if we

6    lose, we still win, because the parents are so happy with

7    what's being provided.  And that creates really kind of a --

8          THE COURT:  She was paraphrasing my offhanded comment

9    that it didn't matter whether she won or lost.

10         MR. LASSEN:  Right.  And the dilemma there -- and I

11   guess my point is we presented a, I think, reasonable basis for

12   compensatory education at the due process hearing based upon

13   standard -- the hours of instruction that were denied, a

14   standard rate of pay for additional --

15         THE COURT:  That hearing was a year and a half ago.

16         MR. LASSEN:  I know, and that's why I'm -- I need to

17   address an alternative.

18         To the extent that intervening events, including, you

19   know, what's being provided today, and including what really

20   makes it complicated is we have a whole year in which there was

21   a resolution between the parties that's not -- we haven't

22   talked about.  But I would submit that that might be relevant

23   to an inquiry as to compensatory education.

24         And I don't recommend this, okay, because I still

25   prefer what we had asked for originally.  We think it's fair.

274

1    It's simple.  Okay?

2            But there is another way to do it, and that is --

3            THE COURT:  Before you get to the other way to do it,

4    I don't understand what you just said.  What is it that you're

5    asking for?

6            MR. LASSEN:  In the administrative hearing, we asked

7    for essentially additional tutoring in a sum that would be paid

8    for out of a sum equivalent to the lost hours.  We asked for

9    $73,500 for two years, because at that point in time the ALJ

10   had dismissed the '03-'04 year.

11           THE COURT:  How do you get that number?

12           MR. LASSEN:  It was based on $40 per hour.  Now, if

13   you're hiring someone like Dr. Gentry, it's going to be a lot

14   more, but the aide that you provide is probably going to be

15   paid $20 to $30 per hour.  But they would have to be trained by

16   someone at a much higher rate, so that's sort of a -- that's an

17   agreed-upon figure that was submitted at that time.

18           THE COURT:  How many hours of tutoring is that?

19           MR. LASSEN:  Well, it's -- It translates to a dollar

20   figure, but it's -- it was based upon the number of lost hours

21   of instruction, and I think it was 1,800.

22           THE COURT:  How many hours of tutoring is it?

23           MR. LASSEN:  Well, it -- it was 1,837 hours for two

24   years.

25           THE COURT:  1,800 hours of tutoring?

1          MR. LASSEN:  Over two years.

2          THE COURT:  900 hours a year?

3          MR. LASSEN:  Right.

4          THE COURT:  All right.  Go ahead.

5          MR. LASSEN:  Okay.  Now, the alternative -- and this

6     is where it's complicated, but there's precedent for that in

7     this district, in fact, because I was one of the parties to one

8     where you have an issue, and there are circumstances that come

9     up in the interim, and there's the ability to not dismiss the

10    case but to stay the IDEA and remand to the ALJ for a

11    determination of what's appropriate to, you know, take evidence

12    on that issue.  And that was done by Judge Broomfield in an

13    earlier case that's reported.

14         And that's the alternative, because the complicating

15    factor here, candidly, Your Honor, is the '06-'07 school year

16    by which the parties, you know, reached a settlement.  But some

17    of what may have been provided there might have implications

18    for compensatory ed beginning, you know, in the future.  And

19    that's my point.

20         Thank you.

21         THE COURT:  All right.  Ms. Staton.

22         MS. STATON:  I'll address just what Mr. Lassen talked

23    about.  Your Honor, they've asked for compensatory education.

24    They have provided the Court with no basis upon which to

25    provide compensatory education.  There's no expert that says

1    that Cody Parenteau needed compensatory education either here

2    or before the administrative law judge.

3            Exhibit 43 is the hearing, the entire hearing record

4    of the administrative action.  I just looked at Exhibit 7

5    within Exhibit 43, because that's the way it's listed, and

6    that's the petitioner's, Mr. Lassen's, post-hearing legal

7    memorandum.  And he asks for what he --

8            THE COURT:  I apologize for interrupting you.  You've

9    got to stop calling him Mr. Lawson, because he's my former law

10   partner, and it's Lassen.

11           MS. STATON:  You know, that's what Bill Jones told me

12   last night when I -- In any event, counsel asked for that in

13   the -- in the -- before the administrative law judge as a

14   request for relief.  But the facts, he presented no facts

15   because there were no facts before the administrative law

16   judge, nor did he cite anything to the record that would

17   suggest that 1,837 hours were needed.

18           It's just a number that they pulled out of the air.

19   It's just a number that they've created.

20           THE COURT:  What you're telling me is that the record

21   before the ALJ is the same as the record here, which is

22   nothing?

23           MS. STATON:  Exactly.  There's zero, because they had

24   no expert there, and there was no testimony to support that.

25   And it's the same here.

1          So that's my first response, is there's no basis upon

2     which this Court could fashion any kind of compensatory

3     education.

4          And the second, I have no idea as to the basis for

5     asking that anything be remanded, but it would seem to me that

6     that would have been -- the time to have asked for that would

7     have been not after we spent a day and a half in trial.

8          So I have nothing further to add.

9          THE COURT:  All right.  Then the hearing on the IDEA

10    claim will be taken under advisement, and I'll try to get a

11    written ruling out within two weeks.

12         Let's talk for a minute about what, if anything, is

13    left in this case.  We've briefly touched on this at the

14    beginning yesterday, and, Mr. Lassen, you've acknowledged that

15    there is no 1983 claim, and your complaint summarily refers to

16    ADA and Section 504.

17         Depending on how I rule on the IDEA claim, what if

18    anything would be left of those claims?

19         MR. LASSEN:  Your Honor, it was our position that

20    those claims remain and that they go to a different set of

21    facts.  There's a different legal analysis.

22         And we withdraw our Section 1983 due process violation

23    and obviously IDEA.  The case law since that time has made it

24    clear that there's not a 1983 action under IDEA.  But there

25    is -- And my recommendation is that after your ruling, you

1    schedule this matter for a conference.

2            THE COURT:  Well, I'm having a hard time right now

3    seeing what's left of this case, because my research shows that

4    under both of them, you have to prove something more than the

5    mere denial of a free appropriate public education under the

6    IDEA.  And you haven't --

7            MR. LASSEN:  Right.

8            THE COURT:  And you'd want to look at Sellers versus

9    City of Manassas, 141 F.3d 2524, and plenty of other cases.

10   And I haven't heard anything here other than a contention of a

11   denial of the free appropriate public education.  So what else

12   is there?

13           MR. LASSEN:  Well, Your Honor, we have purposely not

14   addressed their issues because they were irrelevant to IDEA.

15   But the issue under 504 is whether this child was a victim of

16   discrimination based upon his handicap, and it's a different

17   set --

18           THE COURT:  You know, reading your complaint, there

19   are no facts alleged.  There's just a naked assertion of a

20   claim.  It doesn't even meet the Twombly standard of pleading.

21   So tell me if you are granted leave to amend, what would you

22   allege?

23           MR. LASSEN:  What we would say is that Prescott

24   Unified School District in this case treated Cody differently

25   than other children because of his handicapped condition.

1           And I would submit that there's a lot of evidence

2      regarding -- that we very carefully didn't go into here

3      regarding hostility toward special ed kids, that they are put

4      off, that the principals don't support -- now the current

5      principal does.  The principals don't support that these

6      children -- For example, Cody was to be in a kindergarten class

7      in the fall of '06.  The regular teacher said we can't have

8      Cody show up on day one because the other kids will get upset.

9      He was allowed to come two weeks late to school.  Now we

10     contend that that's evidence of discrimination.  There was no

11     intervention to prevent that from occurring.

12          THE COURT:  That's a denial of the education.  That's

13     the denial of the free appropriate public education.  That's

14     the IDEA claim, which isn't merely replicated by the ADA or

15     Section 504.  That's my understanding.  Now, maybe there's more

16     here than my --

17          MR. LASSEN:  My point is that that shows a

18     discrimination against someone not regarding the provision of

19     free appropriate --

20          THE COURT:  What have all of you done in terms of

21     discovery or case processing on those other claims?

22          MR. LASSEN:  None.

23          THE COURT:  Is that correct, Ms. Staton?

24          MS. STATON:  That's correct, Your Honor.  As I

25     understood it, I think Ms. Love was down here at the case

1    management, and it was decided we would try these serially,

2    assuming anything was remaining.

3         But my recollection was that the, at least based on

4    Ms. Love's representation, was depending on how the Court

5    rules, there may be nothing left.

6         THE COURT:  Well, explain that to me, because I'll

7    tell you when you all came in the last time, I deferred to your

8    requests how to process this, and I really didn't probe it at

9    the time.  So now I'm doing a little of that probing.

10        How is it that a disposition of the IDEA claim might

11   be preclusive of the rest of the case?

12        MS. STATON:  Because there's, Your Honor, I mean, I

13   just reread the complaint, and the facts do not talk about

14   discrimination at all.

15        THE COURT:  That's my reading of it as well.

16        MS. STATON:  And this case was filed over a year ago,

17   August of 2007, and it's just -- it's just -- all it -- It just

18   refers to we incorporate the previous, you know, allegations 1

19   through 14.  They slap on 1983 and 504.  That's it.

20        THE COURT:  And frankly, Mr. Lassen, the way your

21   complaint looked to me is that you just did a very summary

22   allegation relating to IDEA -- that acronym is too hard for me

23   to pronounce -- IDEA claim.  And then you relabeled it 1983

24   Section 504 and ADA.  That's all did in your complaint.  I

25   don't see any allegations there that would suggest anything

```
1     other than the denial of a free appropriate public education.

2           So I'm wondering -- So I guess I interrupted you,

3     Ms. Staton.  What's your view if in fact obviously if I rule in

4     favor of the plaintiff on this claim, that would go one way.

5     If I rule in the District's favor, tell me how that precludes

6     other proceedings, if that is your position.

7           MS. STATON:  Well, it is our position, because, well,

8     first of all, the IDEA claim is gone, and, second, we'd file a

9     motion to dismiss because this doesn't state any kind of claim.

10          THE COURT:  Actually I don't think you filed a motion

11    to dismiss, did you?

12          MS. STATON:  No, because the reason it was done is you

13    said we would take them serially.  We would first deal with

14    this, and then we would deal with the other.  So I wouldn't

15    file a motion to dismiss, because the whole idea, as I

16    understood what the Court was saying, is I -- at least this was

17    some time ago when you first had the hearing --

18          THE COURT:  Actually let me help you.  You weren't

19    here.  Both counsel came in, and they had a package deal for me

20    that they were in agreement on, and I accepted it, which was

21    that we would first do the bench trial on this IDEA claim, but

22    at the time I didn't really think through the substantive

23    connections between the IDEA claim and the other claims.  And

24    now that I am thinking about it, I'm scratching my head as to

25    what's left.
```

```
1          MS. STATON:  I don't think there is anything.  That's
2    our position.
3          MR. LASSEN:  Your Honor, let me -- I think I might be
4    able to short -- Why don't we wait to see what the Court rules.
5    I would -- If it's our assessment based on the ruling, we would
6    file a motion to amend and set forth in greater particularity
7    those claims.
8          THE COURT:  Don't take it for granted that you're
9    going to have a motion to amend granted a year later.
10         MR. LASSEN:  I know that, but at the same time I think
11   we -- both parties acted in good faith, and we have been very
12   good, I think, about not straying into matters outside of these
13   three years and the IEPs.
14         THE COURT:  Well, again, this isn't a ruling, but it
15   doesn't appear to me that your complaint even states a claim
16   for these other matters.  It's just nothing more than a legal
17   label slapped onto the IDEA claim.
18         All right.  Well, as I said, I'll have a ruling out
19   within about two weeks, and then I, because of the age of this
20   case, I intend to move this promptly without further delay with
21   respect to whatever remains, if anything does remain.
22         All right.  Counsel, thank you, and with that, as I
23   said, the matter is taken under advisement, and you will hear
24   from me pretty soon.
25         MS. STATON:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT

1          MR. LASSEN:  Thank you.

2     (Proceedings recessed at 11:41 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3            I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 24th day of May, 2009.

12

13                                    s/Linda Schroeder
                              Linda Schroeder, RDR, CRR
14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT